### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

_____

SECURITIES AND EXCHANGE COMMISSION,

                    Plaintiff,

        v.

CONCORD MANAGEMENT LLC and
MICHAEL MATLIN,

                    Defendants.

_____

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 23-cv-8253

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff, the Securities and Exchange Commission (the "Commission" or "SEC"), for its

complaint against Defendants, Concord Management LLC ("Concord") and Michael Matlin

("Matlin"), alleges as follows:

## SUMMARY

1. Since approximately 1999, Concord and Matlin have operated as investment

advisers for the benefit of a single client: a wealthy former Russian political official living

outside the United States. From the beginning, the purpose of this investment advisory business

was to provide supervisory and management services so that its client's assets would be

continuously invested in a diverse portfolio of United-States-based private fund investments.

Over time, Concord's assets under management grew substantially. As the assets grew, Concord

likewise grew to deliver the increased scale of operational and administrative services necessary

to service the securities portfolio. By 2012, Matlin and Concord employed approximately a

dozen investment professionals who collectively provided supervisory and management services

over hundreds of individual investments. As of January 2022, Concord managed a private fund

securities portfolio with an estimated total value of $7.2 billion.

2.      Based on the work that they performed in providing investment advice for compensation, Concord and Matlin acted as investment advisers.  And, because Concord and Matlin provided continuous and regular supervisory and management services for the billions of dollars' worth of private fund investments on which they advised, they were required to register with the Commission unless specifically excluded or exempted from doing so.  No exclusion or exemption applied to Concord or Matlin, but neither registered with the Commission.

3.      Matlin's failure to register either Concord or himself as an investment adviser prevented the Commission's oversight of both the organization as a whole and the activities of Matlin and his employees.  As a result, over $7 billion of assets that belonged to one foreign individual was actively managed in the United States securities markets by a single advisory firm, out of an office in Tarrytown New York, with no regulatory oversight.

4.      Concord received compensation for its work in the form of a monthly consulting fee, along with an annual performance bonus and expense reimbursement.  From 2012 to February 2022, Concord received approximately $85 million in total compensation, comprised of approximately $50 million in performance bonuses, approximately $29 million in fees, and approximately $6 million in reimbursed expenses.  Matlin received an annual salary and took distributions of Concord's profits.

5.      As described further below, the client held ownership of the private fund investments through an interrelated group of investing entities.  But functionally, regardless of the corporate structure, Concord was one business:  a United States investment adviser providing continuous and regular supervisory and management services over a securities portfolio of private fund investments with billions of dollars of assets under management belonging to one

individual client.

6.      In March 2022, that client was designated as a sanctioned individual by the United Kingdom and the European Union, and his assets were frozen.  As a result of the asset freeze and other factors, Concord and Matlin have not actively engaged in investment activity since that time.  However, many of the underlying investments continue to be active, and, if the asset freeze is lifted, Concord and Matlin would be able to resume managing their client's investments.

7.      As a result of the conduct alleged herein, the Defendants have violated, and unless restrained and enjoined will continue to violate, Section 203(a) of the Investment Advisers Act of 1940 [15 U.S.C. § 80b-3(a)] (the "Advisers Act").

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

8.      The Commission brings this action pursuant to the authority conferred upon it by Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)].

9.      The Commission seeks a final judgment permanently enjoining the Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint; ordering disgorgement of all ill-gotten gains from the unlawful conduct set forth in this Complaint, together with prejudgment interest, and civil penalties pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and ordering such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action pursuant to Section 214 of the Advisers Act [15 U.S.C. § 80b-14].

11.      Defendants, directly and indirectly, have made use of the means and

3

instrumentalities of interstate commerce, of the mails and wires, and/or of the facilities of a national securities exchange in connection with transactions, acts, practices, and courses of business alleged herein.

12.     Venue lies in this Court pursuant to Section 214 of the Advisers Act [15 U.S.C. § 80b-14].  Certain of the acts, practices, and transactions and courses of business alleged in this Complaint occurred within the Southern District of New York.  Specifically, Concord's office, where most of the business activity described herein occurred, was located in Tarrytown, New York.

## DEFENDANTS

13.     **Concord Management LLC** (Concord), is a limited liability company based in Tarrytown, New York that was incorporated in Delaware in May 1999 and re-incorporated in Delaware in May 2012.

