**Exhibit E**

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C.

INVESTMENT ADVISERS ACT OF 1940
Rel. No. 2694 / January 16, 2008

Admin. Proc. File No. 3-12357

In the Matter of

WARWICK CAPITAL MANAGEMENT, INC.

and

CARL LAWRENCE

OPINION OF THE COMMISSION

INVESTMENT ADVISER PROCEEDING

CEASE-AND-DESIST PROCEEDING

Grounds for Remedial Action

Antifraud violations

Reporting and registration violations

Investment adviser and its president reported false information about adviser's assets under management and performance in Forms ADV filed with the Commission and to database services that published the false information to their subscribers. Investment adviser also maintained its Commission registration when it was not eligible to do so. Held, it is in the public interest to bar president from association with any investment adviser and to impose cease-and-desist orders against Respondents.

APPEARANCES:

Carl Lawrence, pro se and on behalf of Warwick Capital Management, Inc.

Jack Kaufman and Howard S. Kim, for the Division of Enforcement.

2

Appeal filed: February 26, 2007
Last brief received: May 21, 2007

I.

Warwick Capital Management, Inc., an investment adviser, and its president, Carl Lawrence (collectively, "Respondents"), appeal from an administrative law judge's initial decision. The law judge found that Warwick willfully violated, and that Lawrence willfully aided and abetted and was a cause of Warwick's violations of, Section 203A of the Investment Advisers Act of 1940 by maintaining Warwick's Commission registration while having less than $25 million of assets under management. 1/ The law judge found that Respondents willfully violated Advisers Act Section 207 by falsely representing in Commission filings that Warwick had assets under management in excess of $25 million. 2/ The law judge found that Respondents willfully violated Advisers Act Sections 206(1) and 206(2), and that Warwick willfully violated, and Lawrence willfully aided and abetted and was a cause of Warwick's violations of, Advisers Act Section 206(4) by falsely representing Warwick's assets under management and 2003 total performance returns to database services that published the misrepresentations to subscribers in the securities industry. 3/ The law judge concluded that it was in the public interest to bar Lawrence from association with any investment adviser and to enter cease-and-desist orders against Lawrence and Warwick. We base our findings on an independent review of the record, except with respect to those findings not challenged on appeal.

---

1/    15 U.S.C. § 80b-3A(a)(1) (generally prohibiting an investment adviser with less than $25 million of assets under management from registering with the Commission). Advisers Act Section 203A defines "assets under management" as "the securities portfolios with respect to which an investment adviser provides continuous and regular supervisory or management services." 15 U.S.C. § 80b-3A(a)(2). A "securities portfolio" is an account at least 50% of the total value of which consists of securities. See Advisers Act Form ADV, Schedule I, Instruction 7(a); Rules Implementing Amendments to the Investment Advisers Act of 1940, Investment Advisers Act Rel. No. 1633 (May 15, 1997), 64 SEC Docket 1524, 1527.

2/    15 U.S.C. § 80b-7 (prohibiting an investment adviser from willfully making material misstatements and omissions in applications and reports filed with the Commission).

3/    15 U.S.C. §§ 80b-6(1), (2), and (4) (prohibiting fraudulent conduct by an investment adviser). Respondents were charged with violating Advisers Act Section 204 and Rules 204-2(a)(11), 204-2(a)(16), and 206(4)-1(a)(5), but the law judge found that the charges had not been established. 15 U.S.C. § 80b-4; 17 C.F.R. §§ 275.204-2(a)(11), 275.204-2(a)(16), and 275.206(4)-1(a)(5). That determination was not appealed.

3

II.

Lawrence is Warwick's founder, president, and sole control person.  He and his wife own Warwick, and they are its only employees.  Lawrence makes Warwick's investment decisions while his wife performs the administrative work.  Lawrence has operated Warwick's business from his home since 2001.  At all relevant times, Warwick, through Lawrence, met the definition of an "investment adviser" because it was engaged for compensation in the business of advising clients on investing in securities. 4/  As discussed below, Respondents inflated Warwick's assets under management in Forms ADV filed with the Commission between 1997 and 2000 and in data supplied during 2004 and earlier to database services that published the data to subscribers. Additionally, Respondents supplied inflated 2003 performance returns to the database services.

A.  Respondents Report Inflated Assets Under Management in Forms ADV

Warwick first registered with the Commission as an investment adviser on March 15, 1996.  A Form ADV dated March 29, 1996, reported that, as of year end 1995, Warwick had $5 million of assets under management on a discretionary basis.  The $5 million figure was repeated in a Form ADV amendment dated November 1, 1996.

Beginning on July 8, 1997, pursuant to Advisers Act Section 203A, 5/ an investment adviser that was subject to state authorities like Warwick was not permitted to be registered with the Commission unless it had at least $25 million in assets under management.  From July 1997 forward, Warwick's Forms ADV represented that it had over $25 million of assets under management.  The values reported rose precipitously from $5 million in 1996 to $26.55 million in 1997, and higher in subsequent years, as set forth in the chart below:

| Form ADV Date | Assets Under Management |
|---|---|
| March 29, 1996 | $5 million |
| November 1, 1996 | $5 million |
| July 3, 1997 | $26.55 million |
| March 25, 1998 | $28.9 million |
| November 17,1999 | $28.9 million |
| January 28,1999 | $28.9 million |

---

4/      See 15 U.S.C. § 80b-2(a)(11) (defining "investment adviser").

5/      Advisers Act Section 203A was added to the Advisers Act by Title III of the National Securities Markets Improvement Act of 1996.