14.     **Michael Matlin**, age 59, is a resident of Airmont, New York.  Matlin was born in Russia, and emigrated to the United States in 1988.  He is a citizen of the United States.  Matlin founded Concord in 1999 and is its managing member and 100% owner.

## RELEVANT ENTITIES

15.     **UBO A** is a Russian individual that was the Ultimate Beneficial Owner (UBO) of all assets managed by Concord until February 2022.  UBO A is a former Russian political official widely regarded as having political connections to the Russian Federation and vast wealth from the privatization of state-run industries after the collapse of the former Soviet Union.  In March 2022, the United Kingdom and the European Union designated UBO A as a sanctioned individual, and in April 2022, the Royal Court of Jersey issued an order freezing his assets.

16.     **Company 1** is a limited liability company organized in the British Virgin Islands in February 2002 and one of the principal corporate entities through which UBO A held beneficial ownership of the assets managed by Concord.  Company 1 is the direct controlling owner of certain subsidiary Investing Entities, defined further below, which in turn held direct nominal ownership of the investments.  Company 1 is also the entity through which UBO A eventually contracted with Concord for investment advisory services, as described further below. Company 1 is thus the corporate entity that is technically Concord's client.  Company 1 re-domiciled to the Isle of Jersey in April 2021.  In February 2022, UBO A transferred beneficial ownership of Company 1 to five of his children.

17.     **The "Investing Entities"** are the nominee companies that UBO A uses to hold the hedge fund and private equity fund investments for which Concord and Matlin provided continuous and regular supervisory and management services.  Directors of these nominee companies sign subscription documents as the named investor, but they held legal title for the benefit of UBO A.  Between 1999 and 2015, Company 1 held ownership of over a dozen different nominee companies.  In 2015, UBO A consolidated Company 1's subsidiary nominee entities down to four British Virgin Islands ("BVI") limited liability companies.  In April 2021, UBO A "re-domiciled" these entities from the BVI to the Isle of Jersey.  UBO A also held ownership of other nominee entities through parent vehicles other than Company 1.  One of these nominee entities was a Cyprus limited liability company, which UBO A used to hold certain private equity investments.  For the purpose of this complaint, the Commission uses the term "Investing Entities" to refer to all of the nominee entities UBO A used to hold hedge fund and private equity investments for which Concord and Matlin provided continuous and regular supervisory and management services, which includes all of the Company 1 nominee entities and

the Cypriot entity.

18.     **Company 2** is an entity domiciled in the United Kingdom that is affiliated with UBO A.  With respect to Concord's investment operations, Company 2 employees provided back-office administrative support services.  Between 2005 and June 2022, its registered office was in London.

19.     **Person B** was born in Russia and is reportedly a citizen of both the United States and the United Kingdom.  He is a longtime close associate of UBO A.  As of March 24, 2022, Person B was designated as a sanctioned individual in the United Kingdom.  Person B was the point of contact for receiving investment advice from Matlin and Concord and for either deciding or communicating the decision whether to go forward with recommended transactions.

20.     **Employee C** worked for Concord from its early days through 2023.  Employee C was invited to join Matlin and Concord's business through Person B, a longtime friend of Employee C.  Employee C, Person B, and Matlin grew up in Russia and met as students in Moscow.  When UBO A decided to invest in United States private funds, Concord was created as the vehicle to do so, with Matlin as the owner and operator and Employee C as the functional head of operations.  As the assets Concord managed grew, Matlin hired investment analysts and administrative personnel to handle the increased scale of investment and asset management services.  Company 2 appointed staff to assist with the back-office operations and help facilitate the completion of transaction paperwork.  Employee C's formal title became Head of Operations & Administration, but she continued to supervise or manage both operational and administrative services necessary to implement the business of managing UBO A's private fund investments.  Employee C also handled the performance reporting for UBO A's portfolio of assets under management, which Employee C delivered monthly to Matlin and representatives of UBO A.

## FACTUAL ALLEGATIONS

### A. Formation of Concord

21.     Matlin founded Concord in 1999, two years after obtaining a Masters in Business Administration from an Ivy League university and working at a United States hedge fund. Matlin founded Concord to provide investment advice for compensation, and to supervise and manage UBO A's investments in United States-based private funds, focusing on hedge funds and ultimately including private equity funds and other investments.  Person B, a close associate of UBO A and former classmate of Matlin and Employee C, recruited Matlin to run the business of managing UBO A's private fund securities portfolio, and he asked Employee C to provide operational and other support to the business.  Person B received all investment recommendations from Matlin and Concord.  Person B also made investment decisions based on those recommendations, and communicated the decisions to Matlin.