4

| June 3, 1999 | $29.4 million |
| March 18, 1999 | $29.4 million |
| March 23, 2000 | $37.2 million |

Each of the Forms ADV represented that Warwick did not manage any securities portfolios on a non-discretionary basis. 6/  All were signed by Lawrence as Warwick's president.

Respondents ceased filing annual Forms ADV, including amendments, after March 23, 2000.  Respondents assert that Warwick withdrew its registration with the Commission in 2000. We take official notice, pursuant to Rule of Practice 323, 7/ that the Commission's files do not include a Form ADV-W to withdraw Warwick's registration. 8/  By order dated January 31, 2002, the Commission cancelled Warwick's registration under Advisers Act Section 203(h). 9/

---

6/    A non-discretionary account is one in which an investor must give prior approval to all transactions.  See Hotmar v. Lowell H. Listrom & Co., 808 F.2d 1384, 1385 (10th Cir. 1987); Scott E. Wiard, Securities Exchange Act Rel. No. 50393 (Sept. 16, 2004), 83 SEC Docket 2752, 2756 & n.12.

7/    17 C.F.R. § 201.323 (official notice may be taken of any matter in the Commission's public official records).

8/    Filing Form ADV-W is mandatory for an investment adviser to withdraw from Commission registration.  17 C.F.R. § 275.203-2; Electronic Filing by Investment Advisers; Amendments to Form ADV; Technical Amendments, Advisers Act Rel. No. 1916 (Dec. 21, 2000), 73 SEC Docket 3934.  The only Form ADV-W contained in the record was filed in 1996 for Warwick's predecessor.

9/    To cancel an adviser's registration, we must find that the adviser is "no longer in existence, is not engaged in business as an investment adviser, or is prohibited from registering as an investment adviser under section 203A."  15 U.S.C. § 80b-3(h).  We have stated that "an adviser will be given notice and an opportunity to show why its registration should not be cancelled."  Rules Implementing Amendments to the Investment Advisers Act of 1940, 64 SEC Docket at 1529 n.47. The record does not indicate why the cancellation order was issued.  In the past, the Commission has cancelled the registration of investment advisers based on the absence of amendments to Forms ADV or annual filings.  See Notice of Intention to Cancel Registrations of Certain Investment Advisers, Advisers Act Rel. No. 1705 (Mar. 9, 1998), 66 SEC Docket 2136, 2137.  By 2002, Warwick had not filed any amendments to Forms ADV or annual filings for nearly two years.

(continued...)

5

However, after January 31, 2002, Respondents continued to hold themselves out to the database services as Commission-registered investment advisers, as recently as 2004.

### B.  Respondents Report Inflated Assets Under Management to Database Services

During 2004 and earlier, Respondents provided information about Warwick, primarily to three database services:  Nelson MarketPlace ("Nelson's"); Mobius Group, Inc. ("Mobius"); and Plan Sponsor Network, Inc. ("PSN").  The database services obtained information about, among other things, assets and performance from investment managers, compiled the information, and sold it to subscribers for a fee. 10/  The database services relied on the investment managers for the accuracy of the information they submitted.  The subscribers -- consultant firms, pension plan sponsors, brokerage firms, banks, investors, and investment managers -- used the information to evaluate and select managers and to determine what comparable firms were doing.

Lawrence testified at the hearing that he knew that the database services published the information he reported to their subscribers.  He stated that "the purpose of [reporting data] was to try to get clients [for Warwick] through the database services."  He also stated that he "depended a lot" on the database services for client referrals.  Lawrence affirmed that some of Warwick's clients retained Warwick because of its database service listings.

From 2000 through 2004, Respondents reported to Nelson's, and Nelson's published to subscribers, that Warwick had the following assets under management:

| Year | Assets Under Management |
|------|-------------------------|
| 2000 | $35.2 million |
| 2001 | $26.9 million |
| 2002 | $54.5 million |

---

9/   (...continued)
Although Lawrence claimed at the hearing that he was not aware that Warwick's registration had been cancelled, the law judge generally found that his hearing testimony was not credible.  We have repeatedly stated that a law judge's credibility findings are entitled to considerable weight and deference, absent substantial evidence to the contrary.  See, e.g., Leslie A. Arouh, Exchange Act Rel. No. 50889 (Dec. 20, 2004), 84 SEC Docket 1880, 1893 n.40; Anthony Tricarico, 51 S.E.C. 457, 460 (1993).

10/   Respondents claim that the witnesses representing the database services did not give credible testimony.  The law judge, who observed the witnesses' demeanor, did not suggest that the database service witnesses gave anything but credible testimony.  She relied on their testimony in reaching her conclusions.

6

| 2003 | $95.2 million |
| 2004 (1st quarter) | $94.2 million |

From 1995 through 2003, Respondents reported to Mobius, and Mobius published to subscribers, that Warwick had the following assets under management:

| **Year** | **Assets Under Management** |
| --- | --- |
| 1995 | $40.5 million |
| 1996 | $25 million |
| 1997 | $31.6 million |
| 1998 | $35.8 million |
| 1999 | $47.2 million |
| 2000 | $35.5 million |
| 2001 | $26.86 million |
| 2002 | $64.5 million |
| 2003 | $95.2 million |

From 1999 to 2002, Respondents reported to PSN, and PSN published to subscribers, that Warwick had the following assets under management:

| **Year** | **Assets Under Management** |
| --- | --- |
| 1999 | $47.2 million |
| 2000 | $35 million |
| 2001 | $28 million |
| 2002 (3rd quarter) | $58.2 million |

Respondents reported to a fourth database service, Money Manager Review ("MMR"), that Warwick managed $36 million of assets as of year end 2000.