22.     Concord grew from Matlin and Employee C to a much larger business operation. By March 2012 and continuing through at least March 2022, Concord employed approximately ten individuals, most of whom were investment analysts.  As further detailed below, these employees worked to identify investment opportunities, to facilitate the execution of investments, and to monitor fund and investment performance.  Matlin supervised and directed the investment analysts and engaged with them in analysis and development of investment advice.  Matlin then communicated the investment recommendations directly to Person B.  The Concord investment analysts never communicated recommendations directly to Person B.

23.     While Concord employees generally became aware over time of the identity of UBO A, Matlin not only did not directly tell them who it was, but he also created an atmosphere that discouraged speculation or discussion regarding UBO A's identity.  With limited

information regarding the beneficiary of the funds they were managing, Concord employees typically described Concord to outside parties as a fund of funds or as a family office for high-net-worth European families.

24.     By contrast, Matlin and Employee C knew that UBO A was the source of assets that Concord managed.  They also communicated with Person B directly and in communications amongst their three-person group via email, text, and messaging applications including WhatsApp and Telegram.  When it was necessary to disclose UBO A's identity pursuant to the terms of a particular investment, Employee C, working with Company 2, facilitated the provision of information (i.e. "know your customer" or "KYC" documents) that revealed UBO A's identity on a transaction-by-transaction basis to private fund advisers or their third-party administrators.

### B.  Concord's Business Activities: Continuous and Regular Supervision and Management of UBO A's Private Fund Securities Portfolio

25.     On a day-to-day basis, Concord and Matlin provided continuous and regular supervision or management services over UBO A's private fund securities portfolio.  As explained in detail below, they were responsible for supervising and managing substantially all aspects of the Investing Entities' continuous cycle of investments.

*i.       Sourcing Private Fund Investments*

26.     Concord and Matlin's continuous and regular supervision and management services included continuously sourcing potential investments for the Investing Entities.  The Investing Entities' assets were spread over hundreds of private fund advisers, and the Investing Entities often invested in more than one fund with the same adviser.  The Investing Entities typically made initial investments of $10 to $15 million, with additional follow-on investments in increments of $10 to $15 million.  Given the breadth of this investment activity, Concord analysts were constantly scouring the private funds market for investment opportunities.

27.     Concord was given a broad, open-ended mandate to identify hedge funds and private equity funds, primarily based in the United States.  There was no limit on the number of investments that Concord and Matlin could recommend to Person B, and no formal restrictions on the investments that analysts could recommend.  Concord and Matlin's principal goal was to ensure that UBO A's assets were continuously invested in private funds.

28.     Concord analysts, under Matlin's supervision, utilized various methods to identify and maintain a constant awareness of potential investments, such as participating in programs that match advisers and prospective investors offered by investment banks and by attending industry conferences.

29.     While Concord primarily focused on hedge funds, the Investing Entities invested in at least six private equity funds, with initial capital commitments ranging from $5 million to $100 million.  Once the Investing Entities made an initial investment in a particular hedge fund or private equity fund, the private fund advisers often solicited Concord analysts for follow-on investments, co-investments, or new investments in other affiliated funds.  These solicitations were another source of investment recommendations made by Concord and Matlin to Person B.

*ii.     Due Diligence and Negotiations*

30.     Concord and Matlin's continuous and regular supervision and management services included due diligence and investment negotiations.  Once Concord analysts identified a potential investment, they conducted due diligence on the fund adviser, from its investment track record and performance to its back-office operations and compliance infrastructure.

31.     To conduct the diligence, Concord analysts requested and received ongoing access to confidential, non-public fund data from the fund adviser, such as detailed portfolio holdings.  Concord analysts were typically required to sign confidentiality agreements with the

fund adviser as a condition of receiving this access.

32.     Concord analysts reviewed governing fund documents, such as private placement memoranda and limited partnership agreements.

33.     Concord analysts extensively negotiated key terms with the fund advisers, primarily lower management fees, most favored nations clauses, reduced redemption fees, and rights to be a member of any fund advisory committee.