7

C.  Respondents Report Significantly Smaller Asset Values to Commission Staff

In June 2000, Commission staff conducted an examination of Warwick.  Lawrence produced records reflecting a total of $3 million of assets under management.  He stated that clients with assets under management of approximately $37.5 million terminated their accounts with Warwick between October 1999 and February 2000, but that the records of the terminated clients were unavailable due to a fire.

In June 2004, Lawrence gave sworn investigative testimony to the staff during which he testified that Warwick had the following assets under management:

| Year | Assets Under Management |
|------|-------------------------|
| 1998 | $15 million |
| 1999 | $2 million |
| 2000 | $4 million |
| 2001 | $6 million |
| 2002 | $6 million |
| 2003 | $10.5 million |

The chart below compares the asset values described in Lawrence's June 2004 sworn investigative testimony with those reported in Forms ADV and to the database services:

| Date | June 2004 testimony | Forms ADV | Nelson's | Mobius | PSN | MMR |
|------|---------------------|-----------|----------|--------|-----|-----|
| 1995 | | | | $40.5 M | | |
| 1996 | | $5 M | | $25 M | | |
| 1997 | | $26.5 M | | $31.6 M | | |
| 1998 | $15 M | $28.9 M | | $35.8 M | | |
| 1999 | $2 M | $28.9 & $29.4 M | | $47.2 M | $47.2 M | |
| 2000 | $4 M | $37.2 M | $35.2 M | $35.5 M | $35 M | $36 M |
| 2001 | $6 M | | $26.9 M | $26.86 M | $28 M | |

8

| | | | | | | |
|---|---|---|---|---|---|---|
| 2002 | $6 M | | $54.5 M | $64.5 M | $58.2M (3rd Quarter) | |
| 2003 | $10.5 M | | $95.2 M | $95.2 M | | |

At the October 2006 hearing before the law judge, Lawrence testified that the asset values reported in Forms ADV and to the database services included certain non-discretionary accounts that Warwick "indirectly" controlled and for which it made investment "recommendations" in return for "compensatory business." However, the values reported in Warwick's Forms ADV were for discretionary accounts only. All of the Forms ADV stated that Warwick did not maintain any assets on a non-discretionary basis. Furthermore, the record contains no evidence that any "indirect" or "recommendation" accounts existed. Lawrence claimed that he had such arrangements with New York University ("NYU"), Merrill Lynch, and Morgan Stanley (although he could not recall a contact at Morgan Stanley). However, the testimony of the Division of Enforcement's ("Division") witnesses from NYU and Merrill Lynch did not support his claim. 11/

At one point during the 2006 hearing, Lawrence testified that the asset values reported in Forms ADV and to the database services actually understated Warwick's assets, to protect the privacy of clients. Lawrence claimed that Respondents managed $300 million of assets of the Mellon family of Pittsburgh. 12/ He also claimed that Respondents managed $150 to $300

---

11/  NYU's chief investment officer, Maurice Maertens, testified that he spoke with Lawrence numerous times between 1999 and 2002, but that he never recommended or hired Lawrence as an investment adviser, and that Lawrence did not perform any investment services for, or receive payment from, NYU.

Former Merrill Lynch financial advisor John Toomey testified that one of his clients wanted Warwick to manage a portion of his portfolio because the client had seen Warwick listed in Nelson's World's Best Money Managers. According to Toomey, Respondents managed the client's portfolio for seven or eight months, after which the relationship was terminated. Toomey denied paying Lawrence for any recommendations or referring any clients to Lawrence, and stated that he was unaware of any relationship by which Lawrence would make stock recommendations to Merrill Lynch in return for a fee or client referrals.

12/  Before us, Respondents submit a May 2006 UBS Financial Services account statement that purports to show that Warwick managed $6 million for a James R. Mellon. We find that the May 2006 account statement is not material evidence because it refers to transactions after the events at issue. Moreover, while we are permitted under Rule of Practice 452 to admit additional evidence on motion of a party, the motion must show

(continued...)

9

million of assets of an entity called "First Deposit." The law judge rejected these claims as unsupported and incredible. 13/ As noted, the law judge generally found Lawrence's hearing testimony to be not credible. 14/ The law judge determined that Warwick's actual assets under management did not exceed the values described in Lawrence's investigative testimony. 15/ She found that those values were "not inconsistent" with the values established in connection with the June 2000 examination. She also found that, because Lawrence himself supplied the values in his sworn investigative testimony, there was no unfairness to him in finding them to be the assets under management as of the dates indicated.

### D. Respondents Report Inflated 2003 Performance to Database Services

In a February 19, 2004, letter to Nelson's, Respondents reported that Warwick's total 2003 performance returns were "gross – 57.3%" and "net – 56.3%." In April 2004, Respondents reported to Mobius that Warwick's total 2003 performance return was 57.680% and its equity only return was 77.065%. Respondents reported monthly performance returns to PSN that resulted in a total 2003 performance return of 60.37% on its database. Relying on Respondents' representations, the database services published Warwick's 2003 performance returns to their subscribers and used those returns to rank Warwick as a top investment manager in industry publications, including Nelson's World's Best Money Managers and PSN's "Top Gun" quarterly rankings. Lawrence admitted that he was solely responsible for calculating Warwick's performance figures.

---

12/    (...continued)
with particularity that, among other things, there were reasonable grounds for the failure to adduce such evidence previously. See 17 C.F.R. § 201.452. Respondents have not provided such a motion.