34.     Concord analysts reviewed, revised and helped execute these specific terms in side letters with fund advisers.

35.     These negotiations generally occurred before any recommendations were made, but Concord sometimes negotiated and facilitated the execution of side letters in connection with follow-on and co-investments that occurred after the initial recommendation and investment.

          *iii.*      *Investment Recommendation and Approval Process*

36.     Concord and Matlin's continuous and regular supervision and management services included a regular, routinized process for making investment recommendations and receiving client approvals.  On a monthly basis, Concord analysts recommended potential investments to Matlin.  If Matlin agreed with the recommendation, he would include it in a monthly "short list" that he compiled and emailed to Person B each month.  The short list contained information about the funds being recommended for investment, including descriptions of the fund's strategy, securities portfolio, track record, fees, and adviser.

37.     Matlin knew how much money was available to invest each month because Concord tracked the Investing Entities' incoming and outgoing cash flows.  Matlin typically confirmed the amount available for investment by emailing or messaging Employee C, who received daily updates on the Investing Entities' bank account balances from Company 2.

38.     Matlin regularly provided Employee C with a list of fund names and allocated investment amounts recommended to Person B so that Employee C could initiate the process of preparing transaction documents for execution.

39.     For these recommended investments, Employee C requested and/or received from each Concord analyst (i) the documents necessary to make each investment, (ii) the dates on which subscription documents were due, and (iii) the dates on which wire transfers were due. After the Investing Entities were re-domiciled to Jersey in April 2021, in order to comply with policies and procedures connected to that move, Employee C also requested and received from each analyst a short explanation of the investment rationale that would be provided to the director of the Investing Entity signing the investment documents.

40.     Throughout this process, Person B, Matlin, and Employee C would share confidential information about the recommendations, decisions, and cash positions by phone, text messages, or messaging applications.  Before the end of each month, Person B communicated whether investments were approved or not.  These communications typically happened during one-on-one telephone calls between Matlin and Person B.  Person B typically approved the investments that Matlin and his team recommended.

*iv.     Execution of the Investments*

41.     Concord and Matlin's continuous and regular supervision and management services included responsibility for arranging and facilitating execution of the transaction with the private funds.  Once Person B communicated his decision on whether to invest in a particular fund, the process of making the investments required a series of coordinated actions.  The logistics of coordinating these actions were often complicated by the tight timing of the monthly investment cycle.  Funds typically are open for new investments at the same time, generally the

first business day of the month.  In months where Concord was arranging and facilitating the execution of multiple new investments, these investments all happened simultaneously or within a day or two of each other.  Further, the paperwork required to make a new investment varied by private fund.  Generally, the investment is made through a subscription agreement, which is the investor's application to join the private fund (usually a limited partnership).  The supporting documentation can include anti-money laundering (AML) and know-your-customer (KYC) forms.

42.     In Concord's earlier days, Employee C handled much of the coordination and paperwork for the subscription process on her own.  However, as the number and size of Concord's recommended investments grew over time, the paperwork requirements of the funds generally increased as well (for instance, funds increasingly asked for more robust AML/KYC disclosure regarding the investment's UBO).  As a result, Company 2 assumed a greater role in providing administrative back-office support—filling out transaction documents, compiling AML/KYC disclosure and obtaining any necessary signatures.  Employee C, however, retained a central role in supervising and managing this process.  During each monthly cycle, Employee C communicated frequently with Company 2 and Concord employees to collaboratively ensure that documents for the approved transactions were filled out correctly, signed, and timely delivered to the funds or their third-party administrators.

43.     For instance, as Employee C collected documents and information, she created and updated a spreadsheet that she emailed to Company 2 staff with the recommended investments, so that Company 2 staff would be prepared to execute the back-office administrative functions necessary to complete the approved investments.  The spreadsheet typically included the names of recommended investments, the amount of the investments,

deadlines for the submission of documents and money wires, a column with initials identifying each covering Concord analyst, and a column for indicating whether an investment was ready to proceed (titled as "good to go") or still in progress (titled "working").

44.     At the same time, Employee C and Matlin allocated the approved investments among the Investing Entities, and added that information to the spreadsheet.  If the Investing Entities had more or less cash on hand than needed for all approved investments, Matlin and Employee C would collaborate on the decision of which investment(s) to increase or decrease.