13/    Respondents now allege that an unnamed person formed a joint venture with Warwick, that Warwick had a recommendation-type arrangement with NYU six years before the hearing, and that there were external portfolios under Warwick's control from 1997 to 2000. However, Respondents have adduced no evidence to support any of these allegations. Nor have they explained their failure to raise these matters before the law judge, as required under Rule 452.

14/    See supra note 9.

15/    Respondents assert that Lawrence was not advised that his investigative testimony was voluntary. The investigative transcript belies this assertion and shows that Division of Enforcement staff informed Lawrence that his appearance was voluntary, that he was not required to answer any questions, and that he was free to leave at any time. Lawrence affirmed that he understood this.

10

### E.  Respondents Report Significantly Smaller Performance Values to Commission Staff

In May 2004, during the investigation of this matter, Respondents produced to Division staff an undated marketing brochure that reported a 2003 total performance of 25.6%. In his June 2004 sworn investigative testimony, Lawrence testified that Warwick's 2003 total performance was no greater than the 25.6% reported in the marketing brochure.  He also sought to disavow his February 19, 2004, letter to Nelson's reporting inflated 2003 performance returns for Warwick, stating, "I don't recognize it.  This is impossible."  In the days after his investigative testimony, Lawrence mailed to Division staff a copy of a document that purported to be a letter to Nelson's dated February 26, 2004, correcting 2003 performance returns reported in his February 19 letter downward from 57.3% "gross" and 56.3% "net"  to 25.6% "gross" and 24.6% "net."  However, a Nelson's witness testified that Nelson's never received this letter.  The record shows that Nelson's continued to publish the inflated 2003 performance to subscribers as late as 2006. 16/

At the October 2006 hearing, Lawrence claimed that the 2003 performance reported to the database services was the result of an inadvertent error in a single month in the year 2003 for which he reported performance of positive 9.77% when it was actually negative 9.77%.  The law judge did not believe Lawrence's claim of error.  Division witness Anthony Fiduccia calculated that Warwick's actual 2003 performance return was 18.65% and actual equity only performance return was 21.68%.  The law judge found that Warwick's actual 2003 performance was no more than 25.6%. 17/  She also found that Lawrence never revised the inflated performance figures published by Nelson's, and that the February 26, 2004, letter to Nelson's was "part of a pattern of dubious mishaps and newly discovered exculpatory evidence that indicate[d] a lack of truthfulness."

### F.  Respondents Give Conflicting Explanations for Their Inability to Produce Records

In his June 2004 sworn investigative testimony, Lawrence testified that the records of Warwick's assets under management and performance from January 2000 forward had been destroyed by a fire in June 2002.  He also testified that he called the fire department for service and filed an insurance claim for fire damage.  However, at the October 2006 hearing, Lawrence testified that the records had been destroyed in June 2002, not by a fire, but by a flood.  Lawrence stated that he was "confused" in his prior testimony, that shortly before the flood there was a

---

16/    Lawrence also contacted Mobius and PSN to restate 2003 performance.  As a result, Mobius published Warwick's 2003 performance as 26.54% and PSN published it as 26.28%.

17/    The law judge found that the difference between the 18.65% and 25.6% was due to an inadvertent error.  In their brief, Respondents assert that the "favorable parts" of Fiduccia's testimony are missing from the transcript.  Respondents fail to identify what exactly is missing from the transcript.  Based on our review of the record, we find no gaps or deletions in Fiduccia's testimony.

11

"smoking condition" in his chimney, that he called the fire department, but then extinguished the "smoking condition," and told the fire department not to come. Lawrence also stated that he had filed an insurance claim for damages resulting from the "smoking condition." Lawrence's hearing testimony about the flood and "smoking condition" was contradicted by the testimony of Division witnesses that the fire department did not receive any calls for service at Lawrence's home and that no insurance claim for a fire or "smoking condition" was filed. The law judge rejected Lawrence's conflicting explanations for his failure to produce records. She found that there was no flood or fire at Lawrence's home which, in her view, strongly supported a finding that the records that he claimed were destroyed never existed.

III.

A. Advisers Act Section 203A

Advisers Act 203A generally prohibits an investment adviser that is subject to state authorities from registering with the Commission unless it has assets under management of at least $25 million. The record shows that Warwick maintained its Commission registration while having less than $25 million of assets under management. In seven reports filed between 1997 and 2000, Respondents represented that Warwick had between $26.55 and $37.2 million of assets under management. However, in June 2000, Lawrence was able to produce records reflecting a total of only $3 million of assets. In his June 2004 sworn investigative testimony, Lawrence stated that Warwick did not have more than $15 million of assets under management during the dates specified. Respondents were unable to substantiate the numbers provided in the reports. 18/ Their claims at the hearing of managing hundreds of millions of dollars more than reported were unsupported and deemed not credible. Like the law judge, we find that Warwick's assets under management were no greater than the values described in Lawrence's sworn investigative testimony 19/ and, at all relevant times, were substantially less than $25 million.

---

18/    See Donald T. Sheldon, 51 S.E.C. 59, 77 (1992) (stating that once the party having the
       burden of proof has come forward with evidence, the burden shifts to its opponent to
       refute that evidence), aff'd, 45 F.3d 1515 (5th Cir. 1995).