45.     Employee C also emailed Company 2 staff with updated spreadsheets as investments were approved, deadlines were received for executed documents and wire transfers, and investments were ready to proceed.

46.     As Person B approved recommended investments, Employee C updated her detailed list to Company 2 staff to inform them that the approved investments on the list were ready to proceed.  Company 2 staff filled out the relevant documents, which were then signed by the directors of the relevant Investing Entities as necessary.

47.     Employee C reviewed and commented on the executed documents before Company 2 staff submitted them to the fund adviser or fund administrator.  Based on her knowledge and experience at Concord working with United States investment funds, Employee C at times had corrections or adjustments to make to the forms, and Company 2 would not send the executed documents until Employee C performed a quality control review and confirmed they were ready to send.

48.     Company 2 employees typically sent the executed documents and AML/KYC paperwork to the relevant fund adviser or fund administrator directly, copying Employee C. Employee C, however, sometimes sent the executed documents to the fund adviser or its fund

administrator herself, and Concord analysts would sometimes email executed side letters directly to the relevant fund adviser.  And on the occasions when Company 2 employees sent the executed documents directly, they would sometimes do so with a coversheet on Concord letterhead, listing Matlin and Employee C as the appropriate contacts.

49.    Concord did not have direct control of the Investing Entities' bank accounts. Company 2 staff were responsible for ensuring that the Investing Entities sent wire transfer payments by the deadlines gathered and communicated by Employee C each month.  Employee C sometimes provided the relevant wire instructions to Company 2 staff if the information was not in the relevant fund documents.  Regardless of the sequence, Company 2 would not submit any executed documents or wire money for investments unless Employee C confirmed that Company 2 should do so.

50.    Employee C informed Concord analysts when the relevant documents and wires were submitted, so that the Concord analysts could then confirm the relevant adviser received them.

v.    *Active Monitoring of the Private Fund Securities Portfolio*

51.    Concord and Matlin's continuous and regular supervision and management services included active monitoring of the private fund securities portfolio.  Once an investment was made, Concord assigned two analysts—a lead and a secondary—to cover the position.  A Concord employee, often Matlin, was typically listed in subscribing documents as a point of contact for investor correspondence.

52.    As the main point of contact for the investment, Concord employees requested and were given access to all confidential information concerning investments, such as access to client portals and registration on client distribution lists.  Concord was also the point of contact

for receiving notices of financial statements, distributions, and capital calls.

53.     As part of their ongoing monitoring, Concord analysts routinely requested and received periodic performance reports and regularly inquired about fund performance, as well as audited financial statements.  They also requested and received periodic on-site meetings with fund advisers.

54.     Concord analysts also served as the Investing Entities' representative on the advisory committees of at least four different private equity funds and two creditors' committees. In this capacity, Concord had the authority to act on the relevant Investing Entity's behalf, without consulting Person B or UBO A.  For example, Concord served as the relevant Investing Entities' authorized representative for over ten years on two redeemer committees, which oversaw and made decisions with respect to the liquidation of hedge funds, in order to ensure that its client recovered as much money as possible.

55.     More broadly, Concord analysts, under Matlin's supervision, collected and analyzed investment-related information on both particular investments and on the collective portfolio of investments made by the Investing Entities.

56.     For example, Concord analysts maintained running logs of active investments, which tracked fees paid, key terms, cash flow, existing balance, and distributions, and separately tracked the status of all illiquid investments, including likelihood of return of funds.

57.     Concord analysts also tracked performance information for investments made by the Investing Entities and analyzed it based on the composition of each Investing Entity's portfolio.  They also monitored cash flow on a portfolio-wide basis by tracking investment allocations, distributions and redemptions for all investments made by the Investing Entities.

58.     Concord employees actively and regularly shared this fund performance

information with each other and conducted ongoing analysis of the investments.  On a weekly or bi-weekly basis, Matlin, Concord analysts, and Employee C had a staff meeting where they would report on market conditions, investment performance, and operational and management issues.  As part of these meetings, a Concord analyst was typically assigned to conduct a "portfolio review" of an existing fund position.  The assigned analyst would prepare a comprehensive review of the fund holdings and performance for discussion by the group.