19/    Throughout the hearing, Lawrence disavowed numerous portions of his investigative
       testimony, stating that he did not give the answers attributed to him. As noted, the law
       judge generally did not credit Lawrence's hearing testimony. We have upheld a law
       judge's determination to accept prior sworn investigative testimony over conflicting
       hearing testimony. See, e.g., Michael J. Fee, 50 S.E.C. 1124, 1125 (1992), aff'd, 998
       F.2d 1002 (3d Cir. 1993) (Table); Wheat First Sec., Inc., 56 S.E.C. 894, 899 n.8 (2003)
       (citing Fee); see also Bearcat, Inc., Exchange Act Rel. No. 49375 (Mar. 8, 2004), 82 SEC
       Docket 1336, 1343 n.16 (finding that investigative testimony, being earlier in time, was
       entitled to more weight than contrary hearing testimony).

12

The law judge found that Warwick ceased to be registered on August 31, 2000, and that no violations of Section 203A occurred after that date. We disagree. The law judge's finding was based primarily on Lawrence's hearing testimony that he filed for withdrawal of Warwick's registration in 2000 and believed that Warwick was not registered as of June 2000 or a few months later. The record fails to support this finding. Lawrence offered no evidence that he ever withdrew Warwick's registration and, as noted previously, our official files contain no Form ADV-W for Warwick. Moreover, as late as 2004, Lawrence continued to report to one or more database services that Warwick was Commission-registered. We conclude that Warwick willfully violated Advisers Act Section 203A by maintaining its registration with the Commission while having less than $25 million of assets under management from July 8, 1997, until January 31, 2002, when we cancelled Warwick's registration. [20]/

We also conclude that Lawrence willfully aided and abetted Warwick's Advisers Act Section 203A violations. [21]/ The elements of aiding and abetting liability are: (1) a securities law violation by another party; (2) substantial assistance by the aider and abettor in the conduct constituting the violations; and (3) a general awareness or knowledge by the aider and abettor that his actions are part of an overall course of conduct that is improper. [22]/ Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." [23]/ Recklessness satisfies the scienter requirement. [24]/ Recklessness is "an extreme departure from the standards of ordinary care . . . present[ing] a danger of misleading buyers or sellers that is either known to the [respondent] or is so obvious that the [respondent] must have been aware of it." [25]/

---

[20]/ Willfulness under the federal securities laws "means intentionally committing the act which constitutes the violation," and not, as Respondents suggest, an intent to violate the laws or rules. Wonsover v. SEC, 205 F.3d 408, 414 (D.C. Cir. 2000).

[21]/ Our finding that Lawrence aided and abetted Warwick's violations necessarily makes him a "cause" of those violations. See Sharon M. Graham, 53 S.E.C. 1072, 1085 n.35 (1998), aff'd, 222 F.3d 994 (D.C. Cir. 2000)

[22]/ See, e.g., Graham v. SEC, 222 F.3d 994, 1000 (D.C. Cir. 2000). A person cannot escape aiding and abetting liability by claiming ignorance of the securities laws. See Graham, 53 S.E.C. at 1084 n.33.

[23]/ Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976).

[24]/ See, e.g., SEC v. McNulty, 137 F.3d 732, 741 (2d Cir.), cert. denied, 525 U.S. 931 (1998); SEC v. Steadman, 967 F.2d  967 F.2d 636, 641-42 (D.C. Cir. 1992).

[25]/ Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1044-45 (7th Cir.), cert. denied, 434 U.S. 875 (1977).

13

Warwick's primary violations of Section 203A have been established.  Lawrence, as Warwick's president, substantially assisted those violations by signing Warwick's Forms ADV and amendments thereto.  The evidence demonstrates Lawrence's scienter.  Lawrence was Warwick's control person and solely responsible for its filings.  Lawrence must have known that his description of Warwick's assets greatly exaggerated the amounts actually under management, or he was at least reckless in his description of those assets.  Lawrence repeatedly reported values that could not be confirmed and which contradicted his sworn investigative testimony.  We find it telling that Warwick's reported assets increased precipitously from $5 to $26.55 million in 1997, the year that Section 203A's $25 million minimum asset requirement became effective.  Lawrence testified at the hearing that Warwick's Commission registration bolstered its reputation with clients and potential clients.  Lawrence therefore had a pecuniary motive for misrepresenting Warwick's data, which provides additional circumstantial evidence that he deliberately inflated Warwick's assets in order to maintain its Commission registration. 26/ Accordingly, we find that Lawrence knew of the wrongdoing and his role in furthering it.

B. Advisers Act Section 207

Advisers Act Section 207 makes it unlawful for any person willfully to make an untrue statement of material fact or to omit to state a material fact required to be stated in applications or reports to the Commission. 27/  Scienter is not required. 28/  In Forms ADV filed between 1997 and 2000, Respondents falsely stated that Warwick had assets under management in excess of $25 million when, in fact, they were unable to substantiate the values reported, those values were refuted at the hearing, and Lawrence's sworn investigative testimony supported asset values substantially less than $25 million during that time.  Respondents made false statements about Warwick's assets under management in order improperly to qualify Warwick for Commission registration.  Respondents' false statements were material because they gave an erroneous impression of Warwick's size and asset base, qualities that would be important to clients and prospective clients in selecting an investment adviser. 29/  For the reasons set forth in connection with the Section 203A violations, we find that Respondents' conduct was willful.  By making

---

26/   See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2511 (2007) (stating that "motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference").

27/   A fact is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."  Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988); see supra note 20 (definition of willfulness).

28/   IMS/CPAs & Assocs., 55 S.E.C. 436, 455 (2001), petition denied, 327 F.3d 851 (9th Cir. 2003).

29/   See, e.g., The Barr Fin. Group, Inc., 56 S.E.C. 1243, 1255 (2003).

14

untrue statements of material fact in reports filed with the Commission, Respondents willfully violated Advisers Act Section 207.