59.    On at least a monthly basis, Matlin or Employee C sent Person B performance updates based on the performance of all of the Investing Entities' private fund investments managed by Concord and Matlin.

60.    Further, Employee C received a daily snapshot from Company 2 of the cash available in the Investing Entities' bank accounts.  Employee C monitored this information in order to confirm that the Investing Entities received any expected distributions and redemptions.

> vi.    *Responsibilities for Existing Positions and Related Opportunities*

61.    Concord and Matlin's continuous and regular supervision and management services also included evaluating, offering investment advice, and sometimes taking direct action on behalf of the Investing Entities, both concerning existing positions as well as new investment opportunities arising from those existing positions in UBO A's private fund securities portfolio. Concord and Matlin were responsible for evaluating and facilitating subsequent investment decisions with respect to each investment on an ongoing basis, including whether to maintain the investment, add to the investment, redeem the investment in full or in part (or rescind any redemption request), as well as whether to participate in any co-investments or secondary transactions.

62.    Concord analysts continuously evaluated whether or not to redeem all or some of

the Investing Entities' investments from private funds based on performance and other factors, and would make any redemption recommendations to Matlin.

63.     As with initial investments, Matlin typically determined which redemptions to recommend and made any such recommendations to Person B.  However, Concord analysts had significantly more discretion and apparent authority with respect to redemptions and redemption rescissions.  For example, while Employee C coordinated the execution of any documentation required by the adviser for redemptions or rescissions with Company 2 staff, Concord analysts would often inquire directly about the redemption (or rescission) and would sometimes submit the request themselves via email if the fund adviser did not require any formal documentation.

64.     Concord analysts considered and made recommendations on interim investment-related decisions, including whether to provide investor consent when required by governing fund documents and whether to pursue co-investment opportunities offered by fund advisers. Concord analysts routinely evaluated and facilitated follow-on investments made in the same fund, as well as co-investments, which are minority investments in a single company alongside, but not through, the private equity fund.

65.     For example, in 2014, Concord evaluated and facilitated an initial $100 million commitment to an energy-focused private equity fund.  Over the next four years, while supervising and managing this investment, Concord evaluated several opportunities and facilitated two subsequent co-investments totaling $44 million.  For both co-invest opportunities, the covering Concord analyst communicated to the adviser the Investing Entity's binding commitment to invest, including the amount committed, using a Concord e-mail account. Employee C coordinated with Company 2 staff to submit the relevant documentation.

66.     As part of its continuous and regular supervision and management services,

Concord was always in the process of analyzing additional investments and redemptions, and providing advice and recommendations about those positions—in addition to making investment recommendations in entirely new private funds.  Concord's business was thus cyclical, continuous, and overlapping.  There was a monthly cadence of entering and exiting investments, and a weekly or bi-weekly cadence of meetings where performance was analyzed and monitored.  And, on a daily basis, some aspect of each of these business functions occurred:  Concord was sourcing, analyzing, vetting, negotiating, recommending, monitoring, and arranging and facilitating the execution of investments in the private fund securities portfolio of UBO A.

### C.  Concord and Matlin Acted as Investment Advisers

67.     Concord and Matlin provided the above services to UBO A for compensation, without a written agreement, from 1999 until 2012.  In 2012, Matlin executed a "consulting agreement" on behalf of Concord with Company 1 (signed by Person B) to provide "consulting services" to Company 1.

68.     Under the terms of the agreement, Concord received a monthly fee of $235,000, reimbursement of monthly expenses, and an annual "performance bonus."  This monthly fee eventually increased to approximately $350,000.  Between approximately February 2012 and February 2022, Concord received approximately $85 million in total compensation, comprised of approximately $50 million in performance bonuses, approximately $29 million in fees, and approximately $6 million in reimbursed expenses.  The total bonus amount fluctuated each year, ranging from approximately $4,021,000 in 2015 to $7,128,000 in 2014.

69.     The financial structure of the arrangement allowed Concord to pay its expenses and Matlin to take distributions of profit each year, the combination of which exhausted substantially all of Concord's cash.

70.    In exchange for this compensation, Matlin and Concord engaged in the business of advising UBO A, through Person B, as to the value of securities and as to the advisability of investing in, purchasing, and selling securities.  In doing so, they acted as investment advisers.