    C.  <u>Advisers Act Sections 206(1), 206(2), and 206(4)</u>

      Advisers Act Section 206(1) makes it unlawful for an investment adviser to employ any device, scheme, or artifice to defraud any client or prospective client.  Advisers Act Section 206(2) makes it unlawful for an investment adviser to engage in any transaction, practice, or course of business that operates as a fraud or deceit on any client or prospective client.  Advisers Act Section 206(4) makes it unlawful for an investment adviser to engage in any act, practice, or course of business that is fraudulent, deceptive, or manipulative.  Scienter is required for violations of Section 206(1), but not for violations of Sections 206(2) or 206(4). <u>30</u>/

    As investment advisers, Respondents owed fiduciary duties to exercise good faith in dealing with clients and prospective clients and to employ reasonable care to avoid misleading them. <u>31</u>/  Respondents breached those duties by making false and misleading statements to the database services about Warwick's assets and 2003 performance. <u>32</u>/  Respondents' statements were false and misleading because they greatly exaggerated Warwick's assets and more than doubled its total 2003 performance, which we find was 18.65%.  Their false and misleading statements were material because they made Warwick appear to be larger and more skillful at managing assets than it actually was.  A reasonable investor would have wanted to know that the values reported to the database services overstated Warwick's actual assets and performance because investors routinely consider an adviser's past investment performance and attractiveness to other investors when making investment decisions.

    The record shows Lawrence's scienter, which is attributed to Warwick. <u>33</u>/  Lawrence admitted that he alone calculated Warwick's performance and provided those values, along with

---

<u>30</u>/   <u>SEC v. Capital Gains Research Bureau, Inc.</u>, 375 U.S. 180, 195 (1963); <u>Steadman</u>, 967 F.2d at 641-43 & nn.3 & 5; <u>Steadman v. SEC</u>, 603 F.2d 1126, 1134 (5th Cir. 1979), <u>aff'd on other grounds</u>, 450 U.S. 91 (1981).

<u>31</u>/   <u>See</u> <u>Capital Gains Research Bureau</u>, 375 U.S. at 191-92,194; <u>SEC v. Washington Inv. Network</u>, 475 F.3d 392, 404 (D.C. Cir. 2007).

<u>32</u>/   Respondents also appear to have overstated the number of Warwick's clients to Nelson's database service.  Because we believe that the evidence supporting the charge of inflated client numbers is weaker than the evidence supporting the charges of inflated assets and performance, we confine the findings of liability under Advisers Act Sections 206(1), 206(2), and 206(4) to the latter charges.

<u>33</u>/   A company's scienter is imputed from that of the individuals controlling it.  <u>Clarke T. Blizzard</u>, Advisers Act Rel. No. 2253 (June 23, 2004), 83 SEC Docket 362, 374 & n.16.

15

the values of Warwick's assets, to the database services. The accuracy of the values Lawrence supplied was contradicted by the values described in his sworn investigative testimony, certain of Warwick's Forms ADV, and documents, including Warwick's marketing brochure, that he provided to the staff. Lawrence also admitted that he knew the database services published the values he reported to the public, and that he relied on the database services for client referrals. In fact, he testified that he hoped the information about Warwick published by the database services would bring Warwick additional clients. 34/ Thus, as stated previously, Lawrence had a motive for overstating Warwick's assets and performance, which provides circumstantial evidence of his scienter. 35/ His self-interest in providing inaccurate information about Warwick is apparent. We find that Lawrence knew or was at least reckless in not knowing that the asset and 2003 performance values reported to the database services were materially false and misleading. 36/ We conclude that Respondents willfully violated Advisers Act Section 206(1) and Section 206(2), and that Warwick willfully violated, and Lawrence willfully aided and abetted and was a cause of Warwick's violation of, Advisers Act Section 206(4). 37/

---

34/    Courts have held that a misrepresentation communicated to a third party can support a fraud claim if the defendant intended or expected the misrepresentation to reach that particular plaintiff, or a class of persons including the plaintiff. See, e.g., Peerless Mills, Inc. v. AT&T, 527 F.2d 445, 450 (2d Cir. 1975) ("A third party can recover damages for a fraudulent misrepresentation if he can establish that he relied upon it to his detriment, and that the defendants intended the misrepresentation to be conveyed to him."); Chase Manhattan Bank, N.A. v. Fidata Corp., 700 F. Supp. 1252, 1261 (S.D.N.Y. 1988) ("A misrepresentation communicated to one person can support a claim for fraud by another person if the maker of the misrepresentation intends or has reason to expect that the statement will be repeated to the other person."). See generally Restatement (Second) of Torts § 533 (1977) (stating that maker of misrepresentation may be subject to liability for loss to third party if maker "intends or has reason to expect that its terms will be repeated or its substance communicated" to third party).

35/    See supra note 26.

36/    Lawrence's assertion that he did not know what numbers the database services were publishing was rejected by the law judge as not credible. We find no basis to disagree with that finding.

37/    Lawrence has not asserted that he was, at most, secondarily liable and should not have been charged as a primary violator under Advisers Act Section 206. The record shows that, at all times, Lawrence acted on Warwick's behalf. In addition, Lawrence has not disputed that he was an "investment adviser" as the term is defined under the Advisers Act. See supra note 4. We have held that an associated person may be charged as a primary violator under Section 206 where his activities cause him to meet the "broad" definition of "investment adviser." John J. Kenny, 56 S.E.C. 448, 485 & n.54 (2003).

16

17

IV.