### D.  Concord and Matlin Failed to Register

71.    The Advisers Act requires that, with certain exceptions, firms or individuals that are in the business of advising others about securities investments and are compensated for doing so must register with the Commission and comply with certain regulations.  While many of the Advisers Act regulations are designed to protect individual clients of each adviser, the Advisers Act as a whole serves to protect the securities markets and the national economy.[1]

72.    Specifically, the registration provision of the Advisers Act makes it is unlawful for any non-registered investment adviser to make use of the mails or any means or instrumentality of interstate commerce in connection with its business as an investment adviser unless it is (1) prohibited from registering with the Commission pursuant to Section 203A, which prohibits Commission registration for certain small or mid-sized advisers; or (2) exempted from registration under Section 203(b).

73.    Registration with the Commission subjects investment advisers to periodic reporting requirements and comprehensive examination by the Commission.  This regulatory oversight enables the Commission to collect information and to assess and monitor systemic risk both at the adviser and in the private fund industry more generally.

74.    Pursuant to the relevant provisions of Sections 203(a) and 203A of the Advisers

---

[1] *See e.g.*, Section 201 of the Advisers Act, finding that "investment advisers are of national concern, in that, among other things…their advice, counsel, analyses and reports customarily relate to the purchase and sale of securities traded on national securities exchanges and in inter-state over-the-counter markets, securities issued by companies engaged in business in interstate commerce…[and] the foregoing transactions occur in such volume as substantially to affect interstate commerce, national securities exchanges, and other securities markets, the national banking system and the national economy."

Act, by no later than March 2012, investment advisers with a principal office and place of business in New York have been required to register with the Commission if they have assets under management exceeding $25 million.  Section 203A defines assets under management as "the securities portfolios with respect to which an investment adviser provides continuous and regular supervisory or management services."

75.     As explained above, Concord and Matlin provided continuous and regular supervisory and management services for the portfolio of investments made by the Investing Entities, which were ultimately beneficially owned by UBO A.

76.     The securities portfolio for which Concord and Matlin provided continuous and regular supervisory and management services had an average value of several billion dollars. The following table shows the total approximate number of fund advisers with which the Investing Entities invested and the total approximate value of their investments within each year from 2017 through 2022.  The lowest value in 2019, $5.5 billion, was still more than 200 times the $25 million threshold for registration.[2]

| Year | Number of Investment Advisers | Securities Portfolio Estimated Value |
|------|-------------------------------|--------------------------------------|
| 2017 | 155 | $6,463,955,160 |
| 2018 | 136 | $6,577,947,545 |
| 2019 | 156 | $5,574,380,485 |
| 2020 | 106 | $6,262,084,064 |
| 2021 | 106 | $7,049,850,986 |
| 2022 | 112 | $7,204,844,740 |

Further, neither Concord nor Matlin qualified for any exemption from registration under Section 203(b) of the Advisers Act.  Nevertheless, neither Concord nor Matlin as an individual ever registered with the Commission as an investment adviser as required by the Advisers Act.

---

[2] This chart does not include investments owned by the Cypriot Entity, which was not a Company 1 subsidiary.  As of year-end 2021, that entity's investments were worth at least $182 million.

**E. Events of 2022**

77.     In late 2021 and early 2022, there were media reports regarding the possibility that Russia would enter into a military operation aimed at Ukraine, with far reaching global consequences.

*i.     Concord's Effort to Redeem or Monetize the Investing Entities' Holdings*

78.     In early February 2022, Matlin instructed Concord analysts to liquidate the Investing Entities' investments.  The decision to redeem billions' of dollars of private fund investments *en masse* was a significant change of course.  Indeed, as of the beginning of that month (mere days earlier), Concord and Matlin had just arranged, and Person B had just approved, ten private fund investments valued over $100 million, including two investments with new private fund advisers.

79.     As part of the liquidation mandate, Matlin directed Concord analysts to review all hedge fund investments and identify which investments could be redeemed quickly, and instructed them to investigate secondary transactions for investments that could only be redeemed on a quarterly basis.

80.     Concord analysts contacted numerous hedge fund advisers seeking to redeem the Investing Entities' investments, representing that Concord required the redemption for unexpected cash needs and liquidity purposes.