We determine sanctions pursuant to a public interest standard under Advisers Act Sections 203(e) and 203(f). 38/  We consider such factors as the egregiousness of a respondent's actions, the isolated or recurrent nature of the infractions, the degree of scienter involved, the sincerity of any assurances against future violations, respondent's recognition of the wrongful nature of his conduct, and the likelihood that respondent's occupation will present opportunities for future violations. 39/  We also consider the extent to which a sanction will have a deterrent effect. 40/  In making a determination of appropriate sanctions, we have stated that conduct violating the antifraud provisions of the securities laws is "especially serious and subject to the severest of sanctions." 41/

A.  Statute of Limitations

As an initial matter, we note that the Order Instituting Proceedings issued on July 6, 2006. The five-year statute of limitations in 28 U.S.C. § 2462 commenced on July 6, 2001. 42/  Some conduct violative of every provision charged, except for Section 207, occurred within the five-year limitations period and therefore is not time-barred.  Section 2462 precludes consideration of Respondents' conduct occurring before July 6, 2001, in determining whether to impose an investment advisory bar or civil penalties. 43/  Such conduct may be considered, however, to establish Respondents' motive, intent, or knowledge in committing violations that are within the limitations period. 44/  Further, we may consider the entirety of Respondents' conduct in

---

38/    15 U.S.C. §§ 80b-3(e), 80b-3(f).

39/    Steadman, 603 F.2d at 1140.

40/    See, e.g., McCarthy v. SEC, 406 F.3d 179, 190 (2d Cir. 2005) (noting that deterrent value is a relevant factor in deciding sanctions); Ahmed Mohamed Soliman, 52 S.E.C. 227, 231 n.12 (1995) (stating that selection of an appropriate sanction involves consideration of several elements including deterrence).

41/    Marshall E. Melton, 56 S.E.C. 695, 713 (2003).

42/    See Johnson v. SEC, 87 F.3d 484 (D.C. Cir. 1996) (holding that Section 2462 applies to Commission administrative proceedings).

43/    See Terry T. Steen, 53 S.E.C. 618, 623-25 (1998).

44/    Id. at 624; see also Joseph J. Barbato, 53 S.E.C. 1259, 1278 (1999); Graham, 53 S.E.C. at 1089 n.47.

18

deciding whether to impose cease-and-desist orders because such orders, like injunctions, operate prospectively and are not subject to Section 2462. 45/

   B.  Bar and Cease-and-Desist Orders

   Lawrence's conduct on behalf of Warwick was egregious, recurrent, and prolonged. Lawrence maintained Warwick's Commission registration when it was not eligible to do so. In addition, Lawrence overstated Warwick's assets under management and 2003 performance in data reported to database services which published the information to subscribers in the securities industry. The false data that Lawrence reported to the Commission and the database services misled clients and prospective clients by making Warwick appear to be larger and more skillful at managing assets than it actually was, contrary to Respondents' fiduciary duties to exercise good faith and use reasonable care to avoid misleading clients and prospective clients. Lawrence's attempts to justify or conceal his actions in the days after his sworn investigative testimony underscore the seriousness of his conduct.

   The degree of scienter was knowing and intentional, or at least reckless. Lawrence gave false information about Warwick to the database services knowing or recklessly disregarding that the information greatly exaggerated Warwick's actual assets and performance and intending that the false information be reported to the database service subscribers.

   Lawrence has not acknowledged any wrongdoing. Rather, he continues to blame what the law judge described as a series of "dubious mishaps" for the absence of records -- records which remain unaccounted for to date. Nor has he offered assurances against future violations. In fact, the Nelson's witness testified that, as late as three weeks before the hearing, Lawrence called and asked Nelson's to report that Warwick managed $10 million of assets for the second quarter of 2006, even though the actual amount of its managed assets for that quarter was less than $10 million. The witness testified that he understood that Lawrence wanted him to falsely report and publish that Warwick had $10 million of assets in order to qualify it for listing in Nelson's World's Best Money Managers, which has a minimum asset requirement of $10 million. Lawrence's apparent persistence in providing false information about Warwick to the database services, and thereby to the public, despite the serious fraud charges against him for the same conduct, raises substantial uncertainty about Lawrence's willingness to comply with applicable regulatory requirements in the future. It also demonstrates his complete disregard for the fiduciary principles governing his conduct as an investment adviser.

   Lawrence testified that he has been in the investment advisory business for nearly thirty years and wishes to continue serving clients as an adviser. His occupation presents opportunities for future violations. Absent a bar, Lawrence could return to association with an investment adviser. The record as a whole, including the evidence of the seriousness of the violations, the

---

45/   See Edgar B. Alacan, Exchange Act Rel. No. 49970 (July 6, 2004), 83 SEC Docket 842, 869-70.

19

degree of scienter involved, the lack of assurances against future violations, and the opportunity to commit future violations, warrants Lawrence's exclusion from the investment advisory business. We find it is appropriate in the public interest to bar Lawrence from association with any investment adviser for his violations of Advisers Act Sections 203A , 206(1), 206(2), and 206(4) that fall within the statute of limitations. 46/

As to the remedy of cease-and-desist orders, we look to whether there is some risk of future violations. 47/ The risk of future violations required to support a cease-and-desist order is significantly less than that required for an injunction. 48/ The existence of a violation raises an inference that the violation will be repeated, and where the misconduct resulting in the violation is egregious, the inference is justified. 49/ Here, Respondents engaged in not one but repeated instances of egregious violative behavior.