*ii.     Change of Beneficial Ownership to UBO A's Children*

81.     At approximately the same time as the effort to redeem or otherwise monetize the Investing Entities' securities portfolio, UBO A transferred beneficial ownership of Company 1 and the Investing Entities to five of UBO A's children.

82.     In March 2022, representatives of UBO A sent letters to fund administrators on

behalf of the Investing Entities, notifying administrators of the change in beneficial ownership.

       *iii.*    *Attempt to Market and Sell the Private Fund Securities Portfolio*

83.    Shortly before, in February 2022, Matlin, Person B, and one of UBO A's children began an effort to market and sell the Investing Entities' hedge fund portfolio.  The proposed transaction was structured to allow Concord and its employees to continue managing the same portfolio of assets, while allowing UBO A to extract himself and obtain cash for the value of his portfolio of illiquid private fund investments.

84.    As part of the process of marketing the managed portfolio, Employee C and Matlin, with substantive input from Concord staff, worked together with UBO A's son to prepare a PowerPoint presentation for the purpose of marketing and selling an ownership stake in the Investing Entities' private fund portfolio in hedge funds.  The presentation described the portfolio as a fund of hedge funds and explained the fund's investment management process in a substantially similar manner to Section B above: with Matlin, Concord and its employees managing a portfolio of United-States-based alternative funds.  Indeed, the presentation highlighted details of the portfolio's professional management as one of its selling points.

85.    The final version of the presentation entitled, "Secondary offering of interest in Fund of Hedge Funds" (hereinafter, the "Fund of Hedge Funds Presentation"), included a slide entitled "Portfolio Highlights," which described certain aspects of the hedge fund portfolio.  The slide described the fund of hedge funds as receiving "[a]ctive portfolio management including opportunistic divestments and reallocations" as well as "[s]elective direct co-investment opportunities."  The same slide described an "[e]xpert team of 6 investment professionals, leveraging broader Family Office ecosystem."

86.    A later slide described the Fund of Funds' "Organizational Structure and Team."

The slide listed an "Investment and Portfolio Management" group consisting of seven persons. Matlin and Concord's analysts made up six of the seven persons listed. The seventh was Person B. The same slide listed a two-person "Operations" team consisting of Employee C and Matlin's administrative assistant.

*iv. Asset Freeze and Concord at a Standstill*

87.     In March 2022, after Russia had invaded Ukraine the previous month, UBO A was sanctioned by the United Kingdom and the European Union, and his assets were subsequently frozen by a formal order, known as a saisie judicaire, imposed by the Royal Court of the Isle of Jersey in April 2022.

88.     Concord itself functionally froze in place as well. Concord and Matlin appear to have halted any active investment activity because of the asset freeze and sanctions. For a few months, until approximately the summer of 2023, some employees were still being paid a salary. But the underlying investments continue to be active, and if the asset freeze is lifted, Concord and Matlin would be able to resume acting as unregistered investment advisers.

## CLAIM FOR RELIEF

### Violation of Section 203(a) of the Investment Advisers Act of 1940

89.     The Commission re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 88.

90.     By reason of the conduct described above, between at least March 2012 and March 2022, Defendants acted as investment advisers within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)] and, directly or indirectly, made use of the mails or means or instrumentalities of interstate commerce in connection with their business as investment advisers without being registered with the Commission and without the applicability of Section 203(b) of the Advisers Act [15 U.S.C. § 80b-3(b)] or Section 203A of the Advisers

Act [15 U.S.C. § 80b-3a].

91.    As a result, Defendants have violated and, unless enjoined, will continue to violate Section 203(a) of the Advisers Act [15 U.S.C. § 80b-3(a)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a Final Judgment:

A.    Permanently restraining and enjoining the Defendants, their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 203(a) of the Advisers Act [15 U.S.C. § 80b-3(a)];

B.    Ordering the Defendants pay disgorgement plus prejudgment interest of all ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint, pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)];

C.    Ordering the Defendants to each pay civil monetary penalties pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and

D.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands a jury trial in this matter.

DATED:  September 19, 2023

Respectfully submitted,

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

By its attorneys,

Amy Harman Burkart
Richard M. Harper II
Anne Hancock
Michael Franck
Boston Regional Office
33 Arch Street, 24th Floor
Boston, Massachusetts  02110
(617) 573-8900 (Main)
(617) 573-4590 (Facsimile)
BurkartA@sec.gov
HarperR@sec.gov