We also consider whether other factors demonstrate a need for cease-and-desist orders, including the seriousness of the violation, its isolated or recurrent nature, whether the violation is recent, the degree of harm to investors or the marketplace, the respondent's state of mind, the sincerity of assurances against future violations, the opportunity to commit future violations, and the remedial function to be served by cease-and-desist orders in the context of other sanctions sought in the proceeding. 50/

Respondents' conduct was egregious and recurrent, with a common thread of misrepresentation that continued for seven years. The violations were recent and involved at least recklessness. Although the law judge found no evidence of harm to Warwick's clients,

---

46/    The Commission has authority to bar a person who violates the Advisers Act from associating or seeking to associate with unregistered investment advisers. Teicher v. SEC, 177 F.3d 1016, 1017-18 (D. C. Cir. 1999), cert. denied, 529 U.S. 1003 (2000). We reject Respondents' suggestion that there is no basis to impose a bar because no criminal acts were committed. We have stated previously, in reliance on United States Supreme Court precedent, that a bar is a civil rather than criminal penalty. See The Barr Fin. Group, 56 S.E.C. at 1258 n.29 (citing Hudson v. United States, 522 U.S. 93 (1997)); William F. Lincoln, 53 S.E.C. 452, 459-60 (1998) (same). We see no basis to reach a contrary conclusion here. Respondents have made no showing that this remedy is criminal. Lincoln, 53 S.E.C. at 462.

47/    KPMG Peat Marwick LLP, 54 S.E.C. 1135, 1185 (2001), petition denied, 289 F.3d 109 (D.C. Cir. 2002).

48/    Id. at 1191.

49/    See Geiger v. SEC, 363 F.3d 481, 489 (D.C. Cir. 2004).

50/    KPMG Peat Marwick LLP, 54 S.E.C. at 1192.

20

Respondents' conduct in inflating Warwick's assets under management and 2003 performance returns in Forms ADV and to the database services misled investors and potential investors about Warwick's size and the willingness of others to trust Respondents with their assets.  We have long held that the "public interest determination extends beyond the consideration of particular investors to the public-at-large." 51/  An acknowledgment of the wrongful nature of the conduct and assurances against future violations are absent.  As the law judge observed, Lawrence either believed that his conduct was justified or was ready to fabricate evidence in order to justify or conceal violative conduct.  This lack of remorse demonstrates the need for cease-and-desist orders against future violations.  In addition, cease-and-desist orders will serve the remedial purpose of encouraging Lawrence to take his responsibilities more seriously in the future, should his involvement in the securities industry recur.  We conclude that Respondents pose a continuing risk of harm to investors.  Therefore, in addition to a bar, 52/ it is in the public interest to impose cease-and-desist orders against Respondents from violating Advisers Act Sections 203A, 206(1), 206(2), 206(4), and 207.

    C.  <u>Civil Money Penalties</u>

        Advisers Act Section 203(i) authorizes us to assess a civil penalty if we find that such penalty is in the public interest. 53/  Section 203(i) establishes three tiers of penalties, graduated according to the seriousness of the offense. 54/  The Division seeks second-tier penalties against Respondents. 55/  Although we find that second-tier penalties can be justified, we agree with the law judge that the combination of a bar and cease-and-desist orders are sufficient in the public interest.  The record shows that Warwick had only two clients at the time of the hearing.  Lawrence's claims of managing assets totaling in the hundreds of millions of dollars were

---

51/    <u>Christopher A. Lowry</u>, 55 S.E.C. 1133, 1145 (2002), <u>aff'd</u>, 340 F.3d 501 (8th Cir. 2003).

52/    We have stated that "injunctive and administrative remedies serve different purposes, one restrains further violative activity, the other seeks to determine whether it is in the public interest to exclude somebody from the securities industry or to limit his activities in it." <u>Samuel H. Sloan</u>, 45 S.E.C. 734, 738-39 (1975).  We believe that the same rationale pertains to cease-and-desist orders.

53/    15 U.S.C. § 80b-3(i)(2).

54/    The maximum penalty for each "act or omission" is $5,500 for a natural person or $55,000 for any other person in the first tier, $55,000 for a natural person or $275,000 for any other person in the second tier, and $110,000 for a natural person or $550,000 for any other person in the third tier.  <u>See</u> 15 U.S.C. § 80b-3(i)(2)(A)-(C).

55/    A second-tier penalty is permissible if the act or omission involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement. 15 U.S.C. § 80b-3(i)(2)(B).

21

unsubstantiated and deemed not credible.  As the law judge stated, without Lawrence as an associated person, Warwick will need to cease operations.

An appropriate order will issue. 56/

By the Commission (Chairman COX and Commissioners ATKINS, NAZARETH and CASEY).

Nancy M. Morris
Secretary

---

56/    We have considered all of the parties' contentions.  We have rejected or sustained them to the extent that they are inconsistent or in accord with the views expressed in this opinion.

UNITED STATES OF AMERICA
before the
SECURITIES AND EXCHANGE COMMISSION

INVESTMENT ADVISERS ACT OF 1940
Rel. No. 2694 / January 16, 2008

Admin. Proc. File No. 3-12357

In the Matter of

WARWICK CAPITAL MANAGEMENT, INC.

and

CARL LAWRENCE

ORDER IMPOSING REMEDIAL SANCTIONS

On the basis of the Commission's opinion issued this day, it is

ORDERED that Carl Lawrence be, and he hereby is, barred from association with any investment adviser; and it is further

ORDERED that Carl Lawrence and Warwick Capital Management, Inc. cease and desist from committing or causing any violations or future violations of Sections 203A, 206(1), 206(2), 206(4), and 207 of the Investment Advisers Act of 1940.

By the Commission.


Nancy M. Morris
Secretary