**Exhibit F**

# Regulation of Investment Advisers

# by the

# U.S. Securities and Exchange Commission

**March 2013**

**Staff of the Investment Adviser Regulation Office**
**Division of Investment Management**
**U.S. Securities and Exchange Commission**

# Regulation of Investment Advisers by the
# U.S. Securities and Exchange Commission[*]

## I.    Introduction

Money managers, investment consultants, and financial planners are regulated in the United States as "investment advisers" under the U.S. Investment Advisers Act of 1940 ("Advisers Act" or "Act") or similar state statutes.  This outline describes the regulation of investment advisers by the U.S. Securities and Exchange Commission ("SEC").

The Advisers Act is the last in a series of federal statutes intended to eliminate abuses in the securities industry that Congress believed contributed to the stock market crash of 1929 and the depression of the 1930s.  The Act is based on a congressionally-mandated study of investment companies, including consideration of investment counsel and investment advisory services, carried out by the SEC during the 1930s.[1]  The SEC's report traced the history and growth of investment advisers and reflected the position that investment advisers could not properly perform their function unless all conflicts of interest between them and their clients were removed.  The report stressed that a significant problem in the industry was the existence, either consciously or, more likely, unconsciously, of a prejudice by advisers in favor of their own financial interests.

The SEC's report culminated in the introduction of a bill that, with some changes, became the Advisers Act.  The Act, as adopted, reflects congressional recognition of the delicate fiduciary nature of the advisory relationship, as well as Congress' desire to eliminate, or at least expose, all conflicts of interest that might cause advisers, either consciously or unconsciously, to render advice that is not disinterested.[2]

The outline that follows is divided into five sections, each of which addresses a different question:  Who is an "investment adviser?"  Which investment advisers must register with the SEC?  Who must register under the Act?  How does an investment adviser register under the Act?  What are the requirements applicable to an investment adviser registered under the Act?

---

[*]    The U.S. Securities and Exchange Commission, as a matter of policy, disclaims responsibility for any private publication or statement by any of its employees.  The views expressed in this outline are those of the staff of the Investment Adviser Regulation Office, and do not necessarily reflect the views of the U.S. Securities and Exchange Commission or others on the staff of the U.S. Securities and Exchange Commission.  The Investment Adviser Regulation Office would like to thank Robert E. Plaze, the original author of this outline, for his substantial contribution.

[1]    *See Investment Trusts and Investment Companies, Report of the Securities and Exchange Commission, Pursuant to Section 30 of the Public Utility Holding Company Act of 1935, on Investment Counsel, Investment Management, Investment Supervisory and Investment Advisory Services*, H.R. Doc. No. 477, 76th Cong., 2d Sess. (1939).

[2]    *SEC v. Capital Gains Research Bureau, Inc*., 375 U.S. 180, 189, 191-192 (1963).

II.    **Who is an Investment Adviser?**

    A.    Definition of Investment Adviser

        Section 202(a)(11) of the Act defines an investment adviser as any person or firm that:

- for compensation;
- is engaged in the business of;
- providing advice to others or issuing reports or analyses regarding securities.

        A person must satisfy all three elements to fall within the definition of "investment adviser," which the SEC staff has addressed in an extensive interpretive release explaining how the Act applies to financial planners, pension consultants and other persons who, as a part of some other financially related services, provide investment advice.[3]  Published in 1987, Investment Advisers Act Release No. 1092 represents the views of the Division of Investment Management, which is primarily responsible for administering the Act.

    1.    *Compensation.*  The term "compensation" has been broadly construed. Generally, the receipt of any economic benefit, whether in the form of an advisory fee, some other fee relating to the total services rendered, a commission, or some combination, satisfies this element.[4]  The person receiving the advice or another person may pay the compensation.

    2.    *Engaged in the Business.*  A person must be engaged in the business of providing advice.  This does not have to be the sole or even the primary activity of the person.  Factors used to evaluate whether a person is engaged are:  (i) whether the person holds himself out as an investment adviser; (ii) whether the person receives compensation that represents a clearly definable charge for providing investment advice; and (iii) the frequency and specificity of the investment advice provided.[5]  Generally, a person providing advice about specific securities will be "engaged in the business" unless specific advice is rendered only on a rare or isolated occasion.[6]

---

[3]    *Applicability of the Investment Advisers Act of 1940 to Financial Planners, Pension Consultants, and Other Persons Who Provide Others with Investment Advice as a Component of Other Financial Services*, Investment Advisers Act Release No. 1092 (Oct. 8, 1987) ("Release 1092").

[4]    *Id.*; *see also Kenisa Oil Company*, SEC Staff No-Action Letter (May 6, 1982); *SEC v. Fife*, 311 F. 3d 1 (1st Cir. 2002) (a person provides advice "for compensation" if it understands that successful investment will yield it a commission);  *In the Matter of Alexander V. Stein*, Investment Advisers Act Release. No. 1497 (June 8, 1995) (a person receives "compensation" if it fraudulently converts client funds to its own use).

[5]    *Zinn v. Parish,* 644 F.2d 360 (7th Cir. 1981); Release 1092, *supra* note 3.

[6]    For instance, the SEC staff would not view an employer providing advice to an employee in connection with an employer-sponsored employee benefit program to be in the business of providing advice, *see Letter to Olena Berg, Assistant Secretary, Department of Labor, from Jack W. Murphy, Chief Counsel, Division of Investment Management, SEC* (Feb. 22, 1996).  *See also Zinn, supra* note 5 at 364 ("isolated transactions with a client as an incident to the main purpose of his management contract to negotiate football contracts do not constitute engaging in the business of advising others on investment securities.").

3.    *Advising Others about Securities*

    a.    *Advice about Securities*.  A person clearly meets the third element of the statutory test if he provides advice to others about specific securities, such as stocks, bonds, mutual funds, limited partnerships, and commodity pools.  The SEC staff has stated that advice about real estate, coins, precious metals, or commodities is not advice about securities.[7]  The more difficult questions arise with less specific advice, or advice that is only indirectly about securities.  The SEC staff has stated in this regard:

        (i)    advice about market trends is advice about securities;[8]

        (ii)    advice about the selection and retention of other advisers is advice about securities;[9]

        (iii)    advice about the advantages of investing in securities versus other types of investments (*e.g.*, coins or real estate) is advice about securities;[10]

        (iv)    providing a selective list of securities is advice about securities even if no advice is provided as to any one security;[11] and

        (v)    asset allocation advice is advice about securities.[12]

    b.    *Advising Others.*  Questions about whether a person advises "others" usually arise when a client is not a natural person.  The SEC staff generally looks to the substance of the arrangement rather than its form:

        (i)    A general partner of a limited partnership that provides advice with respect to the investments of partnership assets is advising others (the limited partners) even where the general partner may have legal title to these assets.[13]

---

[7]    *Robert R. Champion*, SEC Staff No-Action Letter (Sept. 22, 1986).

[8]    *Dow Theory Forecasts*, SEC Staff No-Action Letter (Feb. 2, 1978).  Thus, market-timing advice is advice about securities.  *See Maratta Advisory, Inc*., SEC Staff No-Action Letter (July 16, 1981).

[9]    Release 1092, *supra* note 3; *FPC Securities Corp*., SEC Staff No-Action Letter (Dec. 1, 1974).  *See also SEC v. Bolla,* 401 F.Supp. 43 (D.D.C. 2005), *aff'd. in relevant  part, SEC v. Washington Investment Network,* 475 F.3d 392 (D.C. Cir. 2007) (person selecting investment advisers for clients meets the Advisers Act's definition of  "investment adviser").

[10]    Release 1092, *supra* note 3.

[11]    *RDM Infodustries, Inc.,* SEC Staff No-Action Letter (Mar. 25, 1996).  The SEC staff takes the position that providing information about securities in a report does not constitute providing advice about the securities if:  (i) the information is readily available to the public in its raw state; (ii) the categories of information presented are not highly selective; and (iii) the information is not organized or presented in a manner that suggests the purchase, holding, or sale of any security.  *See id.*

[12]    *Maratta Advisory, Inc*., *supra,* note 8.  *See also SEC v. Bolla*, *supra,* note 9.

[13]    *Abrahamson v. Fleschner,* 566 F.2d 862, 870 (2d Cir. 1977), *cert. denied,* 436 U.S. 913 (1978); *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 383 (S.D.N.Y. 2007).

      (ii)    A wholly-owned corporate subsidiary exclusively advising the parent or another wholly owned corporate subsidiary would not generally be considered advising "others."[14]

    c.    *Investment Banking.* The SEC staff does not believe that the Act applies to persons whose activities are limited to advising issuers concerning the structuring of their securities offerings (although such advice may technically be about securities).[15]

    d.    *Non-U.S. Clients.* The Act is silent regarding whether the clients must be U.S. persons. The SEC takes the position that a U.S. person providing advice exclusively to non-U.S. persons would still be subject to the Act.[16]

B.    <u>Exclusions from Definition</u>

There are several exclusions from the investment adviser definition available to persons who presumably (or at least arguably) satisfy all three elements of the definition. A person eligible for one of the exclusions is not subject to any provisions of the Act.

1.    *Banks and Bank Holding Companies.* This exclusion is generally limited to U.S. banks and bank holding companies.[17] The SEC staff has stated that the exclusion is unavailable to non-U.S. banks,[18] credit unions, and investment adviser subsidiaries of banks or bank holding companies.[19]

2.    *Lawyers, Accountants, Engineers, and Teachers.* The professional exclusion is available only to those professionals listed, and only if the advice given is incidental to the practice of their profession. Factors considered by staff to evaluate whether advice is incidental to a profession are: (i) whether the professional holds himself out as an investment adviser; (ii) whether the advice is reasonably related to the professional services provided; and (iii) whether the charge for advisory services is based on the same factors that

---

[14]    *See Zenkyoren Asset Management of America Inc.*, SEC Staff No-Action Letter (June 30, 2011).

[15]    *See, e.g., The Applicability of the Investment Advisers Act of 1940 to Financial Advisors to Municipal Bond Issuers, Division of Investment Management,* SEC Staff Legal Bulletin No. 11 (Sept. 19, 2000), *available at* http://www.sec.gov/interps/legal.shtml.

[16]    *See* Release 3221, *infra* note 46, at n.76.

[17]    The term "bank" is defined in section 202(a)(2) of the Act. In 2001, the Act's definition of "investment adviser" was amended so that banks and bank holding companies are not eligible for this exclusion to the extent that they serve or act as an investment adviser to a registered investment company. However, if, in the case of a bank, such services or actions are performed through a separately identifiable department or division, the department or division, and not the bank itself, is deemed to be the investment adviser. The term "separately identifiable department or division" is defined in section 202(a)(26).

[18]    *Letter to Rep. William J. Hughes from Stanley B. Judd, Deputy Chief Counsel, Division of Investment Management,* SEC (June 4, 1980).

[19]    *First Commerce Investors, Inc.*, SEC Staff No-Action Letter (Jan. 31, 1991); *Southwest Corporate Federal Credit Union*, SEC Staff No-Action Letter (May 31, 1983).

determine the professional's usual charge.[20]

3.  *Brokers and Dealers*.  A broker or dealer that is registered with the SEC under the Securities and Exchange Act of 1934 ("Exchange Act") is excluded from the Act if the advice given is: (i) solely incidental to the conduct of its business as broker or dealer, and (ii) it does not receive any "special compensation" for providing investment advice.

   a.  *Solely Incidental.*  The SEC has stated that investment advice is "solely incidental" to brokerage services when the advisory services rendered are "in connection with and reasonably related to the brokerage services provided."[21]  If advice is not "solely incidental," a broker-dealer is subject to the Advisers Act regardless of the form of compensation it receives.

   b.  *Special Compensation.*  Generally, to avoid receiving "special compensation," a broker or dealer relying on this exclusion must receive only commissions, markups, and markdowns.[22]

   *Bundled Fees.*  The SEC has stated a broker or dealer that receives a fee based on a percentage of assets that compensates the broker or dealer for both advisory and brokerage services receives "special compensation."[23]

   *Separate or Identifiable Charge.*  The SEC has stated that a broker-dealer charges "special compensation" when it charges its customer a separate fee for investment advice, or when it charges its customers different commission rates, one with advice and one without, because the difference represents a clearly definable charge for investment advice.[24]

   *Broker-Dealer Agents.*  The SEC staff has stated that a registered representative of a broker-dealer can rely on the exclusion if she is: (i) giving advice within the scope of her employment with the broker-

---

[20]  Release 1092, *supra* note 3; *Henry S. Miller Companies of Dallas, Texas*, SEC Staff No-Action Letter (Feb. 21, 1975).

[21]  *Certain Broker-Dealers Deemed Not To Be Investment Advisers*, Investment Advisers Act Release No. 2376 (Apr. 12, 2005) ("Release 2376"), *available at* http://www.sec.gov/rules/final/34-51523.pdf.

[22]  Section 202(a)(11)(C).  *See* S. Rep. No. 76-1775 at 22; H.R. Rep. No. 76-2639 at 28 (the term "investment adviser" was "so defined as specifically to exclude . . . brokers (insofar as their advice is merely incidental to brokerage transactions for which they receive only brokerage commissions.")).

[23]  In Release 2376, the SEC adopted a rule that, among other things, deemed brokers charging asset-based brokerage fees (rather than commissions, mark-ups, or mark-downs) not to be investment advisers based solely on their receipt of special compensation.  The rule was vacated for other reasons by a federal court in March 2007.  *Financial Planning Association v. SEC*, 482 F.3d (D.C. Cir. 2007).  *See also National Regulatory Services*, SEC Staff No-Action Letter (Dec 2, 1992) at n.3.

[24]  *Final Extension of Temporary Exemption from the Investment Advisers Act for Certain Brokers and Dealers*, Investment Advisers Act Release No. 626 (Apr. 27, 1978) ("Release 626").  *See also, Opinion of the General Counsel Relating to Section 203(b)(3) of the Investment Advisers Act of 1940*, Investment Advisers Act No. 2 (Oct. 28, 1940).  The Commission proposed to codify this interpretation in a rule.  *See Interpretive Rule under the Advisers Act Affecting Broker-Dealers*, Investment Advisers Act Release No. 2652 (Sept. 24, 2007).

dealer; (ii) the advice is incidental to her employer's brokerage activities; and (iii) she receives no special compensation for her advice.[25]

*Brokerage Customers.* The SEC has stated that a broker-dealer does not have to treat its brokerage customers to whom it provides investment advice as advisory clients simply because it is registered under the Advisers Act. It must treat as an advisory client only those accounts for which it provides advice (*i.e.*, non-incidental advice) or receives compensation (*i.e.*, special compensation) that subjects the broker-dealer to the Advisers Act.[26]

4. *Publishers.* Publishers are excluded from the Act, but only if a publication: (i) provides only impersonal advice (*i.e.,* advice not tailored to the individual needs of a specific client);[27] (ii) is "bona fide," (containing disinterested commentary and analysis rather than promotional material disseminated by someone touting particular securities); and (iii) is of general and regular circulation (rather than issued from time to time in response to episodic market activity).[28]

5. *Government Securities Advisers.* This exclusion is available to persons and firms whose advice is limited to certain securities issued by or guaranteed by the U.S. government.[29]

6. *Credit Rating Agencies.* This exclusion is available to any rating agency regulated under section 15E of the Exchange Act as a "nationally recognized statistical rating organization."[30]

---

[25]  *Institute of Certified Financial Planners*, SEC Staff No-Action Letter (Jan. 21, 1986).

[26]  Release 626, *supra* note 24. The Commission has proposed to codify this interpretation in a rule. *See Interpretive Rule under the Advisers Act Affecting Broker-Dealers*, *supra* note 24.

[27]  *See Weiss Research, Inc., et al*, Investment Advisers Act Release No. 2525 (June 22, 2006) (newsletter publisher deemed to be an investment adviser providing personalized investment advice whose "auto-trading" program sent signals to broker-dealer, which automatically traded subscriber/customer securities consistent with signals).

[28]  Section 202(a)(11)(D). *See Lowe v. SEC*, 472 U.S. 181 (1985); *SEC v. Gun Soo Oh Park, A/K/A Tokyo Joe, and Tokyo Joe's Societe Anonyme Corp.*, 99 F. Supp. 2d 889 (N.D. Ill. 2000). If a publisher is required to register as a result of some other advisory activity, the adviser is subject to all of the provisions of the Act and SEC rules with respect to the publication. *See* Investment Advisers Act Release No. 870 (July 15, 1983)("Release 870").

[29]  Section 202(a)(11)(E). The scope of the exception includes persons whose advice is limited to: (i) direct obligations of the Federal government (*e.g.*, U.S. Treasury obligations); (ii) securities subject to guarantees from the Federal government; and (iii) securities issued by or guaranteed by corporations whose securities are designated by the Secretary of the Treasury as exempt from the Exchange Act. The SEC staff has stated that advice about repurchase agreements collateralized by U.S. government securities does not fall within the exception. *J.Y. Barry Arbitrage Management, Inc*., SEC Staff No-Action Letter (Oct. 18, 1989). *See also In the Matter of Rauscher Pierce Refsnes, Inc., et al.*, Investment Advisers Act Release No. 1863 (Apr. 6, 2000) ("Because Rauscher's advice was not limited to Treasury securities or other government securities as described in section 202(a)(11)(E), that provision did not operate to exclude Rauscher from the definition of investment adviser.").

[30]  Section 202(a)(11)(F), containing this exclusion for rating agencies, was added to the Act by the Credit Rating Agency Reform Act of 2006. Pub. L. No. 109-291, 120 Stat. 1327 (Sept. 29, 2006).

7. *Family Offices.* A family office that manages the wealth and other affairs of a single family is excluded from the investment adviser definition if it: (i) provides investment advice only to family clients; (ii) is wholly owned by family clients and exclusively controlled by family members and/or certain family entities; and (iii) does not hold itself out[31] to the public as an investment adviser.[32]

   a. *Family Members.* A family office's "family members" include all lineal descendants (including adopted children, stepchildren, foster children, and, in some cases, persons who were minors when a family member became their legal guardian) of a common ancestor (no more than 10 generations removed from the youngest generation of family members), and such lineal descendants' spouses or spousal equivalents.[33]

   b. *Family Clients.* The family office's clients generally may include family members; key employees; any non-profit or charitable organization funded exclusively by family clients; any estate of a family member, former family member, key employee, or subject to certain conditions, a former key employee; certain family client trusts; and any company wholly owned by and operated for the sole benefit of family clients.[34]

8. *Governments and Political Subdivisions.* The Act does not apply to the U.S. government, state governments and their political subdivisions, and their agencies or instrumentalities, including their officers, agents, or employees acting in their official capacities.[35]

9. *Non-U.S. Advisers.* There is no exemption for non-U.S. advisers. Non-U.S. persons advising U.S. persons are subject to the Act and must register under the Act[36] unless eligible for one of the exemptions discussed below (*e.g.*, the "foreign private adviser" registration exemption).[37] The SEC does not accept "home state registration" of non-U.S. advisers in lieu of SEC

---

[31]    *See infra* notes 69 to 72 and accompanying text for discussion of "holding out."

[32]    Rule 202(a)(11)(G)-1(b)(defining "family office" for purpose of section 202(a)(11)(G), which was added to the Act by the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) ("Dodd-Frank Act")). Family offices that do not meet these conditions must register with the SEC unless another exemption is available. Rule 202(a)(11)(G)-1(e)(2).

[33]    Rule 202(a)(11)(G)-1(d)(6).

[34]    Rule 202(a)(11)(G)-1(d)(4). Key employees include executive officers, directors, trustees, general partners, or any person serving in a similar capacity for the family office or its affiliated family office, and certain employees who have participated in the investment activities of the family office or its affiliated family office for at least 12 months. Rule 202(a)(11)(G)-1(d)(8).

[35]    Section 202(b).

[36]    *In the Matter of Banco Espirito Santo S.A.*, Investment Advisers Act Release No. 3304 (Oct. 24, 2011) (The SEC brought an enforcement action against a commercial bank headquartered in Portugal for violating section 203(a) by marketing its portfolio of financial services, including offering securities and providing advice regarding those securities, to U.S. residents who were primarily Portuguese immigrants without registering with the Commission.).

[37]    *See* Section III. B. 3 of this outline for discussion of the foreign private adviser exemption.

registration.[38]

The SEC has authority to designate, by rule or order, other persons who are not within the intent of the definition of investment adviser.[39]

## III.    Which Investment Advisers Must Register Under the Advisers Act?

A firm that falls within the definition of "investment adviser" (and is not eligible for one of the exclusions) must register under the Advisers Act, unless it (i) is prohibited from registering under the Act because it is a smaller firm regulated by one or more of the states or (ii) qualifies for an exception from the Act's registration requirement.[40] All advisers, registered or not, are subject to the Act's anti-fraud provisions.

### A.    Prohibitions from Registration

Until 1996, most investment advisers were subject to regulation by both the SEC *and* one or more state regulatory agencies. The Act was amended in 1996 and again in 2010 to allocate regulatory responsibility between the SEC and the states.[41]  Today, most small advisers and "mid-sized advisers" are subject to state regulation of advisers and are *prohibited* from registering with the SEC.[42]  Most large advisers (unless an exemption is available) must register with the SEC, and state adviser laws are preempted for these advisers.[43]

---

[38]    On June 12, 2007, the SEC held a "roundtable discussion" at which the possibility of revising its approach to mutual recognition was discussed.  The SEC press release concerning the roundtable stated that "selective mutual recognition would involve the SEC permitting certain types of foreign financial intermediaries to provide services to U.S. investors under an abbreviated registration system, provided those entities are supervised in a foreign jurisdiction under a securities regulatory regime substantially comparable (but not necessarily identical) to that in the United States."  *See* http://www.sec.gov/spotlight/mutualrecognition.htm.

[39]    Section 202(a)(11)(H).  *See, e.g., International Bank for Reconstruction and Development and International Development*, Investment Advisers Act Release Nos. 1971 (Sept. 4, 2001) (notice) and 1955 (July 27, 2001) (order) (declaring World Bank instrumentalities not to be investment advisers under the Act).  Section 202(a)(11)(H) had been designated as section 202(a)(11)(F) until 2006, and as 202(a)(11)(G) until 2011, when it was re-designated by the Dodd-Frank Act.

[40]    Section 203(a).

[41]    *National Securities Markets Improvements Act of 1996* ("NSMIA"), Pub. L. No. 104-290, 110 Stat. 3416 (1996); Dodd-Frank Act, *supra* note 32.  Most of the provisions amending the Advisers Act to allocate regulatory responsibilities between the SEC and state governments have been codified in section 203A.

[42]    Section 203A(a). Section 203A creates a *prohibition*, not an exemption.  *See In the Matter of Matthew P. Brady*, Investment Advisers Act Release No. 2178 (Sept. 30, 2003); *In the Matter of Warwick Capital Management Inc*., Initial Decision Release No. 327 (Feb. 15, 2007); *Credit Agricole Asset Management Alternative Investments, Inc*., SEC Staff No-Action Letter (Aug. 7, 2006).  *See also In the Matter of Royal Oak Capital Management, LLC*, Investment advisers Act Release No. 3354 (Jan. 17, 2012) (cancelling the registration of an adviser that did not have required amount of assets under management to remain registered with the SEC).

[43]    *See* Sections 203(a) (registration required) and 203A(b) (preemption of state law).

1.    *Operation of Section 203A of the Advisers Act*

a.    *Small Advisers.* Advisers with less than $25 million of assets under management are regulated by one or more states *unless* the state in which the adviser has its principal office and place of business has not enacted a statute regulating advisers.[44]  Thus, unless an exemption is available (discussed below), only a small adviser with its principal office and place of business in Wyoming (which has not enacted a statute regulating advisers) may register with the SEC.

b.    *Mid-Sized Advisers.*  Generally advisers with between $25 million and $100 million of assets under management[45] are regulated by one or more states if (i) the adviser *is registered* with the state where it has its principal office and place of business (*e.g.*, it cannot take advantage of an exemption from state registration), and (ii) the adviser is "subject to examination" by that state securities authority.[46]  Unless an exemption is available, a mid-sized adviser with its principal office and place of business in New York or Wyoming is not "subject to examination" and must register with the SEC.[47]

c.    *Non-U.S. Advisers.*  Advisers whose principal office and place of business is outside the United States are not prohibited from registering with the SEC and thus are not subject to the assets under management thresholds.[48]  A non-U.S. adviser giving advice to U.S. persons[49] must register with the SEC (and thus may avoid registration with state regulators), unless an exemption from registration is

---

[44]    Section 203A(a)(1) prohibits any adviser from registering with the SEC that is *regulated or is required to be regulated* in the state in which it maintains its principal office and place of business.  The SEC interprets this provision to mean the prohibition applies only to an adviser that maintains its principal office and place of business in a state that has enacted an investment adviser statute.  *Rules Implementing Amendments to the Investment Advisers Act of 1940*, Investment Advisers Act Release No. 1633 (May 15, 1997) ("Release 1633") at n.83 and accompanying text.

[45]    The Dodd-Frank Act raised the threshold for advisers to register with the SEC to $100 million of assets under management.  *See* section 410 of Dodd-Frank Act.  A mid-sized adviser *may* register when it acquires $100 million of assets under management and *must* register once it obtains $110 million of assets under management, unless some other exemption is available.  Rule 203A-1(a)(1).  Once registered with the SEC, a mid-sized adviser is not required to withdraw from SEC registration and register with the states until the adviser has less than $90 million of assets under management.  *Id.*

[46]    Section 203A(a)(2) prohibits a mid-sized adviser from registering with the SEC if the adviser is required to be registered as an adviser in the state where it has its principal office and place of business and is subject to examination by that state.  *See Rule Implementing Amendments to the Investment Advisers Act of 1940*, Investment Advisers Act Release No. 3221 (June 22, 2011) ("Release 3221").

[47]    *See* Instructions for Item 2 of Part 1A of Form ADV; Division of Investment Management: Frequently Asked Questions Regarding Mid-Sized Advisers, *available at* www.sec.gov/divisions/investment/midsizedadviserinfo.htm.  New York and Wyoming did not advise the SEC staff that advisers registered with them are subject to examination.  *See* Release 3221 at n.152, *supra* note 46.

[48]    *See* Release 1633, *supra* note 44 at Section II. E.  An adviser with a principal office and place of business in another country does not have a principal office and place of business in a U.S. state that regulates investment advisers.

[49]    *See infra* note 64 for discussions of the definition of a "U.S. person."

available (in which case it may be subject to state registration requirements).[50]

2. *Exceptions to Prohibition.* Section 203A and SEC rules carve out several exceptions from the assets under management tests.

    a. *Advisers to Investment Companies.* Advisers to investment companies registered under the Investment Company Act of 1940 (the "Investment Company Act") must register with the SEC.[51] The exception is not available to an adviser that simply gives advice about investing in investment companies.[52]

    b. *Advisers to Business Development Companies.* Advisers with at least $25 million of assets under management that advise a company which has elected to be a business development company pursuant to section 54 of the Investment Company Act must register with the SEC.[53]

    c. *Pension Consultants.* Advisers providing advisory services to employee benefit plans having at least $200M of assets may register with the SEC (even though the consultant does not itself have those assets under management).[54]

    d. *Related Advisers.* Advisers that control, are controlled by, or are under common control of an SEC-registered adviser may register with the SEC, but only if they have the same principal office and place of business.[55]

    e. *Newly-Formed Advisers.* Advisers that are not registered, and have a reasonable expectation that they will be eligible for SEC registration within 120 days of registering, may register with the SEC.[56]

---

[50]    *See* Section III. A. 3 of this outline for discussion of exemption from registration for foreign private advisers.

[51]    Sections 203A(a)(1)(B); 203A(a)(2)(A).

[52]    *See* Instructions for Item 2 of Part 1A of Form ADV.

[53]    Section 203A(a)(2)(A). *See also* Item 2.A.(6) of Part 1A of Form ADV.

[54]    Rule 203(A)-2(a). In June 2011, the SEC increased the plan assets threshold required for pension consultants from $50 million to $200 million. *See* Release 3221, *supra* note 46. In May 2005, the SEC staff published a report detailing concerns with conflicts of pension fund consultants who help pension managers evaluate money managers. *See Staff Report Concerning Staff Examinations of Certain Select Pension Fund Consultants*, *available at* www.sec.gov/news/studies/pensionexamstudy.pdf. The SEC settled an administrative proceeding with a pension consultant that breached its fiduciary obligations by failing to disclose conflicts of interest. *In the Matter of Yanni Partners, Inc.*, Investment Advisers Act Release No. 2643 (Sept. 4, 2007) (pension consultant held itself out to be "independent" of money managers sold subscriptions to data base to money managers it was evaluating).

[55]    Rule 203A-2(b).

[56]    Rule 203A-2(c). An adviser relying on this exception must file an amendment to its Form ADV at the end of the 120 days indicating whether it has become eligible for SEC registration, or must withdraw its SEC registration. An adviser that expects to be eligible for SEC registration because of the amount of its assets under management must have $100M or more of assets under management no later than 120 days after its registration is declared effective. *See* Instructions for Item 2 of Part 1A of Form ADV.

   f. *Multi-State Advisers*.  Advisers that would otherwise be obligated to register with 15 or more states may register with the SEC.[57]

   g. *Internet Advisers.*  Certain advisers who provide advice though an interactive web site may register with the SEC.[58]

  3. *State Law Still Applicable to SEC-Registered Advisers.*  Although state investment adviser statutes do not apply to SEC-registered advisers, other state laws, including other state securities laws, do apply.  In addition, state laws may (and most state laws continue to) require an SEC-registered adviser to:

   a. comply with state anti-fraud prohibitions;

   b. provide the state regulator with a copy of its SEC registration;

   c. pay state licensing and renewal fees; and

   d. license persons giving advice on behalf of the adviser, but only if the person has a place of business in the state.[59]

  4. *Federal Anti-Fraud Law Still Applicable to State-Registered Advisers*.  The SEC continues to institute enforcement actions against state-registered advisers charging violations of section 206 of the Act.[60]

 B. <u>Exemptions from Registration</u>

  The Advisers Act provides several exemptions from registration.  The exemptions are voluntary; advisers eligible for them can nonetheless register with the SEC.[61]

  1. *Intrastate Advisers*.  Available to an adviser (i) all of whose clients are residents of the state in which the adviser maintains its principal office and place of business and (ii) that does not give advice about securities on any

---

[57] Section 203A(a)(2)(A); Rule 203A-2(d).

[58] Rule 203A-2(e).  *Exemption for Certain Investment Advisers Operating Through the Internet*, Investment Advisers Act Release No. 2091 (Dec. 12, 2002), *available at* http://www.sec.gov/rules/final/finalarchive/finalarchive2002.shtml.

[59] SEC-registered advisers can comply with state requirements that they provide states with a copy of their registration (so-called "notice filings"), pay state registration fees, and license advisory personnel (in most states) through the electronic filing system (IARD) discussed below.

[60] *See, e.g.*, *In the Matter of James William Fuller*, Investment Advisers Act Release No. 1842 (Oct. 4, 1999); *In the Matter of Robert Radano*, Investment Advisers Act Release No. 2750 (June 30, 2008); *SEC v. Aaron Donald Vallett and A.D. Vallett & Co., LLC*, Litigation Release No. 21557 (June 16, 2010).  Most of the anti-fraud rules adopted by the SEC pursuant to its authority under section 206(4) of the Act (and discussed below) are not applicable to state-registered advisers.  States have, however, adopted similar rules in many cases.

[61] Persons who voluntarily register under the Advisers Act, in circumstances where their registration may not be required, are subject to all of the provisions and rules under the Advisers Act applicable to persons required to register. *See* Release 870, *supra* note 28.  State regulatory law is not preempted for an adviser taking advantage of one of the exceptions from registration and thus the adviser may be required to register with one or more state securities regulators.  *See* discussion of state preemption in Section III. A. of this outline.

11

national exchange.[62]

Updated → 2. *Advisers to Insurance Companies.*  Available to an adviser whose only clients are insurance companies.[63]

3. *Foreign Private Advisers.*  Available to an adviser that (i) has no place of business in the United States; (ii) has, in total, fewer than 15 clients in the United States *and investors* in the United States in private funds advised by the adviser; (iii) has aggregate assets under management attributable to these clients and investors of less than $25 million; and (iv) does not hold itself out generally to the public in the United States as an investment adviser.[64]

*The exemption for foreign private advisers was added by the Dodd-Frank Act and replaces the private adviser exemption (i.e., an exemption for any adviser with fewer than 15 clients) previously provided by the same section of the Act, which was repealed.  The SEC incorporated many of the rules from "old" section 203(b)(3).*

a. *Counting Clients*

(i) *Multiple Persons as a Single Client.*  Rule 202(a)(30)-1 provides that the following can be considered a single client:[65]

(A) a natural person and (i) any minor child of the natural person; (ii) any relative, spouse, spousal equivalent, or relative of the spouse or of the spousal equivalent of the natural person with the same principal residence; and (iii) all accounts or trusts of which the persons described above are the only primary beneficiaries; or

(B) a corporation, general or limited partnership, limited liability company, trusts or other legal organization that receives investment advice based on its investment objectives (rather than the individual investment objectives of its owners),[66]

---

[62]  Section 203(b)(1).  The SEC staff takes the position that advice regarding investment companies involves advice about "listed securities" if the investment company invests in listed securities.  *Roy Heybrock*, SEC Staff No-Action Letter (Apr. 5, 1992).

[63]  Section 203(b)(2).  *See also TACT Asset Mgmt., Inc.*, SEC Staff No-Action Letter (Oct. 24, 2012) (stating that the staff would not recommend enforcement proceedings if a U.S. investment adviser whose only client is a foreign insurance company does not register with the SEC).

[64]  Section 203(b)(3) (exempting "any investment adviser that is a foreign private adviser"); Section 202(a)(30) (defining a "foreign private adviser").  Rule 202(a)(30) defines the term "in the United States" by reference to the definitions of a "U.S. person" and the "United States" in Regulation S under the Securities Act, except that the rule treats as "in the United States" any discretionary account owned by a U.S. person and managed by a non-U.S. affiliate of the adviser.  An adviser must assess whether a person is "in the United States" at the time the person becomes a client or, in the case of an investor in a private fund, each time the investor acquires securities issued by the fund.  *See* rule 202(a)(30)-1, at note to paragraph (c)(3)(i).

[65]  Rule 202(a)(30)-1.  The rule provides a non-exclusive safe harbor for counting clients for purposes of section 203(b)(3).  *See* rule 202(a)(30)-1, at note to paragraphs (a) and (b).

[66]  An adviser must count an owner (*e.g.*, a limited partner) as a client if it provides advice to that owner "separate and apart" from the advice provided to the entity.  Rule 202(a)(30)-1(b)(1).  *Cf. Latham &*

and two or more of these entities that have identical owners.

    (ii)    *"Look through" private funds.* An adviser must count both its direct clients and each investor in any "private fund" it advises.

*No Double Counting.* An adviser may treat as a single investor any person who is an investor in two or more of the adviser's private funds.[67]

*Nominal Holders.* An adviser may be required to also "look through" persons who are nominal holders of a security issued by a private fund to count the investors in the nominal holder when determining if the adviser qualifies for the exemption. For example, holders of the securities of any feeder fund in a master-feeder arrangement may be deemed to be the investors of the master fund.[68]

    b.    *Holding Out.* The SEC staff views a person as holding himself out as an adviser if he advertises as an investment adviser or financial planner, uses letterhead indicating activity as an investment adviser, or maintains a telephone listing or otherwise lets it be known that he will accept new advisory clients,[69] or hires a person to solicit clients on his behalf.[70]

    (i)    *Participation in Non-Public Offerings.* Foreign private advisers will not be deemed to be holding themselves out generally to the public in the United States as an investment adviser solely because they participate in a non-public offering in the United States of securities issued by a private fund pursuant to an exemption from registration under the Securities Act of 1933.[71]

    (ii)    *Use of the Internet.* An adviser using the Internet to provide information about itself ordinarily would be "holding itself out" as an adviser. However, the SEC has stated that it will not consider a non-U.S. adviser, including foreign private advisers, to be holding itself out as an adviser if:

    (A)    *Prominent Disclaimer.* The adviser's web site includes a

---

[67]    *Watkins*, SEC Staff No-Action Letter (Aug. 24, 1998); *Burr, Egan, Deleage & Co., Inc.*, SEC Staff No-Action Letter (Apr. 27, 1987).

[67]    Rule 202(a)(30)-1, at note to paragraph (c)(2).

[68]    *Exemptions for Advisers to Venture Capital Funds, Private Fund Advisers With Less Than $150 Million in Assets Under Management, and Foreign Private Advisers*, Investment Advisers Act Release No.3222 (June 22, 2011)("Release 3222") at Section II.C.2.

[69]    *See, e.g.*, *William Bloor*, SEC Staff No-Action Letter (Feb. 15, 1980); *Richard J. Shaker*, SEC Staff No-Action Letter (Aug. 1, 1977); *Al O'Brien Associates*, SEC Staff No-Action Letter (Oct. 6, 1973).

[70]    Investment Advisers Act Release No. 688 (July 15, 1979) at n.9. *See also Lamp Technologies, Inc.*, SEC Staff No-Action Letter (May 29, 1997) (investment adviser not "holding itself out generally to the public as an investment adviser" solely by virtue of posting information about certain private funds (*e.g.*, hedge funds) on a password-protected web site that is accessible only by accredited investors).

[71]    Rule 202(a)(30)-1(d).

        prominent disclaimer making it clear that its web site
        materials are not directed to U.S. persons; and

    (B)   *Procedures.*  The adviser implements procedures reasonably
        designed to guard against directing information about its
        advisory services to U.S. persons (*e.g.*, obtaining residency
        information before sending further information).[72]

4.   *Charitable Organizations and Plans.*  Available to an adviser that is a
charitable organization or a charitable organization's employee benefit plan,
including a trustee, officer, employee, or volunteer of the organization or
plan to the extent that the person is acting within the scope of his
employment or duties.[73]

5.   *Commodity Trading Advisors*

   a.   *Generally.*  Available to any adviser that is registered with the U.S.
     Commodity Futures Trading Commission ("CFTC") as a commodity
     trading advisor and whose business does not consist primarily of acting
     as an investment adviser and that does not advise a registered
     investment company or a business development company.[74]

   b.   *Commodity Trading Advisors to Private Funds.*  Available to any
     adviser registered with the CFTC as a commodity trading advisor that
     advises a private fund, provided that the adviser must register with the
     SEC if its business becomes predominantly the provision of securities-
     related advice.[75]

6.   *Private Fund Advisers.*  Available to an adviser solely to private funds that
has less than $150 million in assets under management in the United
States.[76]  An adviser that has any other type of client is not eligible for the
exemption.[77]

---

[72]   *Statement of the Commission Regarding Use of Internet Web Sites to Offer Securities, Solicit Securities
Transactions or Advertise Investment Services Offshore*, Investment Advisers Act Release No. 1710
(Mar. 23, 1998) section VI, *available at*
http://www.sec.gov/rules/interp/interparchive/interparch1998.shtml.

[73]   Sections 203(b)(4) and (5) were added by the *Philanthropy Protection Act of 1995*, Pub. L. No. 104-62,
109 Stat. 682 (1995). *See also Sisters of Mercy*, SEC Staff No-Action Letter (Oct. 1, 2009).

[74]   Section 203(b)(6) (re-designated as 203(b)(6)(A) by Dodd-Frank Act) was added by the *Commodity
Futures Modernization Act of 2000*, Pub. L. No. 106-554, 114 Stat. 2763 (2000), which also amended
the Act's definition of "security" in section 202(a)(18) of the Act to include certain "securities futures."
The Act repealed the ban on single stock or narrow-based stock index futures and established a
framework for shared jurisdiction over the trading of these instruments and market participants. *See*
Exchange Act Release No. 44288 (May 9, 2001), *available at* http://www.sec.gov/rules/proposed/34-
44288.htm.

[75]   Section 203(b)(6)(B) of the Advisers Act (added by the Dodd-Frank Act).

[76]   Section 203(m) of the Advisers Act (added by the Dodd-Frank Act).   The SEC adopted rule 203(m)-1
on June 22, 2011 to implement the section. *See* Release 3222, *supra* note 68.

[77]   Two nominally separate but related advisers may be considered to be one adviser (and their assets
aggregated) if they do not operate sufficiently independent of one another.

   a.   *Private Funds.*  A "private fund" is an issuer of securities that would be an investment company "but for" the exceptions provided for in section 3(c)(1) or 3(c)(7) of the Investment Company Act.[78]

      (i)   Section 3(c)(1) is available to a fund that does not publicly offer its securities and has 100 or fewer beneficial owners of its outstanding securities.

      (ii)   Section 3(c)(7) is available to a fund that does not publicly offer its securities and limits its owners to qualified purchasers.[79]

   b.   *Calculating Private Fund Assets*

      (i)   *Method of Calculation.*  Generally, advisers must include the value of all private funds managed, including the value of any uncalled capital commitments.[80]  Value is based on market value of those assets, or the fair value of those assets where market value is unavailable, and must calculate the assets on a gross basis, *i.e.,* without deducting liabilities, such as accrued fees and expenses or the amount of any borrowing.[81]

      (ii)   *Annual Assessment.*  An adviser must assess annually whether it has $150 million or more of private fund assets under management. An adviser that meets or exceeds the $150 threshold must register with the Commission.[82]

   c.   *Non-U.S. Advisers.*  An adviser with a principal office and place of business outside the United States may exclude consideration of non-U.S. clients, *i.e.,* it may rely on the exemption if (a) *all* of its clients that are United States persons[83] are qualifying private funds; and (b) any management at a U.S. place of business by the adviser is solely

---

[78]   Section 202(a)(29) of the Advisers Act.

[79]   The term "qualified purchasers" is defined in section 2(a)(51) of the Investment Company Act.

[80]   Form ADV: Instructions for Part 1A, instr. 5.b.(4). Proprietary assets, *i.e,* those of the adviser or its principals may not be excluded.  Form ADV: Instructions for Part1A, instr. 5.b.(1).

[81]   *Id.*  The SEC has recognized that, although many advisers will calculate the fair value of their private fund assets in accordance with Generally Accepted Accounting Principles ("GAAP") or another international accounting standard, other advisers acting consistently and in good faith may utilize another fair valuation standard.  Release 3222, *supra* note 68 at nn.364-365 and accompanying text. Consistent with this good faith requirement, the SEC expects that an adviser that calculates fair value in accordance with GAAP or another basis of accounting for financial reporting purposes will also use that same basis for purposes of determining the fair value of its regulatory assets under management. *Id.* at n.365.

[82]   Rule 203(m)-1(c).  A private fund adviser that had complied with all SEC reporting requirements applicable to an exempt reporting adviser, but reported in its annual updating amendment that fund assets exceeded $150 million, has up to 90 days after filing the annual updating amendment to apply for SEC registration, and may continue doing business as a private fund adviser during this time. General Instruction 15 to Form ADV.

[83]   Similar to the foreign private adviser exemption, a "United States person" generally is a "U.S. person," as defined in Regulation S under the Securities Act, except that a discretionary or other fiduciary account also is a "United States person" if the account is held for the benefit of a United States person by a non-U.S. fiduciary who is a related person of the adviser.  Rule 203(m)-1(d)(8).

attributed to $150 million of private fund assets.[84]

    d.   *Annual Report.*  An adviser relying on the private fund adviser exemption must annually file a report on Form ADV to the SEC [85] and is subject to examination.  Other provisions of the Act and SEC rules applicable only to registered advisers do not apply.  The SEC refers to these advisers as "exempt reporting advisers."

    7.   *Venture Capital Advisers.*  Available to an adviser that solely advises one or more "venture capital funds" as defined by SEC rule (regardless of the amount of assets managed).[86]

        a.   *Definition*.  To qualify as a "venture capital fund," a fund must be a "private fund"[87] that:

            (i)   represents to investors that the fund pursues a venture capital strategy;[88]

            (ii)   does not provide investors with redemption rights;[89]

            (iii)   holds no more than 20% of the fund's assets in non-"qualifying investments" (excluding cash and certain short-term holdings)

                *Qualifying investment* means generally directly acquired investments in equity securities of private companies (generally, companies that at the time of investment have not made a public offering) and that do not incur leverage or borrow in connection with the venture capital fund investment and distribute proceeds of such borrowing to the fund (*i.e.*, have not been acquired in a leveraged buy-out transaction); and

            (iv)   does not borrow (or otherwise incur leverage) more than 15% of the fund's assets, and then only on a short-term basis (*i.e.*, for no more than 120-days).[90]

---

[84]   Rule 203(m)-1(b)(1) and (2).  The term "place of business" has the same meaning as in the exemption for foreign private advisers, discussed above.  *See* Section III. B. 3. of this outline.  Rule 203(m)-1(d)(2).

[85]   Rule 204-2.  The report must be filed within 60 days of relying on the private fund adviser exemption.  Only portions of Form ADV must be completed.  General Instruction 13 to Form ADV.  An exempt reporting adviser is not required to deliver a brochure to its clients. General Instruction 3 to Form ADV.

[86]   Section 203(l) of the Advisers Act (added by the Dodd-Frank Act).  The SEC adopted rule 203(l)-1 on June 22, 2011 to implement the section.  *See* Release 3222, *supra* note 68.

[87]   Rule 203(l)-1(a)(5).  In addition, the fund cannot be registered under the Investment Company Act or have elected to be treated as a business development company as defined by that Act.  Rule 203(l)-1(a)(5).

[88]   Rule 203(l)-1(a)(1).

[89]   Rule 203(l)-1(a)(4) (the rule permits exceptions in extraordinary circumstances).

[90]   Rule 203(l)-1 contains a grandfathering provision for certain private funds that have sold their initial interests in the fund by December 31, 2010, provided that they have represented to their investors that

      b.   *Non-U.S. Advisers.*  The exemption is available to a non-U.S. adviser, but (unlike the private fund adviser exception) such an adviser may not disregard its non-U.S. advisory activities.[91] Thus, all of an adviser's clients, including non-U.S. clients, must be venture capital funds.[92]

      c.   *Annual Reporting.*  An adviser relying on the venture capital adviser exemption must annually file a report on Form ADV to the SEC,[93] and is subject to examination.  Other provisions of the Act and SEC rules applicable only to registered advisers do not apply.  The SEC also refers to these advisers as "exempt reporting advisers."

8.    *Advisers to Small Business Investment Companies ("SBICs").*  SBICs, licensed by the Small Business Administration, are privately owned and managed investment firms that provide venture capital to small businesses from the SBIC's own capital and from funds the SBIC is able to borrow at favorable rates through the federal government.[94]

## IV. Who Must Register Under the Advisers Act?

A.   <u>The Advisory Firm</u>

Although many individuals who are employed by advisers fall within the definition of "investment adviser," the SEC generally does not require those individuals to register as advisers with the SEC.  Instead, the advisory firm must register with the SEC.  The adviser's registration covers its employees *and* other persons under its control, provided that their advisory activities are undertaken on the adviser's behalf.[95]

B.   <u>Affiliates</u>

1.   *Integration.*  The SEC staff takes the view that advisers and their affiliates cannot circumvent the disclosure and other requirements of the Act by separately registering under the Act if they are operationally integrated, *e.g.*, have the same personnel, capital structures, and investment decision-making functions.[96]

---

they pursue a venture capital strategy and that they do not issue any interests to any person after July 21, 2011.

[91]   Release 3222, *supra* note 68.

[92]   Rule 203(l)-1 contains a note the effect of which is to permit a non-U.S. adviser to treat a foreign fund it advises as a "private fund" even if the fund does not meet the Act's definition of a private fund because it is not relying on a statutory exemption from the Investment Company Act, but is rather relying on the lack of jurisdiction of the U.S.  Release 3222, *supra* note 68.

[93]   Rule 204-2.  *See supra* note 85 for a summary of reporting requirements.

[94]   Section 203(b)(7) (added by the Dodd-Frank Act).

[95]   Investment Advisers Act Release No. 688 (July 12, 1979) (persons associated with registered adviser need not separately register as investment advisers solely as a result of their activities as associated persons).  *See also Kevin J. Hughes*, SEC Staff No-Action Letter (Dec. 7, 1983).

[96]   The determination of whether an advisory business of two separately formed affiliates may be required to be integrated is based on the facts and circumstances.  Release 3222, *supra* note 68.  *See Richard*

*For example, an adviser managing $200 million of private fund assets could not simply reorganize as two separate advisers each of which purported to rely on the private fund adviser exemption from registration.[97]*

2.  *Participating Non-U.S. Affiliates.*  The SEC staff takes the view that, under certain conditions, a non-U.S. adviser (a "participating affiliate") does not have to register under the Act if it provides advice to U.S. persons through a registered affiliate.[98]  The conditions that must be satisfied include the following:

    a.  an unregistered adviser and its registered affiliate must be separately organized;

    b.  the registered affiliate must be staffed with personnel (located in the U.S. or abroad) who are capable of providing investment advice;

    c.  all personnel of the participating affiliate involved in U.S. advisory activities must be deemed "associated persons"[99] of the registered affiliate; and

    d.  the SEC must have adequate access to trading and other records of the unregistered adviser and to its personnel to the extent necessary to enable the SEC to monitor and police conduct that may harm U.S. clients or markets.[100]

    *The Commission affirmed these staff positions in the context of the private adviser exemptions.[101]*

3.  *Joint Registration of Affiliates.*

    a.  *Special Purpose Vehicles.*  The SEC staff takes the position that a special purpose vehicle ("SPV") set up by a registered investment adviser to serve as the general partner of a pooled investment vehicle (*e.g.*, a hedge fund) does not have to separately register as an investment adviser if all of the activities of the SPV are subject to the registered adviser's supervision and control,[102] its employees are

---

*Ellis*, SEC Staff No-Action Letter (Sept. 17, 1981); *Kenneth Levanthal*, SEC Staff No-Action Letter (Feb. 7, 1983).  *See also Price Waterhouse*, SEC Staff No-Action Letter (Nov. 22, 1988).

[97]   Release 3222, *supra* note 68, at Section II.D.

[98]   *See Uniao de Bancos de Brasilerios, S.A.*, SEC Staff No-Action Letter (July 28, 1992); *Mercury Asset Management*, SEC Staff No-Action Letter (Apr. 16, 1993); *Kleinwort Benson Investment Management Ltd.*, SEC Staff No-Action Letter (Dec. 15, 1993); *Murray Johnston Holdings Ltd.*, SEC Staff No-Action Letter (Oct. 7, 1994).  *See also* Section II. C. of Release 3222 and Section III. B. 3 of this outline regarding the exemption for foreign private advisers.

[99]   *See* Section V. A. 1 of this outline for the definition of "person associated with an investment adviser."

[100]  *See id*.

[101]  Release 3222, *supra* note 68, at Section II.D.

[102]  For guidance regarding application of the staff's position with respect to directors of an SPV that are independent of the investment adviser, *see American Bar Association Subcommittee on Hedge Funds*, SEC Staff Letter (Jan. 18, 2012) ("ABA Letter 2012"), Question 3, *available at* http://www.sec.gov/divisions/investment/noaction/2012/aba011812.htm.

treated as "supervised persons" of the registered adviser and reported as such on its Form ADV, and the SPV is subject to examination by the SEC.[103] The SEC staff takes the view that this analysis is not limited to a registered adviser with a single SPV.[104]

b.  *Multiple Entities in Control Relationships.* The SEC staff has taken the position that an investment adviser may file (or amend) a single Form ADV on behalf of itself and each other adviser that is under common control with the filing adviser where the filing adviser and each relying adviser collectively conduct a "single advisory business."[105]

## V.  How Does an Investment Adviser Register Under the Advisers Act?

A.  <u>Procedure</u>

Applicants for registration under the Act must file Form ADV with the SEC. Within 45 days the SEC must grant registration or institute an administrative proceeding to determine whether registration should be denied.

1.  *Denial of Registration.* The SEC may deny registration if the adviser is subject to a "Statutory Disqualification," that is, if the adviser or any "person associated with the adviser" makes false or misleading statements in its registration application, has within the past 10 years been convicted of a felony, or if it has been convicted by a court or found by the SEC to have violated a securities-related statute or rule, or have been the subject of a securities-related injunction, or similar legal action.[106]

*Person Associated with An Investment Adviser.* These include employees (other than clerical employees) of the advisers as well as any persons who directly or indirectly control the investment adviser or are controlled by the adviser.[107] The SEC can deny registration if, for example, the parent company of an adviser has been convicted of securities fraud even if the adviser and its employees have not.

*Non-U.S. Based Offenses.* Statutory Disqualifications include convictions in

---

[103]  *American Bar Association Subcommittee on Private Entities*, SEC Staff Letter (Dec. 8, 2005) ("ABA Letter 2005"), Question G1, *available at* http://www.sec.gov/divisions/investment/noaction/aba120805.htm.

[104]  ABA Letter 2012, Question 2. Similarly, under certain circumstances, the staff has indicated that an exempt reporting adviser to which a private fund's day-to-day management responsibility has been delegated may satisfy the Form ADV reporting obligations of one or more special purpose entities. *See* "FAQs" regarding Reporting to the SEC as an Exempt Reporting Adviser ("ERA FAQs") *available at* http://www.sec.gov/divisions/investment/iard/iardfaq.shtml#exemptreportingadviser.

[105]  *See id.* Question 4 (outlining the circumstances under which a filing adviser and one or more relying advisers would, in the staff's view, collectively conduct a single advisory business absent other factors suggesting that they conduct different businesses). Likewise, under certain circumstances, the staff has indicated that an exempt reporting adviser may satisfy the Form ADV reporting obligations of one or more special purpose entities under its control. *See* ERA FAQs.

[106]  Sections 203(c)(2) and (e).

[107]  Section 202(a)(17).

non-U.S. courts, and by findings of violations by "foreign financial regulatory authorities" enforcing non-U.S. laws.[108]

2. *Qualifications.* There are no "fit and proper" or educational requirements for registration as an investment adviser, although certain employees of the adviser may have to pass securities examinations in the states in which they have a principal place of business. Instead, advisers must disclose to clients the background and qualifications of certain of their personnel.[109]

B.  Form ADV

Form ADV sets forth the information that the SEC requires advisers to provide in an application for registration.  Once registered, an adviser must update the form at least once a year, and more frequently if required by instructions to the form.[110] Form ADV consists of two parts.[111]

1. *Part 1.* Part 1 is primarily for SEC use.  It requires information about the adviser's business, ownership, clients, employees, business practices (especially those involving potential conflicts with clients), and any disciplinary events of the adviser or its employees.  The SEC uses information from this part of the form to make its registration determination and to manage its regulatory and examination programs.  Part 1 is organized in a check-the-box, fill-in-the-blank format.

On June 22, 2011, the SEC amended Part 1A to expand the information collected, primarily from advisers to hedge funds and other private funds in order to improve the SEC's ability to oversee registered advisers.  Amended Part 1A requires advisers to provide additional information about three areas of their operations: (i) additional information about private funds they advise; (ii) expanded data provided by advisers about their advisory business (including the types of clients they have, their employees, and their advisory activities), as well as about their business practices that may present significant conflicts of interest; (iii) additional information about advisers' non-advisory activities and their financial industry affiliations.[112]

2. *Part 2.* Amended in 2010, Part 2 is divided into Part 2A and Part 2B and sets forth information required in client brochures and brochure supplements.[113]

---

[108]  Sections 203(c)(2) and (e).  Non-U.S. based offenses were added to section 203(e) in 1990 by the International Securities Enforcement Cooperation Act of 1990, Pub. L. No. 101-550, 104 Stat. 2713 (Nov. 15, 1990).

[109]  Form ADV, Part 2B.

[110]  Rule 204-1(a).

[111]  Both Part 1 and Part 2A of the Form ADV are filed by registered advisers through the IARD system and are available to the public on the Investment Adviser Public Disclosure Website at http://www.adviserinfo.sec.gov/(S(hdqosw4svnoutoxsmgo4mizx))/IAPD/Content/IapdMain/iapd_Site Map.aspx.

[112]  Release 3221, *supra* note 46.

[113]  On July 28, 2010, the SEC adopted amendments to Part 2 of Form ADV. Investment Advisers Act Release No. 3060 (July, 2010), *available at* http://www.sec.gov/rules/final/2010/ia-3060.pdf ("Part 2

Brochure Part 2A requires an adviser to prepare a narrative "brochure" that includes plain English disclosures of, among other things, the adviser's business practices, investment strategies, fees, conflicts of interest, and disciplinary information.[114] Part 2B requires an adviser to prepare a "brochure supplement" that contains information about each advisory employee that provides investment advice to its clients, including her educational background, business experience, other business activities, and disciplinary history. To satisfy the "brochure rule" (discussed below),[115] the adviser must deliver the brochure (and updates to that brochure) to its clients annually and the brochure supplement about a supervisory employee to a client at the time the employee begins to provide advisory services to that client.[116] In addition, the adviser must file its brochure, but not its brochure supplement, with the SEC to satisfy its registration requirements.[117]

C.    Electronic Filing

All applications for registration as an adviser with the SEC must be submitted electronically through an Internet-based filing system called the Investment Adviser Registration Depository ("IARD").[118] The IARD is operated by the Financial Industry Regulatory Authority ("FINRA"), the broker-dealer self-regulator (formerly, NASD).[119]

D.    Public Availability

All current information from advisers' Form ADVs filed with the SEC is publicly available through an SEC web-site: www.adviserinfo.sec.gov.

E.    Withdrawal of Registration

Advisers withdraw from registration by filing Form ADV-W.[120] An adviser may withdraw from registration because it: (i) ceases to be an investment adviser; (ii) is entitled to an exception from the registration requirements; or (iii) no longer is eligible for SEC registration (*e.g.*, it no longer has the requisite amount of assets

---

Adopting Release"). For staff responses to frequently asked questions about the amended Part 2, visit the SEC's website at http://www.sec.gov/divisions/investment/form-adv-part-2-faq.htm ("Part 2 FAQs").

[114]    Prior to the 2010 amendments, Part II of Form ADV was in a check-the-box, fill-in-the-blank format.

[115]    Rule 204-3.

[116]    Rule 204-3(b)(3). For specific delivery requirements under the brochure rule, see Section VI. B. 12 below.

[117]    Rule 203-1(a); Rule 204-1(b)(1).

[118]    Rule 203-1(b). FINRA charges advisers filing fees to defray the cost of maintaining and operating the IARD. To pay the fees, advisers must establish and fund an account with FINRA before making a filing. A fee schedule is available at www.sec.gov/divisions/investment/iard/iardfee.shtml.

[119]    Rule 204-1(b). For information about electronic filing by advisers, *see* www.sec.gov/iard. FINRA does not act as a self-regulatory organization with respect to investment advisers.

[120]    Rule 203-2. Form ADV-W filings are made electronically through the IARD, and are effective immediately. There are no filing fees for Form ADV-W.

21

under management).[121]  The SEC also has the authority under section 203(f) of the
Advisers Act to revoke the registration of an adviser under certain enumerated
circumstances.

F.    Successor Registrations

An unregistered person that assumes and continues the business of a registered
investment adviser (which then ceases to do business) may rely on the registration
of the investment adviser by filing an application for registration within 30 days of
the succession.[122]

## VI.  What Are the Requirements Applicable to a Registered Investment Adviser?

The Advisers Act does not provide a comprehensive regulatory regime for advisers, but
rather imposes on them a broad fiduciary duty to act in the best interest of their clients.
As the Commission explained:

Unlike the laws of many other countries, the U.S. federal securities laws do not
prescribe minimum experience or qualification requirements for persons providing
investment advice.  They do not establish maximum fees that advisers may
charge.  Nor do they preclude advisers from having substantial conflicts of interest
that might adversely affect the objectivity of the advice they provide.  Rather,
investors have the responsibility, based on disclosure they receive, for selecting
their own advisers, negotiating their own fee arrangements, and evaluating their
advisers' conflicts.[123]

There are five types of requirements on an adviser:  (i) fiduciary duties to clients; (ii)
substantive prohibitions and requirements; (iii) contractual requirements;
(iv) recordkeeping requirements; and (v) administrative oversight by the SEC, primarily
by inspection.

A.    Fiduciary Duties to Clients

Fundamental to the Act is the notion that an adviser is a fiduciary.  As a fiduciary,
an adviser must avoid conflicts of interest with clients and is prohibited from
overreaching or taking unfair advantage of a client's trust.  A fiduciary owes its
clients more than mere honesty and good faith alone.  A fiduciary must be
sensitive to the conscious and unconscious possibility of providing less than
disinterested advice, and it may be faulted even when it does not intend to injure a
client and even if the client does not suffer a monetary loss.[124]  The landmark

---

[121]    Before withdrawing from registration, an adviser must arrange for the preservation of records it is
required to keep under the Act.  Rule 204-2(f).

[122]    Section 203(g).  *See* Instruction 4 to Part 1A of Form ADV; *Registration of Successors to Broker-
Dealers and Investment Advisers*, Investment Advisers Act Release No. 1357 (Dec. 28, 1992) (the
provision in rule 203-1 referred to in Release 1357 that addressed successions was moved by the SEC
to Instruction 4 to Form ADV in 2000).  A succession resulting from a change in the place or form of
organization, or composition of a partnership, *i.e.*, a succession that does not involve a change of
control, may be completed by amending the predecessor's Form ADV promptly after the succession.
*Id.*

[123]    *See Amendments to Form ADV*, Investment Advisers Act Release No. 2711 (Mar. 3, 2008).

[124]    *SEC v. Capital Gains Research Bureau, supra* note 2, at 191-192.

court decision defining the duties of a fiduciary is Justice Cardozo's opinion in
*Meinhard v. Salmon,* in which he explains that:

> Many forms of conduct permissible in the workaday world for those acting
> at arm's length are forbidden by those bound by fiduciary ties.  A fiduciary
> is held to something stricter than the morals of the marketplace.  Not honesty
> alone, but the punctilio of an honor the most sensitive, is then the standard of
> behavior.[125]

These concepts are embodied in the anti-fraud provisions of the Advisers Act.  As
the Supreme Court stated in *SEC v. Capital Gains Research Bureau, Inc.*, its
seminal decision on the fiduciary duties of an adviser under the Act:

> [t]he Investment Advisers Act of 1940 reflects a congressional recognition
> of the delicate fiduciary nature of an investment advisory relationship as
> well as a congressional intent to eliminate, or at least to expose, all conflicts
> of interest which might incline an investment adviser—consciously or
> unconsciously—to render advice which was not disinterested.[126]

The duty is not specifically set forth in the Act, established by SEC rules, or a
result of a contract between the adviser and the client (and thus it cannot be
negotiated away).  Rather, fiduciary duties are imposed on an adviser by operation
of law because of the nature of the relationship between the two parties.[127]  It is
made enforceable by section 206 of the Act,[128] which contains the Act's anti-fraud
provisions, and incorporated indirectly into the Act in various provisions and
disclosure requirements discussed below.[129]

Several obligations flow from an adviser's fiduciary duties.

1.   *Full Disclosure of Material Facts*.  Under the Act, an adviser has an
     affirmative obligation of utmost good faith and full and fair disclosure of all
     facts material to the client's engagement of the adviser to its clients, as well
     as a duty to avoid misleading them.[130]  Accordingly, the duty of an
     investment adviser to refrain from fraudulent conduct includes an obligation
     to disclose material facts to its clients whenever failure to do so would
     defraud or operate as a fraud or deceit upon any client.

     *Conflicts of Interest*.  This disclosure of material facts is particularly
     pertinent whenever the adviser is faced with a conflict—or a potential

---

[125]   164 N.E. 545, 546 (N.Y. 1928).

[126]   *SEC v. Capital Gains Research Bureau, supra* note 2, at 190-192.

[127]   *See In the Matter of Arleen W. Hughes*, Exchange Act Release No. 4048 (Feb 18, 1948).

[128]   *Transamerica Mortgage Advisors v. Lewis,* 444 U.S. 11 (1979) ("[T]he Act's legislative history leaves
no doubt that Congress intended to impose enforceable fiduciary obligations.").

[129]   *See Morris v. Wachovia Securities, Inc.,* 277 F. Supp. 2d 622 (E.D. Va. 2003) ("§206(2) is more than
an anti-fraud provision because it establishes fiduciary duties for investment advisers.").  The scope
of the fiduciary duties is determined by reference to federal court and administrative decisions rather than
state common law analogies.  *Laird v. Integrated Resources, Inc.,* 897 F.2d 826 (5th Cir. 1990)
("[B]ecause state law is not considered, uniformity is promoted.").

[130]   *See In the Matter of Arleen W. Hughes, supra* note 127.

conflict— of interest with a client.  As a general matter, the SEC has stated that the adviser must disclose all material facts regarding the conflict so that the client can make an informed decision whether to enter into or continue an advisory relationship with the adviser, or take some action to protect himself or herself against the conflict.[131]

*Disciplinary Events and Precarious Financial Condition*.  The SEC requires a registered adviser to disclose to clients and prospective clients material facts about:

    a.    a financial condition of the adviser that is reasonably likely to impair the adviser's ability to meet contractual commitments to clients;[132] and

    b.    certain disciplinary events of the adviser (and certain of its officers) occurring within the past 10 years, which are presumptively material.[133]

2.    *Suitable Advice.*  Advisers owe their clients a duty to provide only suitable investment advice.  This duty generally requires an adviser to make a reasonable inquiry into the client's financial situation, investment experience and investment objectives, and to make a reasonable determination that the advice is suitable in light of the client's situation, experience and objectives.[134]

3.    *Reasonable Basis for Recommendations*.  An adviser must have a

---

[131]    Part 2 Adopting Release, *supra* note 113.  *See also SEC v. Capital Gains Research Bureau*, *supra* note 2, at 191-192 ("The Investment Advisers Act of 1940 thus reflects a congressional recognition of the delicate fiduciary nature of an investment advisory relationship, as well as a congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser— consciously or unconsciously—to render advice which was not disinterested.").

[132]    Item 18 of Part 1A, Form ADV.  This requirement is applicable to advisers that have discretionary authority with client accounts, or have custody of client assets, or require or solicit prepayment of more than $1,200 in fees per *client*, six months or more in advance.

[133]    Form ADV:  Item 11 of Part 1A; Item 9 of Part 2A, and Item 3 of Part 2B.

[134]    *See Suitability of Investment Advice Provided by Investment Advisers,* Investment Advisers Act Release No. 1406 (Mar. 16, 1994).  In that release, the SEC proposed a rule under the Act's anti-fraud provisions requiring advisers give clients only suitable advice.  Although the rule was never adopted, SEC staff believes that the rule would have codified existing suitability obligations of advisers and, as a result, the proposed rule reflects the current obligation of advisers under the Act.  Suitability obligations do not apply to impersonal investment advice, and compliance with the obligation is evaluated in the context of a client's overall portfolio.  *Id*.  "Thus, inclusion of some risky securities in the portfolio of a risk-averse client may not necessarily be unsuitable."  *Id*.  The SEC has instituted enforcement actions against advisers that provided unsuitable investment advice.  *See In the Matter of George E. Brooks & Associates, Inc*., Investment Advisers Act Release No. 1746 (Aug. 17, 1998) (adviser failed to appropriately diversify, and effected unsuitable trades of speculative high risk stocks in, the discretionary accounts of customers with conservative investment objectives, many of whom were elderly and had little investment experience); *In the Matter of Philip A. Lehman,* Investment Advisers Act Release No. 1831 (Sept. 22, 1999) (alleging adviser recommended risky investment for customer's individual retirement account, despite customer's conservative investment objective and age).

reasonable, independent basis for its recommendations.[135]

4.  *Best Execution.*  Where an adviser has responsibility to direct client brokerage, it has an obligation to *seek* best execution of clients' securities transactions.[136]  In meeting this obligation, an adviser must seek to obtain the execution of transactions for clients in such a manner that the client's total cost or proceeds in each transaction is the most favorable under the circumstances.[137]  In assessing whether this standard is met, an adviser should consider the full range and quality of a broker's services when placing brokerage, including, among other things, execution capability, commission rate, financial responsibility, responsiveness to the adviser, and the value of any research provided.[138]

*Interpositioning.*  An adviser will generally not obtain best execution if it interposes a broker that does not make a market in the security when it could have avoided the unnecessary commission payments by dealing directly with market makers.[139]

*Directed Trades.*  An adviser is relieved of this obligation when a client directs the adviser to use a particular broker.  An adviser may, however, be required to make additional disclosure to clients when it receives some benefit from the direction of the trade.[140]

---

[135]  *In the Matter of Alfred C. Rizzo*, Investment Advisers Act Release No. 897 (Jan 11, 1984) (investment adviser lacked a reasonable basis for advice and could not rely on "incredible claims" of issuer); *In the Matter of Baskin Planning Consultants, Ltd.*, Investment Advisers Act Release 1297 (Dec. 19, 1991) (adviser failed adequately to investigate recommendations to clients).

[136]  *In the Matter of Kidder Peabody & Co., Inc.*, Investment Advisers Act Release No. 232 (Oct. 16, 1968).  *See also* rule 206(3)-2(c) (acknowledging adviser's duty of best execution of client transactions).

[137]  This obligation is different from a broker-dealer's best execution obligation, which typically focuses on the price at which an order is executed and does not consider the broker's compensation, whereas an adviser's duty requires it to consider the total transaction cost to its client.  The SEC has brought enforcement actions against advisers alleging failure to seek best execution.  *See, e.g., In the Matter of Renberg Capital Management, Inc.*, Investment Advisers Act Release No. 2064 (Oct 1, 2002); *In the Matter of Portfolio Advisory Services, LLC*, Investment Advisers Act Release. No. 2038 (June 30, 2002).

[138]  *See Interpretive Release Concerning the Scope of Section 28(e) of the Securities Exchange Act of 1934 and Related Matters,* Exchange Act Release No. 23170 (Apr. 23, 1986) ("1986 Soft Dollar Release").  To fulfill this duty, an investment adviser should "periodically and systematically" evaluate the execution it is receiving for clients.  *Id.*  The scope of the duty evolves as changes occur in the market that give rise to improved execution, including opportunities to trade at more reasonable prices.  *See, e.g., Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 135 F.3d 266, 270-271 (3d Cir. 1998).  *See also, In the Matter of Jamison, Eaton & Wood, Inc.,* Investment Advisers Act Release No. 2129 (May 15, 2003); *In the Matter of Portfolio Advisory Services, LLC, supra* note 137.

[139]  *In the Matter of Delaware Management Company, Inc.*, Securities Exchange Act Release No. 8128 (July 19, 1967).

[140]  *See In the Matter of Mark Bailey & Co.*, Investment Advisers Act Release No. 1105 (Feb. 24, 1988) (adviser failed to disclose that it did not negotiate commissions on directed trades, and failed to disclose that the adviser would be in a better position to negotiate commissions in bunched transactions for non-directed trades, and violated anti-fraud provisions of Advisers Act); *Jamison, Eaton & Wood, Inc., supra* note 138.

*Use of Brokerage Affiliate.*  The Act does not prohibit advisers from using an affiliated broker to execute client trades.  However, use of an affiliate involves a conflict of interest that must be disclosed to client.[141]  For example, use of an affiliated broker may give the adviser incentive to "churn" the account.

*Soft Dollars.*  Section 28(e) of the Exchange Act provides a safe harbor from liability for breach of fiduciary duties when advisers purchase brokerage and research products and services with client commission dollars under specified circumstances.  In July 2006, the SEC issued a revised interpretation as to the scope of the safe harbor.[142]

Under section 28(e), an adviser that exercises investment discretion may lawfully pay commissions to a broker at rates higher than those offered by other brokers, as long as the services provided to the adviser by the broker-dealer: (i) are limited to "research" or "brokerage;" (ii) constitute lawful and appropriate assistance to the adviser in the performance of its investment decision-making responsibilities, and (iii) the adviser determines in good faith that the commission payments are reasonable in light of the value of the brokerage and research services received.

a.  *Research Services.* "Research" services generally include the furnishing of advice, analyses, or reports concerning securities, portfolio strategy and the performance of accounts, which means the research must reflect the expression of reasoning or knowledge relating to the statutory subject matter bearing on the investment decision-making of the adviser.  The SEC does not believe that products or services with "inherently tangible or physical attributes" meet this test.

(i)  Products or services generally falling within the safe harbor include traditional research reports, market data, discussions with research analysts, meetings with corporate executives, software that provides analysis of securities, and publications (other than mass-marketed publications).

---

[141]  *Folger Nolan Fleming Douglas Capital Management, Inc.*, Investment Advisers Act Release No. 2639 (Aug. 23, 2007) (adviser entered into agreements with clients to direct trades to affiliated broker without disclosing commission rates were twice as high as non-directed trades).  *See also* Investment Advisers Act Release 1092, *supra* note 3 (if an investment adviser recommends that a client effect transactions through its broker-dealer employer, the anti-fraud provisions of the Advisers Act require that the adviser make full disclosure of the nature and extent of all adverse interests, including the amount of any compensation the advisers will receive from its broker-dealer employer in connection such transactions); *Don P. Matheson*, SEC Staff No-Action Letter (Aug. 2, 1976) (investment advisers that are also broker-dealers or registered representatives have a duty to inform their investment advisory clients of their ability to seek executions of transactions recommended through other broker-dealers firms); *David P. Atkinson*, SEC Staff No-Action Letter (Aug. 1, 1977).

[142]  *Commission Guidance Regarding Client Commission Practices Under Section 28(e) of the Securities Exchange Act of 1934*, Exchange Act Release No. 34-54165 (July 18, 2006) ("2006 Soft Dollar Release"), *available at* http://www.sec.gov/rules/interp/2006/34-54165.pdf.  The release superseded parts (but not all) of the 1986 Soft Dollar Release.  In particular, the 2006 Soft Dollar Release does not replace Section IV of the 1986 Release, which discusses an investment adviser's disclosure obligations.

    (ii)    Products or services not within the safe harbor include computer hardware, telephone lines, peripherals; salaries, rent, travel, entertainment, and meals; software used for accounting, recordkeeping, client reporting, or other administrative functions; and marketing seminars and other marketing costs.

    (iii)   Where a product or service has uses both inside and outside the safe harbor, the SEC believes that an adviser should make a reasonable allocation of the cost of the product or service according to its use and keep adequate books and records concerning allocations so as to be able to make the required good faith showing.[143]

b.    *Brokerage Services.*  "Brokerage" generally includes activities related to effecting securities transactions and incidental functions.  According to the SEC, brokerage begins when the order is transmitted to the broker-dealer and ends when funds or securities are delivered to the client account.[144]

c.    *Commissions.*  The SEC interprets the safe harbor of section 28(e) as being available for research obtained in relation to commissions on agency transactions, and certain riskless principal transactions.[145]

d.    *Disclosure Obligations.*  Advisers are required to disclose to clients any soft dollar arrangements, regardless of whether the arrangements fall within the section 28(e) safe harbor.[146] Failure to disclose the receipt of products or services purchased with client commission dollars may constitute a breach of fiduciary duties and/or violation of specific provisions of the Advisers Act and other federal laws.[147]

---

[143]    *See id.*, at Section F, n. 148.

[144]    *Id.*

[145]    Exchange Act Release No. 45194 (Dec. 27, 2001) ("Release No. 45194"), *available at* http://www.sec.gov/rules/interp/interparchive/interparch2001.shtml.  In Release No. 45194, the SEC concluded with respect to riskless principal transactions that "[t]he term 'commission' in Section 28(e) . . . include[s] a markup, markdown, commission equivalent or other fee paid by a managed account to a dealer for executing a transaction where the fee and transaction price are fully and separately disclosed on the confirmation and the transaction is reported under conditions that provide independent and objective verification of the transaction prices subject to self-regulatory oversight."  The SEC staff had previously interpreted the safe harbor as being available only to agency transactions.  *Letter to Charles Lerner, Esq., Director of Enforcement, Pension and Welfare Benefit Administration, U.S. Department of Labor, from Richard Ketchum, Director, Division of Market Regulation, SEC* (July 25, 1990).

[146]    Form ADV, the registration form for advisers, requires that advisers disclose soft dollar arrangements. *See* Form ADV, Part 1A, Item 8; Part 2A, Item 12A.1.  *See also SEC Inspection Report on the Soft Dollar Practices of Broker-Dealers, Investment Advisers and Mutual Funds* (Sept. 22, 1998), *available at* http://www.sec.gov/news/studies/softdolr.htm.

[147]    *See, e.g., In the Matter of S Squared Technology Corporation*, Investment Advisers Act Release No. 1575 (Aug. 7, 1996) (adviser's failure to disclose its receipt of benefits in exchange for benefits received in exchange for direction of client brokerage violated section 206 of the Act); *In the Matter of Schultze Asset Management*, Investment Advisers Act Release No. 2633 (Aug. 15, 2007) (adviser

5.   *Proxy Voting*.  The SEC has stated that an adviser delegated authority to vote client proxies has a fiduciary duty to clients to vote the proxies in the best interest of its clients and cannot subrogate the client's interests to its own.[148]

B.   <u>Substantive Requirements</u>

The Act contains other, more specific prohibitions designed to prevent fraud.  In addition, the SEC has adopted several anti-fraud rules, which apply to advisers registered with the SEC.

1.   *Client Transactions*

a.   *Principal Transactions.*  Section 206(3) of the Act prohibits an adviser, acting as principal for its own account, from knowingly selling any security to or purchasing any security from a client for its own account, without disclosing to the client in writing the capacity in which it (or an affiliate[149]) is acting and obtaining the client's consent before the completion of the transaction.[150]  The SEC staff has stated that notification and consent must be obtained separately for each transaction, *i.e.,* a blanket consent for transactions is not sufficient.[151]

---

misrepresented to clients that it would restrict its use of soft dollars to cover only those expenses covered by section 28(e) when it used them to pay for operating expenses).

[148]   *Proxy Voting by Investment Advisers*, Investment Advisers Act Release No. 2106 (Jan. 31, 2003), *available at* http://www.sec.gov/rules/final/ia-2106.htm.  In this release, the SEC adopted rule 206(4)-6, which requires, among other things, each registered investment adviser that has voting authority over client securities to adopt and implement policies and procedures reasonably designed to ensure that client securities are voted in the best interest of clients.  The SEC has instituted enforcement action against an adviser that failed to disclose to clients its conflicts before voting their shares in a hotly contested proxy fight.  *In the Matter of Deutsche Asset Management, Inc.*, Investment Advisers Act Release No. 2160 (Aug. 19, 2003).  *See also* Section VI. B. 6 of this outline.

[149]   The SEC has applied section 206(3) not only to principal transactions engaged in or effected by any adviser, but also when an adviser causes a client to enter into a principal transaction that is effected by a broker-dealer that controls, is controlled by, or is under common control with, the adviser.  *Interpretation of Section 206(3) of the Investment Advisers Act of 1940*, Investment Advisers Act Release No. 1732 (July 17, 1998)("Release 1732"), at n.3, *available at* http://www.sec.gov/rules/interp/interparchive/interparch1998.shtml.  The SEC has instituted enforcement actions when advisers have effected principal transactions through affiliates without complying with section 206(3), s*ee, e.g., In the Matter of Calamos Asset Management,* Investment Advisers Act Release No. 1589 (Sept. 30, 1996), including "riskless principal" transactions;  *In the Matter of Rothschild Investment Corporation*, Investment Advisers Act Release No. 1714 (Apr. 13, 1998); *In the Matter of Concord Investment Co*., Investment Advisers Act Release No. 1585 (Sept. 27, 1996).

[150]   Section 206(3).  The SEC interprets "completion of the transaction" to mean by settlement of the transaction.  Release 1732, *supra* note 149, *available at* http://www.sec.gov/rules/interp/ia-1732.htm.  But the SEC believes that, in order for post-execution, pre-settlement consent to comply with section 206(3), the adviser must provide both sufficient disclosure for a client to make an informed decision, and the opportunity for the client to withhold consent.  *Id.*  While the notice must be in writing, the SEC staff has stated that oral consent is sufficient under the Act.  *Dillon, Reed & Co*., SEC Staff No-Action Letter (Aug. 6, 1975).  The notice and consent provisions of section 206(3) do not apply if the adviser is giving only impersonal advisory services.  Rule 206(3)-1.

[151]   *Opinion of Director of Trading and Exchange Division*, Investment Advisers Act Release No. 40 (Jan. 5, 1945).  The SEC has instituted enforcement actions against investment advisers for violating section

*Pooled Investment Vehicles.* The SEC staff has stated that section 206(3) may apply to client transactions with a pooled investment vehicle in which the adviser or its personnel may have interests depending on the facts and circumstances, including the extent of the interests held by the adviser and its affiliates.[152] The SEC staff, however, believes that section 206(3) does not apply to a transaction between a client account and a pooled investment vehicle of which the investment adviser and/or its controlling persons, in the aggregate, own 25% or less.[153]

*Statutory Exception.* The restrictions on principal transactions do not apply to transactions by a client where the adviser (or an affiliate) is also a broker-dealer, but "is not acting as an investment adviser with respect to the trade," *e.g.*, it has not given the advice to buy or sell the security.[154]

Updated →    *Rule 206(3)-3T.* The SEC has adopted a temporary rule, set to expire on December 31, 2014, that permits advisers that are also registered with the SEC as broker-dealers to comply with section 206(3) by providing oral (instead of written) notice of principal transactions so long as certain conditions are met.[155] Specifically, rule 206(3)-3T permits an adviser, with respect to a non-discretionary advisory account, to comply with section 206(3) of the Act by, among other things:

(i)    providing written prospective disclosure regarding the conflicts arising from principal trades;

(ii)    obtaining written, revocable consent from the client prospectively authorizing the adviser to enter into principal transactions;

(iii)    making certain disclosures either orally or in writing and

---

206(3) when they entered into principal transactions with their clients using only prior blanket disclosures and consents. *See In the Matter of Stephens, Inc.,* Investment Advisers Act Release No. 1666 (Sept. 16, 1997); *In the Matter of Clariden Asset Management (New York) Inc*., Investment Advisers Act Release No. 1504 (July 10, 1995).

[152]    ABA Letter 2005, *supra* note 103 at II.A.1. The SEC has instituted enforcement actions based on claims of violations of section 206(3) against advisers and their principals when the advisers effected transactions between their advisory clients and accounts in which the principals of the advisers held significant ownership interests. *See In the Matter of SEC v. Beacon Hill Asset Management, LLC*, *et al.*, Litigation Release No. 18950 (Oct. 28, 2004); *In the Matter of Gintel Asset Management, et al.*, Investment Advisers Act Release No. 2079 (Nov. 8, 2002).

[153]    *Gardner Russo & Gardner*, SEC Staff No-Action Letter (June 7, 2006).

[154]    Section 206(3) provides that the section's "prohibitions…shall not apply to any transaction with a customer of a broker or dealer if such broker or dealer is not acting as an investment adviser in relation to such transaction."

[155]    Rule 206(3)-3T. *Temporary Rule Regarding Principal Trades with Certain Advisory Clients,* Investment Advisers Act Release No. 2653 (Sep. 24, 2007) (adopting rule 206(3)-3T), *available at* http://www.sec.gov/rules/final/2007/ia-2653.pdf; *Temporary Rule Regarding Principal Trades with Certain Advisory Clients*, Investment Advisers Act Release 3522 (Dec. 20, 2012) (extending expiration date to Dec. 31, 2014), *available at* http://www.sec.gov/rules/final/2012/ia-3522.pdf.

obtaining the client's consent before each principal transaction;

(iv)   sending to the client confirmation statements disclosing the capacity in which the adviser has acted and disclosing that the adviser informed the client that it may act in a principal capacity and that the client authorized the transaction; and

(v)    delivering to the client an annual report itemizing the principal transactions.

With certain limited exceptions (for non-convertible investment-grade debt securities underwritten by the adviser or a person who controls, is controlled by, or is under common control with the adviser (a "control person")), the rule generally is not available for principal trades of securities issued or underwritten by the investment adviser or a control person of the adviser.[156]

*Fiduciary Obligations.* Compliance with the disclosure and consent provisions of section 206(3) or rule 206(3)-3T alone does not satisfy an adviser's fiduciary obligations with respect to a principal trade. The SEC has expressed the view that section 206(3) must be read together with sections 206(1) and (2) of the Act to require that the adviser disclose additional facts necessary to alert the client to the adviser's potential conflict of interest in the principal trade.[157]

b.    *Agency Cross Transactions.* Section 206(3) also prohibits an adviser from knowingly acting as broker for both its advisory client and the party on the other side of the transaction without obtaining its client's consent before each transaction.[158]

*Rule 206(3)-2.* The SEC has adopted a rule permitting these "agency cross-transactions" without transaction-by-transaction disclosure if, among other things:

(i)    the client has executed a written blanket consent after receiving full disclosure of the conflicts involved, which must be renewed each year;

(ii)   the adviser provides a written confirmation to the client before the completion of each transaction providing, among other

---

[156]   The rule also requires that each account for which the adviser relies on the rule be a brokerage account subject to the Exchange Act, and the rules thereunder, and the rules of the self-regulatory organization(s) of which it is a member.

[157]   Release 1732, *supra* note 149. *See also Rocky Mountain Financial Planning, Inc*., SEC Staff No-Action Letter (Feb. 24, 1983) ("While section 206(3) of the Investment Advisers Act of 1940 requires disclosure of such interest and the client's consent to enter into the transaction with knowledge of such interest, the adviser's fiduciary duties are not discharged merely by such disclosure and consent. The adviser must have a reasonable belief that the entry of the client into the transaction is in the client's interest.").

[158]   Section 206(3). The SEC staff has expressed the view that the provisions of section 206(3) do not apply when the adviser/broker effects the trade without charging a commission or other fee. Release No. 1732, *supra* note 149.

30

things, the source and amount of any remuneration it received; and

    (iii)  the disclosure document and each confirmation conspicuously disclose that consent may be revoked at any time.[159]

c.   *Cross-Trades.*  Effecting cross-trades between clients (where a third-party broker is used) is not specifically addressed by the Act, but is subject to the anti-fraud provisions of the Act.[160]  Cross-trades involve potential conflicts of interest (because the adviser could favor one client over another), and thus many advisers follow the methodology required by a rule under the Investment Company Act when one of the clients is an investment company.[161]

d.   *Aggregation of Client Orders.*  The SEC staff has stated that in directing orders for the purchase or sale of securities, an adviser may aggregate or "bunch" those orders on behalf of two or more of its accounts, so long as the bunching is done for the purpose of achieving best execution, and no client is systematically advantaged or disadvantaged by the bunching.[162]

Advisers that aggregate orders of securities face conflicts when they disaggregate the orders to client accounts since, for example, not all securities may have been acquired at the same price.  Advisers should have procedures in place that are designed to ensure that the trades are allocated in such a manner that all clients are treated fairly and equitably.[163]  For example, advisers can allocate orders based on a *pro rata*, rotational, or random basis.

---

[159]   Rule 206(3)-2.  The rule does not apply to a transaction when the adviser has discretionary authority to act for the purchaser and seller.  Paragraph (c) of the rule admonishes advisers that the rule does not relieve them of the duty to act in the best interests of their clients, including the duty to obtain best price and execution for any transaction.  *See Agency Cross Transactions for Advisory Clients,* Investment Advisers Act Release No. 589 (May 31, 1977) (adopting rule 206(3)-2).

[160]   *See* In *the Matter of Renberg Capital Management, Inc. and Daniel H. Renberg*, Investment Advisers Act Release No. 2064 (Oct. 1, 2002).

[161]   Rule 17a-7.  Merely following the procedures set forth in rule 17a-7 may not satisfy an adviser's fiduciary obligations to clients.  The staff has explained that it must be in the interest of both clients to enter into a cross trade and thus, for example, an adviser should not cause a client to enter into a cross-trade if it could obtain a better price in the markets.  *Federated Municipal Funds*, SEC No-Action Letter (Nov. 20, 2006).

[162]   *Pretzel & Stouffer*, SEC Staff No-Action Letter (Dec. 1, 1995).

[163]   The SEC has instituted numerous enforcement actions against advisers that unfairly allocated client trades without making adequate disclosure.  *See In the Matter of John McStay Investment Counsel, L.P*, Investment Advisers Act Release No. 2153 (July 31, 2003) (adviser failed to disclose change in its method of allocating initial public offerings among accounts to a method that favored mutual fund account); *In the Matter of McKenzie Walker Investment Management, Inc., et al*., Investment Advisers Act Release No. 1571 (1996) (adviser allocated profitable trades to accounts charged a performance-based fee); *In the Matter of Nicholas-Applegate Capital Management*, Investment Advisers Act Release No. 1741 (Aug. 12, 1998) (adviser failed to supervise trader who allocated profitable trades to own personal account);  *In the Matter of Ark Asset Management Co., Inc*., Investment Advisers Act Release No. 2962 (Dec. 14, 2009) (adviser allocated profitable trades to the proprietary hedge fund accounts at the expense of the client accounts without disclosing this practice).

2. *Advertising.* The anti-fraud provisions of the Act apply with respect to both clients and *prospective* clients. The SEC has adopted rule 206(4)-1, which prohibits any adviser registered with the SEC from using any advertisement that contains any untrue statement of material fact or is otherwise misleading.[164]

*Specific Restrictions.* An advertisement may not:

a. use or refer to testimonials, which staff views as including any statement of a client's experience with, or endorsement of, an adviser;[165]

b. refer to past specific recommendations made by the adviser, unless the advertisement sets out a list of all recommendations made by the adviser during the preceding year;

c. represents that any graph, chart, or formula can, in and of itself, be used to determine which securities to buy or sell; and

d. refer to any report, analysis, or service as free, unless it really is.

*Performance Advertising.* Advertisements containing information about the performance of client accounts must not be misleading. The SEC staff considers an advertisement containing performance information misleading if it implies, or if a reader would infer from it, something about an adviser's competence or possible future investment results that would be unwarranted if the reader knew all of the facts.[166] Advisers registered with the SEC must maintain records substantiating any performance claimed in an advertisement.[167]

*Definition of Advertisement.* While no communications to clients may be misleading, the specific restrictions discussed above apply only to "advertisements" by advisers, which the SEC defines generally as communications (in writing or electronic form) to more than one person that offer advisory services.[168] The SEC staff does not believe that a written

---

[164]    Rule 206(4)-1. *See also SEC v. C.R. Richmond & Co.*, 565 F.2d 1101, 1104 (9th Cir. 1977) (an adviser's advertising "must be measured from the viewpoint of a person unskilled and unsophisticated in investment matters"); *In the Matter of Jesse Rosenblum*, Investment Advisers Act Release No. 913 (May 17, 1984) (an investment adviser's advertisement that contained materially misleading statements was "not cured by the disclaimers buried in the [smaller print] text [of the advertisement]").

[165]    For further discussion, *see DALBAR, Inc.,* SEC Staff No-Action Letter (Mar. 24, 1997).

[166]    *Edward F. O'Keefe*, SEC Staff No-Action Letter (Apr. 13, 1978); *Anametrics Investment Management*, SEC Staff No-Action Letter (May 5, 1977). *See also Clover Capital Management, Inc.*, SEC Staff No-Action Letter (Oct. 28, 1986).

[167]    Rule 204-2(a)(16). *See In the Matter of Warwick Capital Management, Inc.*, Initial Decision Release No. 327 (Feb. 15, 2007). ("Respondent blamed a series of dubious calamities for their inability to produce records that would support the inflated numbers and created after-the-fact documents concerning the inflated numbers.").

[168]    Rule 206(4)-1(b) defines advertisement for purposes of the rule as "[a]ny notice circular, letter or other written communication addressed to more than one person, or any notice or other announcement in any publication or by radio or television, which offers (1) any analysis, report or publication concerning securities, or (2) any graph, chart, formula or other device to be used in making any determination as to

communication by an adviser that does no more than respond to an unsolicited request by a client is an advertisement even if it received multiple requests for the same information, *e.g.*, in multiple RFPs.[169]

*Use of Social Media.*  Use of social media to communicate with clients and prospective clients may implicate rule 206(4)-1.[170]

3.  *Custody of Client Assets.*  A registered adviser with custody of client funds or securities ("client assets") is required by rule 206(4)-2 to take a number of steps designed to safeguard those client assets.[171]  These requirements were amended in December 2009.[172]

a.  *Definition of Custody.*  Custody means "holding, directly or indirectly, client funds or securities, or having any authority to obtain possession of them."  An adviser has custody if an affiliate has custody of its client funds or securities in connection with advisory services it provides to clients.

Custody includes:

(i)  Possession of client funds or securities;

(ii)  Any arrangement under which an adviser is permitted or authorized to withdraw client funds or securities (such as check-writing authority or the ability to deduct fees from client assets), and

(iii)  Any capacity that gives an adviser or its supervised person legal ownership of or access to client funds or securities (such as acting as general partner or trustee of a pooled investment vehicle).[173]

b.  *Qualified Custodians.*  An adviser with custody must maintain client funds and securities with "qualified custodians" either under the client's name or under the adviser's name as agent or trustee for its clients.  Qualified custodians are:

---

when to buy or sell any security, or which security to buy or sell, or (3) any other investment advisory service with regard to securities."  A communication covered by the rule may be made to new clients or to existing clients where the purpose is to induce them to renew their advisory contract or subscription. *Spear & Staff*, 42 S.E.C. 549 (1965).

[169]    *Investment Counsel Association of America*, SEC Staff Letter (Mar. 1, 2004).

[170]    The SEC staff has made observations regarding advisers' use of social media.  *Investment Adviser Use of Social Media*, National Examination Risk Alert, Vol. II, Issue 1 (Jan. 4, 2012), *available at* http://www.sec.gov/about/offices/ocie/riskalert-socialmedia.pdf.

[171]    Rule 206(4)-2.  The staff of the SEC's Division of Investment Management has published responses to "FAQs" (frequently asked questions) on the custody rule ("Custody Rule FAQs"), *available at* http://www.sec.gov/divisions/investment/custody_faq_030510.htm.

[172]    *See Custody of Funds or Securities of Clients by Investment Advisers*, Investment Advisers Act Release No. 2968 (Dec. 30, 2009) ("Release 2968"), *available at* http://www.sec.gov/rules/final/2009/ia-2968.pdf.

[173]    Rule 206(4)-2(d)(2).

(i)  broker-dealers, banks, savings associations, futures commission merchants, and

(ii)  non-U.S. financial institutions that customarily hold financial assets for their customers, if the institutions keep the advisory assets separate from their own.

c.  *Quarterly Account Statements.*  The adviser must have a reasonable basis, after due inquiry, for believing that the qualified custodian sends quarterly account statements directly to the client.[174]

d.  *Notification.*  The adviser must notify the client as to where and how the funds or securities will be maintained, promptly after opening an account for the client and following any changes to this information.[175] If the adviser also sends its own account statements to clients, this notice and subsequent account statements from the adviser must contain a statement urging the client to compare account statements from the custodian with those from the adviser.[176]

e.  *Surprise Examinations.*  An adviser that has custody of client assets generally must undergo an annual surprise examination by an independent public accountant to verify the client's funds and securities.[177]  One exception from this requirement is if it has custody *solely* because it has authority to deduct advisory fees directly from client accounts.[178]

Updated →  f.  *Pooled Investment Vehicles.*  If the adviser is the general partner of a limited partnership (or holds a similar position with another form of pooled investment vehicle such as a hedge fund)[179]:

(i)  the adviser is deemed to have complied with the annual surprise examination requirement and need not form a reasonable belief regarding delivery of account statements if the pool's financial statements are audited by an independent public accountant that is registered with, and subject to regular inspection by, the Public

---

[174]  A common method of forming a reasonable belief acceptable to the SEC is receipt of a copy of an account statement sent to the client.  Release No. 2968, *supra* note 172.

[175]  Notice need not be given if the client opens the account himself.

[176]  Rule 206(4)-2(a)(2).

[177]  The timing of exams must be irregular from year to year.  Rule 206(4)-2(a)(4).  *See also, In the Matter of Kaufman, Bernstein, et al.,* Investment Advisers Act Release No. 2194 (Nov. 20, 2003) (independent auditor began examination the same date each year).  The accountant conducting the examination must file a certificate on Form ADV-E within 120 days of the time chosen by the accountant for the examination.  Rule 206(4)-2(a)(4)(i).  The SEC has issued guidance for accountants performing an examination pursuant to this rule.  *See Commission Guidance Regarding Independent Public Accountant Engagements Performed Pursuant to Rule 206(4)-2 Under the Investment Advisers Act of 1940*, Investment Advisers Act Release No. 2969 (Dec. 30, 2009).

[178]  Rule 206(4)-2(b)(3).

[179]  The SEC staff takes the position that a state-created 529 plan may be treated as a pooled investment vehicle for these purposes.  *See Investment Company Institute*, SEC Staff No-Action Letter (Sept. 5, 2012).

34

Company Accounting Oversight Board ("PCAOB"),[180] and the audited statements are distributed to the pool's investors;[181] or

(ii)    the qualified custodian must send quarterly account statements to each investor in the pool and the adviser must obtain a surprise examination of the pool's assets.[182]

g.    *Adviser or "Related Person" as Custodian.*[183] If the adviser or its related person maintains client assets as the qualified custodian in connection with the adviser's advisory services, the adviser must:

(i)    have an independent public accountant that is registered with, and subject to regular inspection by, the PCAOB perform the required annual surprise examination, unless the related person is "operationally independent" of the adviser;[184] and

(ii)    obtain, or receive from the affiliate, an annual report of the internal controls relating to the custody of client assets prepared by an independent public accountant that is registered with, and subject to regular inspection by, the PCAOB.[185]

4.    *Use of Solicitors.* An adviser generally is prohibited by rule 206(4)-3 from paying a cash fee, directly or indirectly, to a third party (a "solicitor") unless it meets the requirements of the rule:

a.    *Registered.* The adviser must be registered under the Act.

b.    *Not Disqualified.* An adviser may not pay solicitation fees to a solicitor that would itself be subject to Statutory Disqualification as an investment adviser.[186]

---

[180]    The audited financial statements must be prepared according to, or reconciled to, U.S. GAAP.

[181]    The audited financial statements must be distributed to investors within 120 days after the close of the pool's fiscal year. In 2006, the Division of Investment Management issued a letter indicating that it would not recommend enforcement action to the Commission under section 206(4) of the Act or rule 206(4)-2 against an adviser of a "fund of funds" relying on the annual audit provision of rule 206(4)-2 if the audited financial statements of the fund of funds are distributed to investors in the fund of funds within 180 days of the end of its fiscal year. *See ABA Committee on Private Investment Entities*, SEC Staff Letter (Aug. 10, 2006); Release 2968, *supra* note 172, at n. 45. *See also* Custody Rule FAQs, *supra* note 171.

[182]    Rule 206(4)-2(a)(5) and (a)(4).

[183]    A "related person" includes any person, directly or indirectly, controlling or controlled by the adviser, and any person that is under common control.

[184]    The surprise examination is not required of the adviser if it can demonstrate that the related person acting as qualified custodian is operationally independent. This determination is made by examining the relationship between the adviser and the related person, including whether there are common employees, shared premises, and common supervision. *See* rule 206(4)-2(d)(5).

[185]    Rule 206(4)-2(a)(6).

[186]    *See supra* notes 106-108 and accompanying text. Through a series of no-action letters, however, the SEC staff expressed the view that statutorily disqualified persons may act as solicitors if the disqualifying conduct is disclosed in a separate written document to be given to each solicited person (i) at least 48 hours before such solicited person enters into an advisory contract, or (ii) at the time the

    c.   *Written Agreement.*  The solicitation fee must be paid pursuant to a written agreement that:

      (i)   describes the solicitation activities and the compensation to be paid;

      (ii)   contains an undertaking by the solicitor to perform his duties according to the agreement and in compliance with the Act; and

      (iii)   requires the solicitor to provide a prospective client a copy of:

        (A)   the adviser's disclosure statement (brochure), and

        (B)   a separate disclosure statement describing the terms of the solicitation arrangement, including that the solicitor is being compensated by the adviser.[187]

*Solicitors.*  The rule defines a solicitor as anyone who, directly or indirectly, solicits any client for, or refers any client to, an investment adviser.  The Commission believes that a solicitor would be a "person associated with an adviser" under the Act.  The adviser has an obligation to supervise the activities of solicitors.[188]

*Client Referrals.*  Rule 206(4)-3 does not apply to the direction of brokerage in return for client referrals.  But the adviser directing brokerage to brokers referring clients to it has a significant conflict of interest.  Accordingly, an adviser may be obligated to disclose to clients material information regarding conflicts arising from the arrangement, including any affect on the adviser's ability to obtain best execution.[189]

*Pooled Investment Vehicles.*  The SEC staff has stated that the rule does not apply to payments by an adviser to solicit investments in a pooled investment vehicle sponsored by the adviser.[190]

---

solicited person enters into the advisory contract, *if* the solicited person has the right to terminate the advisory contract within five days.  Accordingly, the staff no longer issues no-action letters of this type, except if the facts raise novel or unusual circumstances.  *See Dougherty & Company LLC*, SEC Staff No-Action Letter (July 3, 2003).

[187]   If the solicitor is an employee of the adviser, however, the solicitor is not required to provide prospective clients a copy of the adviser's brochure or the separate disclosure statement.

[188]   For discussion of an adviser's obligation to supervise cash solicitors acting on its behalf, *see Requirements Governing Payments of Cash Referral Fees by Investment Advisers*, Investment Advisers Act Release No. 615 (Feb. 2, 1978) (proposing release); *Requirements Governing Payments of Cash Referral Fees by Investment Advisers*, Investment Advisers Act Release No. 688 (July 12, 1979) (adopting release).

[189]   *In the Matter of Jamison, Eaton and Wood, Inc*., *supra* note 138; *In the Matter of Portfolio Advisory Services LLC*, *supra* note 137; *In the Matter of Founders Asset Management*, Investment Advisers Act Release No. 1953 (July 20, 2001); *In the Matter of Fleet Investment Advisers, Inc. (successor to Shawmut Investment Advisers, Inc.)*, Investment Advisers Act Release No. 1821 (Sept. 9, 1999).

[190]   *Mayer Brown, LLP*, SEC Staff No-Action Letter (July 15, 2008).  In its response, however, the staff noted that the solicitor may itself be an adviser subject to the antifraud provisions of the Act.  The staff's response was amended on July 28, 2008 but indicates that the response letter should be deemed

5.  *Pay to Play Rule.*  On July 1, 2010, the Commission adopted rule 206(4)-5 to address so-called "pay to play" practices in which investment advisers make campaign contributions to elected officials of state or municipal governments in order to influence the award of contracts to manage public pension plan assets and other government investment accounts.[191]  The rule applies to SEC-registered investment advisers, certain exempt reporting advisers, and foreign private advisers, who provide investment advisory services, or are seeking to provide investment advisory services, to state and municipal government entities.[192]

    a.  *Prohibitions.*  The rule contains three main prohibitions:

        (i)  *Two-Year Time Out.*  An investment adviser is prohibited from receiving compensation for providing advice to a government entity, either directly or through a "covered investment pool", within two years after a contribution by the adviser, or by any of its "covered associates" (which include the adviser's general partner or managing member, executive officers or other individuals with a similar status or function, solicitors, and political action committees they control) to an official of that government entity who can influence the award of advisory business.[193]

        (ii)  *Third Party Solicitor Ban.*  Neither an investment adviser nor any of its covered associates may provide or agree to provide, directly or indirectly, payment to any third party to solicit government clients for the adviser unless such person is a "regulated person."[194]

---

to have been issued on July 15.  *See also* rule 206(4)-5 and Section VI. B. 5 of this outline regarding solicitation of government clients.

[191] *Political Contributions by Certain Investment Advisers*, Investment Advisers Act Release No. 3043 (July 1, 2010)("Pay to Play Release"), *available at* http://www.sec.gov/rules/final/2010/ia-3043.pdf. For staff responses to frequently asked questions about the rule, visit the SEC's website at http://www.sec.gov/divisions/investment/pay-to-play-faq.htm.

[192] Rule 206(4)-5(a).

[193] Rule 206(4)-5(a)(1).  An adviser subject to the rule is not prohibited from providing advisory services to a government client, even after triggering the two-year time out.  Instead, an adviser is prohibited from receiving *compensation* for providing advisory services to such client during the time out.  This enables an adviser to act consistently with its fiduciary obligations and provide uncompensated advisory services for a reasonable period of time to allow the government client to replace the adviser.  *See also* Section VI. B. 4 regarding the cash solicitation rule that applies to all SEC-registered advisers.

[194] Rule 206(4)-5(a)(2)(i).  "Regulated persons" include (i) SEC-registered investment advisers that have not, and whose covered associates have not, within two years of soliciting a government entity, made a contribution to an official of that government entity; or bundled any contribution to an official or payment to a political party of a state or locality where the adviser is providing or seeking to provide investment advisory services to a government entity; (ii) registered broker-dealers that are subject to a pay to play rule adopted by the Financial Industry Regulatory Authority that the Commission, by order, finds substantially equivalent or more stringent than rule 206(4)-5; and (iii) a "municipal adviser" registered with the Commission and subject to rules adopted by the Municipal Securities Rulemaking Board that the Commission, by order, finds substantially equivalent or more stringent than rule 206(4)-

      (iii)  *Bundling Ban.*  Rule 206(4)-5 prohibits an adviser and its covered associates from "bundling" others' contributions -- *i.e.* coordinating or soliciting any person or political action committee to make (A) any contribution to an official of a government entity to which the adviser is providing or seeking to provide investment advisory services; or (B) any payment to a political party of a state or locality where the investment adviser is providing or seeking to provide investment advisory services to a government entity.[195]

  b.  *Catch-All Provision.*  Rule 206(4)-5(d) prohibits acts done indirectly, which, if done directly, would violate the rule.

  c.  *Covered Investment Pools.*  Rule 206(4)-5 includes a provision that applies each of the prohibitions of the rule to an adviser that manages assets of a government entity through a "covered investment pool" defined as (i) any investment company registered under the Investment Company Act that is an investment option of a plan or program of a government entity;[196] or (ii) any company that would be an investment company under section 3(a) of the Investment Company Act but for the exclusions from that definition provided by section 3(c)(1), section 3(c)(7) or section 3(c)(11) of that Act.[197]

  d.  *Recordkeeping.*  Rule 204-2 was amended to require registered advisers that provide investment advisory services to a government entity, or to a covered investment pool in which a government entity is an investor, to make and keep certain records related to the pay to play rule.

6.  *Proxy Voting.*  A registered adviser that exercises voting authority over client securities is required to vote them in the best interest of the client and not in its own interest.  Rule 206(4)-6 requires advisers with voting authority over client securities to:

  a.  adopt and implement written policies and procedures that are reasonably designed to ensure that the adviser votes in the clients' best interests, and which must specifically address conflicts of interest that may arise between the adviser and its clients;

  b.  describe their voting policies and procedures to clients, deliver a copy of the policies and procedures to clients upon request, and inform clients how they can obtain information on how the adviser voted their securities; and

---

5. This prohibition is limited to third-party solicitors.  Thus, the prohibition does not apply to any of the adviser's employees, general partners, managing members, or executive.

[195]   Rule 206(4)-5(a)(2)(ii).

[196]   A plan or a program of a government entity includes participant-directed plans, such as college savings plans like 529 plans and retirement plans like 403(b) and 457 plans.

[197]   Rule 206(4)-5(f)(3).

c.  keep certain records relating to voting of client securities.[198]

7.  *Supervision.*  An adviser has a continuing responsibility to supervise all persons acting on its behalf.[199]  The SEC may sanction an adviser that "has failed reasonably to supervise, with a view to preventing violations of the provisions of such statutes, rules, and regulations, another person who commits such a violation, if such other person is subject to his supervision."[200]

a.  *Supervisor.*  Whether a person has responsibility as a "supervisor" depends on whether, under the facts and circumstances of a particular case, the person has a requisite degree of responsibility, ability or authority to affect the conduct of the employee whose behavior is at issue.[201]

b.  *Safe Harbor.*  Under the Act, a person (*e.g.*, an adviser or an officer of the adviser) will not be deemed to have failed to supervise a person if (i) the adviser had established procedures and a system for applying such procedures that are reasonably expected to prevent and detect the conduct, and (ii) the person reasonably discharged his supervisory duties and had no reasonable cause to believe that the procedures were not being complied with.[202]

8.  *Compliance Program.*  Under rule 206(4)-7 each registered adviser must establish an internal compliance program that addresses the adviser's performance of its fiduciary and substantive obligations under the Act.

a.  *Chief Compliance Officer.*  Each adviser must designate a chief

---

[198]  See also Section VI. A. 5 of this outline.

[199]  The SEC has stated that the "delicate fiduciary relationship" between an investment adviser and a client imposes an obligation on an adviser to review and to monitor its activities and the activities of its employees.  *Shearson Lehman Brothers, Inc. and Stein Roe & Farnham*, Exchange Act Release No. 23640 (Sept. 24, 1986).  The Commission has repeatedly emphasized that the duty to supervise is a critical component of the federal regulatory scheme.  *See In re Rhumbline Advisers*, Investment Advisers Act Release. No. 1765 (Sept. 29, 1998); *In re Scudder Kemper Investments, Inc*., Investment Advisers Act Release. No. 1848 (Dec. 22, 1999) (adviser failed reasonably to supervise employee and did not have policies and procedures designed to detect and prevent employees' unauthorized trading in client accounts); *In re Nicholas-Applegate Capital Management*, Investment Advisers Act Release. No. 1741 (Aug. 12, 1998) (adviser failed reasonably to supervise employee and did not have policies and procedures designed to detect and prevent employees from engaging in improper personal trading); *In re Van Kampen American Capital Asset Management, Inc*., Investment Advisers Act Release. No. 1525 (Sep. 29, 1995) (adviser failed reasonably to supervise employee and did not have policies and procedures designed to detect and prevent employees from mispricing fund securities).  Both registered and unregistered advisers have an obligation to supervise persons acting on their behalf.  *In the Matter of Wilfred Mickel and Robert A. Littell*, Investment Advisers Act Release No. 2203 (Dec. 15, 2003). *See also In the Matter of Western Asset Management Co. and Legg Mason Fund Adviser, Inc*., Investment Advisers Act Release No. 1980 (Sept. 28, 2001) (adviser has a duty to supervise a sub-adviser); *TBA Financial Corporation*, SEC Staff No-Action Letter (Nov. 7, 1983) (duty to supervise employees who are also "registered representatives").

[200]  Section 203(e)(6).

[201]  *See In re John H. Gutfreund*, 51 S.E.C. 93, 113 (1992).

[202]  Section 203(e)(6).

compliance officer ("CCO").[203]  The CCO must be knowledgeable about the Act and have the authority to develop and enforce appropriate compliance policies and procedures for the adviser.  The CCO need not be an employee who does not have other duties.[204]

b.  *Policies and Procedures.*  Each adviser must also adopt and implement written policies and procedures reasonably designed to prevent the adviser or its personnel from violating the Act.[205]  The SEC explained that each adviser, in designing its policies and procedures, should identify conflicts and other compliance factors creating risk exposure for the firm and its clients in light of the firm's particular operations, and then design policies and procedures that address those risks.[206]  The SEC has stated that these policies and procedures should cover, at a minimum, the following areas to the extent applicable to the adviser:

(i)  Portfolio management processes, including allocation of investment opportunities among clients and consistency of portfolios with clients' investment objectives, disclosures by the adviser, and applicable regulatory restrictions;

(ii)  Trading practices, including procedures by which the adviser satisfies its best execution obligation, uses client brokerage to obtain research and other services ("soft dollar arrangements"), and allocates aggregated trades among clients;

(iii)  Proprietary trading of the adviser and personal trading activities of supervised persons;

---

[203]  Rule 206(4)-7(c).   The Commission has stated that having the title of chief compliance officer does not, in and of itself, carry supervisory responsibilities so that an adviser's chief compliance officer would not necessarily be subject to a sanction for failure to supervise other advisory personnel. Investment Advisers Act Release No. 2204 (Dec. 17, 2003) ("Release 2204") at n. 73 *available at* http://www.sec.gov/rules/final/finalarchive/finalarchive2003.shtml.

[204]  Release 2204, *supra* note 203 at Section II. C.  However, the SEC recently settled an enforcement action alleging that a dually-registered broker-dealer and investment adviser violated section 206(4) of the Advisers Act and rule 206(4)-7 thereunder by failing to adopt and implement compliance policies and procedures specific to its advisory business when its CCO spent about 95% of his time on compliance-related issues for the firm's brokerage business and only about 5% of his time on compliance-related issues for the advisory business. *In the Matter of Feltl & Company, Inc.*, Investment Advisers Act Release No. 3325 (Nov. 28, 2011).

[205]  Rule 206(4)-7(a).  The SEC has brought enforcement actions against advisers for failing to adopt and implement adequate policies and procedures as required by rule 206(4)-7. *See, e.g., In the Matter of OMNI Investment Advisors Inc. and Gary R. Beynon*, Investment Advisers Act Release No. 3323 (Nov. 28, 2011); *In the Matter of The Buckingham Research Group, Inc., Buckingham Capital Management, Inc., and Lloyd R. Karp*, Investment Advisers Act Release No. 3109 (Nov. 17, 2010); *In the Matter of Consulting Services Group, LLC, and Joe D. Meals*, Investment Advisers Act Release No. 2669 (Oct. 4, 2007).

[206]  The SEC has settled an enforcement action against an adviser that adopted a "pre-packaged" policies and procedures manual that failed to reflect the risk factors or conflicts of interest of the adviser; the SEC found that the adviser violated rule 206(4)-7 by failing to adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act by that adviser's supervised persons.  *In the Matter of Consulting Services Group, LLC, and Joe D. Meals*, *supra* note 205.

(iv)  The accuracy of disclosures made to investors, clients, and regulators, including account statements and advertisements;

(v)  Safeguarding of client assets from conversion or inappropriate use by advisory personnel;

(vi)  The accurate creation of required records and their maintenance in a manner that secures them from unauthorized alteration or use and protects them from untimely destruction;

(vii)  Marketing advisory services, including the use of solicitors;

(viii)  Processes to value client holdings and assess fees based on those valuations;

(ix)  Safeguards for the privacy protection of client records and information; and

(x)  Business continuity plans.[207]

c.  *Annual Review.*  The adviser must review the adequacy and effectiveness of its policies at least annually.[208]

9.  *Code of Ethics.*  All advisers registered with the SEC must adopt and enforce a written code of ethics reflecting the adviser's fiduciary duties to its clients.[209]  At a minimum, the adviser's code of ethics must:

a.  *Standards of Conduct.*  Set forth a minimum standard of conduct for all supervised persons;

b.  *Compliance with Federal Securities Laws.*  Require supervised persons to comply with federal securities laws;

c.  *Personal Securities Transactions.*  Require each of an adviser's access persons[210] to report his securities holdings at the time that the person becomes an access person and at least once annually thereafter and to make a report at least once quarterly of all personal securities transactions in reportable securities to the adviser's CCO or other designated person;[211]

---

[207]  Release 2204, *supra* note 203.

[208]  Rule 206(4)-7(b).

[209]  Rule 204A-1.  *See also, In the Matter of Consulting Services Group, LLC, and Joe D. Meals*, *supra* note 205 (adviser failed to timely adopt and accurately document ethics code).

[210]  Rule 204A-1(e)(1) defines "access person."  Generally, an access person is a supervised person who has access to non-public information regarding clients' securities purchase or sale of securities.

[211]  Rule 204A-1(b) (1) (holdings reports), and (2) (transaction reports).  Access persons do not have to report holdings of or transactions in: (i) direct obligations in of the U.S. government; (ii) certain bank instruments, commercial paper, and agreements; (iii) shares of money market funds; (iv) shares in open-end investment companies (mutual funds) that are not advised by either the adviser or an entity in a control relationship with the adviser); and (v) shares of a (US) unit investment trust that invests exclusively in an unaffiliated mutual fund.  *See* rule 204A-1(j).  *See also, M&G Investment*

    d.   *Pre-approval of Certain Securities Transactions.*  Require the CCO or other designated persons to pre-approve investments by the access persons in IPOs or limited offerings;

    e.   *Reporting Violations.*  Require all supervised persons to promptly report any violations of the code to the adviser's CCO or other designated person;

    f.   *Distribution and Acknowledgment.*  Require the adviser to provide each supervised person with a copy of the code, and any amendments, and to obtain a written acknowledgment from each supervised person of his receipt of a copy of the code; and

    g.   *Recordkeeping.*  Require the adviser to keep copies of the code, records of violations of the code and of any actions taken against violators of the code, and copies of each supervised person's acknowledgement of receipt of a copy of the code.

10.  *Fraud Against Investors in Pooled Investment Vehicles*.  Rule 206(4)-8 prohibits advisers from defrauding investors and prospective investors in pooled investment vehicles they advise.[212]  The anti-fraud provisions of the Act (section 206(1) and (2)) prohibit advisers from defrauding "clients."  A 2006 court decision created doubt about whether an investor in a pooled investment vehicle (*e.g.*, a hedge fund) advised by an adviser is a "client," and thus whether the SEC could enforce these provisions against an adviser that defrauds the investors, but not the fund.[213]

    a.   *Prohibition on False or Misleading Statements*.  Rule 206(4)-8 prohibits advisers to pooled investment vehicles from making any materially false or misleading statements to investors or prospective investors in those pools.

    b.   *Prohibition of Other Frauds.*  In addition, the rule prohibits advisers to pooled investment vehicles from otherwise defrauding the investors or prospective investors in those pools.  This provision is designed to apply more broadly to fraudulent conduct that may not involve statements.

---

*Management Ltd*., SEC Staff No-Action Letter (Mar. 1, 2007) (permitting access persons of U.K.-based registered adviser to exclude from reports certain analogous instruments).

[212]   Rule 206(4)-8.  *See Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles,* Investment Advisers Act Release No. 2628 (Aug. 3, 2007), *available at* http://www.sec.gov/rules/final/2007/ia-2628.pdf.  *See  also*, *SEC v. Rabinovich & Associates, LP, Alex Rabinovich and Joseph Lovaglio*, 07 Civ. 10547(GEL) (S.D.N.Y.) (Nov. 17, 2008); *SEC v. Moises Pacheco, et al.*, Civil Action No. 09-CV-1355-W-RBB (Nov. 19, 2009) *(*discussed in *In the Matter of Moises Pacheco,* Investment Advisers Act Release No. 2960 (Dec. 11, 2009)); *SEC v. Thomas J. Petters, et al*, Civil Action No. 09 SC 1750 ADM/JSM (D. Minn.) (Oct. 5, 2010) (discussed in *SEC v. Thomas J. Petters, et al*,  Litigation Release No. 21687 (Oct. 18, 2010)); *SEC v. Donald Anthony Walker Young, et al,* Civil Action No. 09-1634 (E.D. Penn.)(Apr. 12, 2011); *SEC. v. Imperium Investment Advisors, LLC, et al*, 8:10-CV-02859-JDW-MAP (M.D.F.L) (June30, 2011) (discussed in *In the Matter of Imperium Investment Advisors, LLC*, Administrative Proceeding File No. 3-14471 (July 20, 2011)).

[213]   *Goldstein v. SEC*, 451 F.3d 873 (D.C. Cir. 2006).

    c.   *No Fiduciary Duty.* Rule 206(4)-8 does not create a fiduciary duty to investors or potential investors in a pooled investment vehicle not otherwise imposed by law, nor does it alter any duty or obligation an adviser has under the Advisers Act, or any state law or requirement to investors in a pooled vehicle.[214] In adopting the rule, the SEC explained that rule 206(4)-8 would, however, permit the SEC to enforce an adviser's fiduciary duty created by other law if the adviser fails to fulfill that duty by negligently or deliberately failing to make the required disclosure.

    d.   *Pooled Investment Vehicles.* Pooled investment vehicles include hedge funds, private equity funds, venture capital funds, and other types of privately offered pools that invest in securities as well as investment companies that are registered with the SEC under the Investment Company Act.[215]

11.   *Insider Trading.* Section 204A of the Act requires advisers to establish, maintain, and enforce written policies and procedures reasonably designed to prevent the misuse of material, non-public information by the adviser or any of its associated persons,[216] including the misuse of material, non-public information about the adviser's securities recommendations and client securities holdings and transactions.[217]

12.   *Brochure Rule.*

    a.   *Firm Brochure.* Rule 204-3, as amended in 2010, requires a registered adviser to prepare and deliver to clients a plain English, narrative brochure that contains all information required by Part 2A of Form ADV, including, among other things, the adviser's business practices, investment strategies, fees, conflicts of interest, and disciplinary information.[218] The adviser must deliver the brochure to a client before or at the time of entering into an advisory contract with the client, and must annually deliver to the client an updated brochure which contains or is accompanied by a summary of material changes, or a summary of

---

[214]   An adviser to a hedge fund may have a separate relationship with an investor in a hedge fund that it advises that gives rise to fiduciary obligations. *U.S. v. Lay*, 566 F. Supp. 2d 652 (N.D. Ohio May 13, 2008).

[215]   Rule 206(4)-8(b) provides that a "pooled investment vehicle" means any investment company as defined in section 3(a) of the Investment Company Act or any company that would be an investment company under section 3(a) of that Act but for the exclusion provided from that definition by either Section 3(c)(1) or section 3(c)(7) of that Act.

[216]   The SEC has brought enforcement proceedings against advisers for violating section 204A. *See, e.g., In the Matter of Gabelli & Co. Inc.*, Investment Advisers Act Release No. 1457 (Dec. 8, 1994).

[217]   *See also*, *Investment Adviser Code of Ethics*, Investment Advisers Act Release No. 2256 (July 2, 2004), *available at* http://www.sec.gov/rules/final/finalarchive/finalarchive2004.shtml ("We … remind advisers that they must maintain and enforce policies and procedures to prevent the misuse of material, non-public information, which we believe includes misuse of material, non-public information about the adviser's securities recommendations, and client securities holdings and transaction.").

[218]   As stated in Section V.B.2, the adviser must also file with the SEC the brochure that it delivered to its client to satisfy its registration requirements under rules 203-1 and 204-1.

material changes with an offer to deliver the updated brochure upon request. [219]

(i) *Non-Required Information.*  Delivery of a brochure meeting the requirements of Part 2A does not necessarily satisfy an adviser's full disclosure obligation under the anti-fraud rules.[220] Accordingly, many advisers include additional information in their brochures.

(ii) *Exceptions to Delivery.*  Advisers are not required to deliver a brochure to investment company clients or to clients for whom they provide only impersonal services for less than $500.[221]

(iii) *Electronic Delivery.*  Advisers may deliver brochures electronically with client consent.[222]

b. *Brochure Supplement.*  Rule 204-3 also requires the adviser to deliver a brochure supplement that contains information about an advisory employee, including the employee's educational background, business experience, other business activities, and disciplinary history, to a client before or at the time the employee begins to provide advisory services to that client.[223]

(i) *Covered employees*.  An employee must deliver a brochure supplement to clients, if the employee formulates investment advice for the client and has direct client contact; or makes discretionary investment decisions for the client even if the employee has no direct client contact.[224]

(ii) *Exceptions to delivery.*  Advisers are not required to deliver a brochure supplement to a client: (i) to whom the adviser is not required to deliver a brochure; (ii) who receives only impersonal service; or (iii) who is an officer, employee or other persons related to the adviser that would be "qualified client" under rule 205-3(d)(1).[225]

(iii) *Electronic Delivery.*  Advisers may deliver brochure supplements

---

[219]    Rule 204-3(b)(1) and (2).

[220]    *See* Part 2 Adopting Release, *supra* note 113, at n. 7.

[221]    Rule 204-3(c).

[222]    *Use of Electronic Media by Broker-Dealers, Transfer Agents, and Investment Advisers for Delivery of Information*, Investment Advisers Act Release No. 1562 (May 9, 1996) (publishing Commission interpretive guidance with respect to use of electronic media to fulfill investment advisers' disclosure delivery obligations).

[223]    Rule 204-3(b)(3).

[224]    *Id.*  Note that if the investment advice is provided by a team comprised of more than 5 employees, only the 5 employees that have the most significant responsibility for the day-to-day advice to a client need to provide brochure supplements to that client.  For more information, see Part 2 FAQs, *supra* note 113.

[225]    Rule 204-3(c)(2).

electronically with client consent.

13. *Systemic Risk Reporting on Form PF.*  In October 2011, the SEC adopted
rule 204(b)-1 requiring registered advisers with at least $150 million in
private fund assets under management to submit regular reports on new
Form PF.  Advisers must file Form PF electronically on a confidential basis.
Form PF is designed, among other things, to assist the Financial Stability
Oversight Council in its assessment of systemic risk in the U.S. financial
system.[226]

    a. *Smaller private fund advisers.* Advisers that manage at least $150
million of private fund assets, but less than the amounts that make
them "large private fund advisers," complete only section 1 of Form
PF.  They file annually within 120 days of the end of their fiscal year.

    Section 1 requires, for each private fund, limited information about the
size, leverage, investor types, investor concentration, liquidity and fund
performance.  This section also requires information regarding
strategy, counterparty exposures, and use of trading and clearing
mechanisms for each private fund that is a hedge fund.

    b. *Larger Private Funds Advisers.*  Three types of "Large Private Fund
Advisers" that meet certain thresholds for assets under management
based on investment strategy type are required to complete additional
sections of Form PF.[227]

        (i) *Large Hedge Fund Advisers.*  Advisers managing at least $1.5
billion in hedge fund assets must file quarterly within 60 days of
their quarter end and, in addition to Section 1, must complete
Section 2 of Form PF.

        Section 2a requires information about aggregate hedge fund
assets the adviser manages, such as the value of investments in
different types of assets, the duration of fixed income holdings,
the value of turnover for certain asset classes and the
geographical breakdown of investments.  Section 2b requires, for
each hedge fund that has net assets of at least $500 million, more
granular information about the fund's exposures, leverage, risk
profile and liquidity.

        (ii) *Large Private Equity Fund Advisers.*  Advisers managing at least
$2 billion in private equity fund assets must file annually within
120 days of the end of their fiscal year (same as smaller advisers)
and, in addition to Section 1, must complete section 4 of Form
PF.

---

[226] *Reporting by Investment Advisers to Private Funds and Certain Commodity Pool Operators and Commodity Trading Advisors on Form PF*. Investment Advisers Act Release No. 3308 (Oct. 2011), *available at* http://www.sec.gov/rules/final/2011/ia-3308.pdf ("Form PF Adopting Release").  The staff of the Division of Investment Management has published responses to frequently asked questions on Form PF, *available at* http://www.sec.gov/divisions/investment/pfrd.pfrdfaq.shtml.

[227] Form PF Adopting Release, *supra* note 226, at 21.

Section 4 requires information about the extent of leverage incurred by funds' portfolio companies, use of bridge financing, funds' investments in financial institutions, and geographical and industry breakdowns of funds' investments in portfolio companies.

(iii)  *Large Liquidity Fund Advisers.*  Advisers managing at least $1 billion in combined unregistered and registered money market fund assets must file quarterly within 15 days of their quarter end and, in addition to Section 1, must complete section 3 of Form PF

Item 3 requires information about each liquidity fund's portfolio, certain information relevant to the risk profile of the fund and the extent to which the fund has a policy of complying with all or aspects of rule 2a-7 under the Investment Company Act.

c.  *Non-US. Advisers.*  A registered adviser with a principal office and place of business outside the U.S. may omit reporting of any private fund that, during the preceding fiscal year: (i) was not organized in the U.S.; (ii) was not beneficially owned by one or more U.S. persons; and (iii) was not offered in the U.S.[228]

14.  *Privacy Rules.*  Title V of the Gramm-Leach-Bliley Act protects the privacy interests of consumers of financial services, including clients of SEC-registered investment advisers.[229]  SEC rules implementing the statute protect only individuals' personal privacy interests, and not those of businesses or individuals who seek to obtain the services of an adviser for business purposes.[230]

a.  *Notices.*  An adviser must provide clients an *initial* and an *annual* notice of the adviser's privacy policies.  The initial notice must be provided no later than when the client enters into an advisory contract.[231]

*Content of Notice.*  Notices must be clear and conspicuous, *i.e.,* reasonably understandable and designed to call attention to the nature and significance of the notice.  They must include, among other things: (i) categories of non-public personal information the adviser collects; (ii) categories of information the adviser shares; (iii) categories of

---

[228]  General Instruction 1 (last paragraph) to Form PF.

[229]  Title V is not codified as part of the Advisers Act.  It is codified at 15 U.S.C. 6801-6827.

[230]  *See* rule 248.3(g)(1).  The SEC's implementing rules can be found at 17 CFR Part 248 ("Regulation S-P")**.**  The rules apply to SEC-registered advisers.  Rule 248.1(b).  Advisers that are unregistered or are registered only with the states are subject to privacy regulations overseen by the Consumer Financial Products Board.  Regulation S-P was adopted under the Securities Exchange Act, the Investment Company Act, and the Advisers Act; therefore the SEC has the remedies available under those statutes as applicable in enforcing the privacy rules.  The SEC staff has posted responses to frequently asked questions about Regulation S-P at www.sec.gov/divisions/investment/guidance/regs2qa.htm.

[231]  Rules 248.4(a), 248.5(a).

affiliates and non-affiliates with which the adviser shares the information; and (iv) the adviser's policies and practices for protecting the confidentiality and security of information.

*Model Form.*  The SEC has adopted a model form that advisers may choose to use to satisfy the initial and annual notice disclosure requirements.  Use of the form provides advisers with a "safe harbor" for the content of the required notice under the privacy rules.[232]

b.   *Opt-Out.*  An adviser must provide clients with an opportunity to "opt out" or block the adviser from sharing "non-public" personal financial information with nonaffiliated third parties.[233]

*Exceptions.*  An adviser does not have to provide an opt-out right in three circumstances:

(i)    the information is provided to an affiliate;[234]

(ii)   the adviser shares the information in the course of providing advisory services to the client (*e.g.,* with a broker, transfer agent, or lawyer) with the client's consent, or as required by law;[235] or

(iii)  the adviser shares the information with a nonaffiliate that performs services, including marketing, for the adviser, but the adviser must have entered into a contract with the nonaffiliate that prohibits the nonaffiliate from using the information except for the purpose for which it received it.[236]

c.   *Safeguarding and Properly Disposing of Client Information.*[237]  An

---

[232]   17 CFR 248.2, *adopted in, Final Model Privacy Form under the Gramm-Leach-Bliley Act*, Investment Advisers Act Release No. 2950 (Nov. 16, 2009), *available at* http://www.sec.gov/rules/final/2009/34-61003.pdf.

[233]   Rule 248.10.

[234]   Subpart B of Regulation S-P governs the use of certain information received by affiliates.  This subpart, Regulation S-AM, allows a consumer, in certain limited situations, to block affiliates of advisers from soliciting the consumer, if the solicitation is derived from certain private information that the adviser has shared with an affiliate.  Subpart B (Regulation S-AM) differs from Subpart A of Regulation S-P in that it does not restrict the *sharing* of certain information, only the actual *use* of the information to solicit.  *See Regulation S-AM: Limitations on Affiliate Marketing*, Investment Advisers Act Release No. 2911 (August, 4, 2009) *available at* http://www.sec.gov/rules/final/2009/34-60423.pdf.

[235]   Rules 248.14, 248.15.

[236]   Rule 248.13.

[237]   The SEC has proposed additional amendments to its privacy rules.  In 2012, the SEC proposed rules, including those that could require certain advisers who have custody or client assets or that otherwise qualify as financial institutions to (i) develop a program to identify "red flags" associated with identity theft, and (ii) have policies and procedure designed to prevent and mitigate identity theft in connection with its consumer accounts. *Identity Theft Red Flags Rules*, Investment Company Act Release No. 29969 (Feb. 28, 2012) *available at* http://www.sec.gov/rules/proposed/2012/ic-29969.pdf.  In 2008, the SEC proposed amendments to its rules, including (i) a requirement that individuals be notified under certain circumstances in the event of a breach of security, (ii) additional guidance as to information that must be included in the safeguard and disposal polices, and (iii) a limited exception to the notice and opt-out requirements to allow a departing registered representative to take certain client

adviser must adopt written procedures reasonably designed to protect client records and information and to dispose of consumer report information properly.[238]

d.   *"Non-public personal information"* includes "personally identifiable financial information" (a defined term) and any list, description, or other grouping of clients derived using "personally identifiable financial information" (*e.g.*, a client list):[239]

   (i)   "Personally identifiable financial information" includes information a client provides an adviser, information that results from services the adviser provides to the client, and information an adviser otherwise obtains about the client in connection with providing advisory services.[240]

   (ii)   "Non-public personal information" does not include "publicly available information"— *i.e.*, information the adviser reasonably believes is lawfully made available to the general public from government records, widely distributed media, or disclosures to the general public required by law.[241]

15.   *Form 13F Disclosure*. An SEC-registered investment adviser that exercises investment discretion over at least $100 million in "section 13(f) securities" must periodically file Form 13F with the SEC.[242] This requirement was designed "to create a central depository of historical and current data about the investment activities of institutional investment managers" to assist investors and regulators.[243]

"Section 13(f) securities" generally include equity securities that trade on an exchange (including the NASDAQ National Market System).[244] Form 13F must be filed electronically, via the SEC's Electronic Data Gathering,

---

information when leaving a firm. *Regulation S-P: Privacy of Consumer Financial Information and Safeguarding Personal Information,* Investment Advisers Act Release No. 2712 (Mar. 4, 2008).

[238]   Rule 248.30(a); 248.30(b). The SEC has settled an enforcement action against an investment adviser that failed to adopt procedures reasonably designed to protect client records and information. *See In the Matter of LPL Financial Corporation*, Investment Advisers Act Release No. 2775 (Sept. 11, 2008).

[239]   Rule 248.3(t)(1).

[240]   Rule 248.3(u)(1).

[241]   Rule 248.3(t)(2).

[242]   Section 13(f) of the Exchange Act; rule 13f-1(a) under the Exchange Act. *See In the Matter of Quattro Global Capital, LLC.*, Investment Advisers Act Release No. 2634 (Aug. 15, 2007) (adviser failed to File Form 13F); *In the Matter of Cabot Money Management Inc.*, Investment Advisers Act Release No. 1577 (Aug. 15, 1996).

[243]   S. Rep. No. 94-75, 94th Cong., 2d Sess. 82-85 (1975). Each quarter, the SEC publishes a list of section 13(f) securities to assist institutional investment managers in the preparation of their Form 13F filings, *available at* http://www.sec.gov/divisions/investment/13flists.htm.

[244]   "Section 13(f) securities" also include certain equity options and warrants, shares of closed-end investment companies, and some convertible securities. Shares of open-end investment companies are not "section 13(f) securities." Rule 13f-1(c). The SEC publishes an official list of section 13(f) securities, *available at* http://www.sec.gov/divisions/investment/13flists.htm.

Analysis and Retrieval ("EDGAR") system, within 45 days after the end of the March, June, September, and December calendar quarters. Form 13F reports must identify, among other things: (i) the name of the issuer; (ii) the number of shares owned; and (iii) the fair market value, as of the end of the quarterly filing period, of the reported securities.[245]

*Non-U.S. Advisers.* Non-US investment advisers must file Form 13F if they (i) use any means or instrumentality of United States interstate commerce in the course of their business; and (ii) exercise investment discretion over $100 million or more in section 13(f) securities.[246]

16. *Large Trader Reporting.* An investment adviser that qualifies as a "large trader" must obtain a large trader identification number from the SEC, file and periodically update Form 13H, and disclose to each SEC-registered broker-dealer through which it trades its large trader identification number and all accounts to which that number applies.[247] These requirements were designed to assist the SEC in both identifying, and obtaining trading information on, market participants that conduct a substantial amount of trading activity.[248]

An adviser is a "large trader" if it exercises investment discretion over one or more accounts through which transactions in "national market system securities" are effected through one or more registered broker-dealers in amounts that, in the aggregate, amount to either: (i) 2 million shares or shares with a fair market value of $20 million during a calendar day; or (ii) 20 million shares or shares with a fair market value of $200 million during a calendar month.[249]

*National market system securities.* These securities include listed options and equity securities listed on an exchange (including the NASDAQ National Market System).[250] The scope of securities that fall under this definition is narrower than the scope of securities that trigger Form 13F filing.[251]

---

[245]  The Division of Investment Management has published a "FAQ" regarding Form 13F ("13F FAQs"), *available at* http://www.sec.gov/divisions/investment/13ffaq.htm.

[246]  *See also* 13F FAQs *at* FAQ #4.

[247]  *See Large Trader Reporting*, Exchange Act Release No. 34-64976 (July 27, 2011) ("LTR Release"). The Commission adopted rule 13h-1 and related Form 13H, as directed by section 13(h) of the Exchange Act, on July 27, 2011. The rule also requires registered broker-dealers to monitor accounts for the purpose of identifying "unidentified large traders," capture certain information relating to all transactions on behalf of large traders and unidentified large traders that are effected directly or indirectly by or through them, and make such information available to the Commission through the already-established trade-reporting infrastructure, commonly referred to as the "electronic blue sheets." *See id.*

[248]  *Id.*

[249]  *See id.*

[250]  *See* Regulation NMS, rule 600(b)(46), (47) and (82).

[251]  *See supra* note 244 and accompanying text.

To comply, a large trader must file a Form 13H initial filing (via EDGAR) generally within 10 days after effecting aggregate transactions equal to or greater than the identifying activity level.[252]  A large trader must then submit an annual filing within 45 days after the end of each calendar year, and must file an amendment no later than the end of the calendar quarter in which information became stale.[253]

*Non-U.S. Advisers*.  Non-U.S. investment advisers that are "large traders under the rule" (*i.e.*, trade through SEC-registered broker-dealers) must comply with the rule's filing and disclosure requirements.[254]

C.   Contractual Requirements

The Act does not require advisory contracts to be written[255] and the existence of a contract and the interpretation of its terms is generally a matter for state law.  Section 205 of the Act, however, requires all advisory contracts to include certain provisions and prohibits the contracts from including other provisions entered into by advisers registered with, or required to be registered with, the SEC.

1.   *Advisory Fees.*  Advisers and clients are free to mutually agree to the amount of the adviser's compensation for its services, and the method by which it will be paid.[256]

*Performance Fees.*  With significant exceptions discussed below, section 205(a)(1) of the Act prohibits advisers from entering into a contract with a client that varies with the adviser's success in managing the client's money, *i.e.,* a fee based on a share of the capital gains or appreciation of a client's

---

[252]   The form requires disclosure of, among other things, the large trader's contact information, its and its affiliates companies businesses, the forms it and its securities affiliates file with the Commission, its organizational structure and legal form, and a list of broker-dealers with which it maintains accounts. *See id.*

[253]   *See* LTR Release.  A large trader may avoid updating filings if it obtains "inactive status" through a Form 13H filing by not having effected aggregated transactions in excess of the thresholds at any time during the previous full calendar year.   *See id.*

[254]   Where the laws of a foreign jurisdiction prevent a non-U.S. large trader (whether itself a broker-dealer or adviser) from disclosing certain personal identifying information of an underlying principal, foreign large traders or representatives of foreign large traders may request an exemption from the SEC pursuant to section 36 of the Exchange Act and subsection (g) of rule 13h-1. *See id.*

[255]   However, section 15(a) of the Investment Company Act requires advisory contracts with investment companies to be in writing.

[256]   The SEC staff has taken the position that an investment adviser that charges fees which substantially exceed those charged by other investment advisers may violate section 206 of the Act, unless it discloses to existing and prospective clients that such a fee is higher than that charged by other advisers that provide the same or similar services.  The staff had indicated that it will consider an advisory fee greater than 2% of the total assets under management as excessive and would violate section 206 unless the adviser disclosure is made that the fee is higher than that normally charged in the industry. *See Equitable Communications Co.*, SEC Staff No-Action Letter (Feb. 26, 1975); *Consultant Publications, Inc.*, SEC Staff No-Action Letter (Jan. 29, 1975); *Financial Counseling Corporation*, SEC Staff No-Action Letter (Dec. 7, 1974); *John G. Kinnard & Co.,* Inc., SEC Staff No-Action Letter (Nov. 30, 1973).

funds.[257]  Congress included this provision in the Act because of its concern that a performance fee would encourage undue speculation with clients' investments.

a.    *Assets Under Management.*  The commonly charged fee based on an amount of assets under management is specifically excepted.[258]

b.    *Fulcrum Fee.*  The Act excepts from the performance fee prohibition a type of fee known as a "fulcrum fee."  This is a fee for "big players" where the investment advisory contract involves registered investment companies or clients with over $1 million of assets.[259]  The fee must be based on the asset value of the funds under management over a "specified period" and must increase or decrease proportionally with the "investment performance" of funds under management in relation to an "appropriate index of securities prices."[260]

c.    *Non-U.S. Clients.*  The Act also excepts contracts with persons who are not residents of the United States.[261]  Congress added this exception in 1996 in recognition that the common use of performance fee arrangements in other countries placed U.S. advisers at a competitive disadvantage.

d.    *Qualified Clients*.  Rule 205-3 permits an adviser to enter into a performance fee contract with certain "qualified clients."  A qualified client is a:

(i)    natural person or company that has at least $1,000,000 under management with the adviser immediately after entering into the

---

[257]    Section 205(a)(1).  The SEC staff has taken the position that section 205(a)(1)'s prohibition of investment advisory contracts that contain performance fees extends to investment advisory contracts that provide for "contingent fees."  *Contingent Advisory Compensation Arrangements*, Investment Advisers Act Release No. 721 (May 16, 1980).  A contingent fee is "an advisory fee [that] will be waived or refunded, in whole or in part, if a client's account does not meet a specified level of performance" or that is contingent on the investment performance of the funds of advisory clients.

[258]    Section 205(b)(1).

[259]    Section 205(b)(2).  The SEC has published a release discussing factors that investment companies considering entering into a fulcrum fee should consider.  Investment Advisers Act Release No. 113 (Apr. 18, 1972).

[260]    Rules 205-1 and 205-2 define the terms in the text.  *But see Royce Value Trust*, SEC Staff No-Action Letter (Dec. 22, 1986) (the SEC staff stated it would not object if an advisory agreement contained a performance fee that decreased at a greater rate than it increased and provided for no compensation if the net asset value per share declined).  The SEC has instituted several enforcement cases against advisers who entered into advisory contracts with investment companies that charge performance fees that did not comply with section 205(b).  In each case, the adviser charged the fund more that it could charge under section 205(b).  *In the Matter of Gartmore Mutual Fund Capital Trust*, Investment Advisers Act Release No. 2548 (Sept. 7, 2006); *In the Matter of Putnam Investment Management*, LLC, Investment Advisers Act Release No. 2547 (Sept. 7, 2006); *In the Matter of Numeric Investors LLC*, Investment Advisers Act Release No. 2546. (Sept. 7, 2006); *In the Matter of Kensington Investment Group, Inc.*, Investment Advisers Act Release No. 2545 (Sept. 7, 2006).

[261]    Section 205(b)(5).

contract;[262]

    (ii)    natural person or company that the adviser reasonably believes has a net worth of more than $2 million at the time the contract is entered into,[263] or is a "qualified purchaser";[264] or

    (iii)    natural person who is an officer, director, trustee, or general partner (or a person serving in a similar capacity) of the adviser, or an employee who participates in investment decisions of the adviser and has done so for at least 12 months.[265]

e.    *Qualified Purchaser Funds*.  The Act also excepts contracts with certain funds not registered under the Investment Company Act because they are offered only to certain wealthy or sophisticated investors.[266]  The funds, which include many hedge funds, rely on the exception from the definition of "investment company" provided by section 3(c)(7) of the Investment Company Act.

f.    *Other Funds*.  Rule 205-3 excepts contracts with other types of funds, but only if *each* equity owner of the company is a qualified client with whom the adviser could otherwise enter into a performance fee contract under the rule.[267]  This exception is available to (i) public investment companies registered under the Investment Company Act of 1940, (ii) business development companies, and (iii) private investment companies that rely on the exception provided by section

---

[262]    Section 418 of Dodd-Frank Act directed the SEC to periodically adjust for inflation the dollar amount threshold for a "qualified client" every five years.  In 2011, SEC issued an order to increase the minimum amount of assets under management threshold from $750,000 to $1,000,000.  *See Order Approving Adjustment for Inflation of the Dollar Amount Tests in Rule 205-3 under the Investment Advisers Act of 1940*, Investment Advisers Act Release No. 3236 (July 12, 2011) (the "Performance Fee Order").  The SEC then amended rule 205-3 to codify the order in the rule. *See Investment Adviser Performance Compensation*, Investment Advisers Act Release No. 3372 (Feb. 15, 2012) ("Release 3372").

[263]    The Performance Fee Order increased the dollar amount for the threshold from $1.5 million to $2 million.  The SEC then amended rule 205-3 to codify the order in the rule and to exclude the value of a person's primary residence and certain property-related debts from the test of whether a person has sufficient net worth to be considered a "qualified client." *See* Release 3372, *supra* note 262.

[264]    A "qualified purchaser" is defined in the rule by reference to section 2(a)(51) of the Investment Company Act, which generally defines a "qualified purchaser" to include: (i) a natural person who owns not less than $5,000,000 in investments; (ii) a trust that meets certain requirements; and (iii) any person (including an investment adviser) who in the aggregate owns and invests on a discretionary basis not less than $25,000,000 in investments.

[265]    Rule 205-3(d)(1)(iii).

[266]    Section 205(b)(4).

[267]    For a discussion of some of the contours of this exception, *see Seligman New Technologies Fund II, Inc.*, SEC Staff No-Action Letter (Feb. 7, 2002).  The adviser itself and any equity owner not charged a performance fee need not be qualified clients.  Rule 205-3(b).  In an arrangement involving multiple tiers of funds, the analysis of whether a performance fee may be charged must be repeated at each tier. *Exception to Allow Registered Investment Advisers to Charge Fees Based Upon a Share of Capital Gains Upon or Capital Appreciation of a Client's Account*, Investment Advisers Act Release No. 1731 (July 15, 1998).

3(c)(1) of the Investment Company Act.[268]

*Non-U.S. Funds.* The SEC staff has stated that if the fund is organized under the laws of a non-U.S. country, only the equity owners that are U.S. residents must be qualified clients.[269]

2.  *Assignments of Advisory Contracts.* Advisory contracts must contain a provision prohibiting their assignment without consent of the client.[270] An assignment generally includes any direct or indirect transfer of an advisory contract by an adviser or any transfer of a controlling block of an adviser's outstanding voting securities.[271] A transaction that does not result in a change of actual control or management of the adviser (*e.g.*, a corporate reorganization) would not be deemed to be an assignment for these purposes.[272]

3.  *Notification of Partnership Changes.* If the adviser is organized as a partnership, each of its advisory contracts must provide that the adviser will notify the client of a change in its membership.[273]

4.  *Hedge Clauses.* The Act voids any provision of a contract that purports to waive compliance with any provision of the Act.[274] The SEC staff takes the position that an adviser that includes any such provision in a contract misleads its clients in violation of the Act's anti-fraud provisions by creating in the mind of the client the belief that a legal right or remedy under the Act is not available.[275]

*Indemnification Clauses.* Historically, the SEC staff has taken the position that prohibition would, for example, preclude an adviser from purporting to limit its culpability to acts involving gross negligence or willful malfeasances,[276] even if the hedge clause explicitly provides that rights

---

[268]    Rule 205-3(b) and (d)(3).

[269]    *See Lazard Frères Asset Management*, SEC Staff No-Action Letter (Feb. 12, 1996).

[270]    Section 205(a)(2).

[271]    Section 202(a)(1).

[272]    Rule 202(a)(1)-1. While rule 202(a)(1)-1 was adopted primarily to deal with intra-corporate reorganizations and reorganizations resulting from changes in domicile, the Division of Investment Management explained in a staff no-action letter that the rule is not so limited. *Zurich Insurance Company, Scudder Kemper Investments*, SEC Staff No-Action Letter (Aug. 31, 1998). Zurich involved a complex corporate transaction, the substance of which the Division did not address. Instead, the Division stated that the adviser must itself evaluate whether a particular transaction involves a change of actual control or management.

[273]    Section 205(a)(3).

[274]    Section 215(a).

[275]    *Opinion of the General Counse*l, Investment Advisers Act Release No. 58 (Apr. 10, 1951). The SEC has instituted enforcement actions against advisers that have utilized hedge clauses in their advisory contracts. *In the Matter of William Lee Parks*, Investment Advisers Act Release No. 736 (Oct. 27, 1980); *In the Matter of Olympian Financial Services*, Inc. Investment Advisers Act Release No. 659 (Jan 16. 1979).

[276]    *Auchincloss & Lawrence Inc.*, SEC Staff No-Action Letter (Feb. 8, 1974).

under federal or state law cannot be relinquished.[277]  More recently, the SEC staff has stated that whether such an indemnification clause would violate the Act's anti-fraud provisions, turns on "the form and content of the particular hedge clause (*e.g.*, its accuracy), any oral or written communications between the investment adviser and the client about the hedge clause, and the particular circumstances of the client."[278]

5.    *Termination Penalties.*  The SEC staff takes the position that certain fees that may have the effect of penalizing a client for ending the advisory relationship, or that may make the client reluctant to terminate an adviser, may be inconsistent with the adviser's fiduciary duties and may violate section 206.[279]  Thus, the SEC staff interprets the anti-fraud provisions of the Act to require an adviser receiving its fee in advance to give a client terminating a contract a *pro rata* refund of pre-paid fees (less reasonable expenses),[280] unless the adviser is to receive a pre-determined amount upon termination for services already performed, and the client is provided adequate disclosure.[281]

D.    Recordkeeping Requirements

The SEC generally requires a registered adviser to maintain two types of books and records:  (i) typical accounting and other records that any business would normally keep; and (ii) certain additional records the SEC believes necessary in light of the adviser's fiduciary duties.[282]

The requirement to keep records does not turn on the medium in which a document is created or maintained.  Thus, electronic documents, including e-mails, must be maintained if they meet the required record described below.

1.    *Typical Records*

a.    All checkbooks, bank statements, and reconciliations.

b.    All written agreements entered into by the adviser with any client or otherwise relating to the business of the adviser, *e.g.,* rental and service agreements, mortgages, employment contracts, advisory contracts.

c.    All invoices or statements relating to the adviser's business.

---

[277]    *Omni Management Corp.* SEC Staff No-Action Letter (Dec. 13, 1975); *First National Bank of Akron*, SEC Staff No-Action Letter (Feb. 27. 1976).

[278]    *Heitman Capital Management, LLC, et al.*, SEC Staff No-Action Letter (Feb. 12. 2007).

[279]    *See, e.g., National Deferred Compensation*, SEC Staff No-Action Letter (Aug. 31, 1987) ("an adviser may not fulfill its fiduciary obligations if it imposes a fee structure penalizing a client for deciding to terminate the adviser's service or if it imposes an additional fee on a client for choosing to change his investment").

[280]    *National Regulatory Services*, SEC Staff No-Action Letter (Dec. 2, 1992).  The staff does not see this view altered by the decision *Transamerica v. Lewis*, 444 U.S. 11 (1979), that clients do not have a private right of action under section 206 of the Act, because they continue to have rights to sue for equitable damages under section 215 of the Act.

[281]    *BISYS Fund Services, Inc.,* SEC Staff No-Action Letter (Sept. 2, 1999).

[282]    Rule 204-2.

      d.     All cash receipts and disbursement journals, other journals, appropriate ledger accounts, all trial balances, financial statements, and internal audit working papers relating to the business of the adviser.

2.    *Additional Records*

      a.     A record of the personal securities transactions of the adviser and its employees.

      b.     Copies of each report of personal securities holdings made by an access person under the adviser's code of ethics.

      c.     Documents supporting an adviser's decision to approve an access person's personal securities transactions.

      d.     A list of all persons who currently are "access persons" and who have been access persons within the last five years.

      e.     A memorandum of each order given by the adviser for the purchase or sale of any security and any instruction from the client concerning such purchase and sale.

      f.     A cross reference of securities held by client and by issuer.

      g.     All written communications received and copies of all written communications sent by the adviser relating to:

          (i)     any recommendation made or proposed to be made, and any advice given or proposed to be given;

          (ii)    any receipt, disbursement or delivery of funds or securities; or

          (iii)  the placing or executing of any order to purchase or sell any security.

      h.     Copies of all circulars, advertisements, newspaper articles, etc., sent to 10 or more persons.

      i.     A list of all accounts over which the adviser has discretionary authority.

      j.     Copies of any power of attorney.

      k.     A copy of each written statement given to any client in compliance with the brochure rule and any document prepared in compliance with the requirements of Form ADV.

      l.     Clients' acknowledgement of receipt of a solicitation agreement.

      m.    Documents substantiating any performance advertised.[283]

---

[283]    Rule 204-2(a)(16).  *See* Investment Advisers Act Release No. 1135 (Aug. 17, 1988) (adopting paragraph (a)(16)); *see also Salomon Brothers Asset Management Inc. and Salomon Brothers Asset Management Asia Pacific Limited*, SEC Staff No-Action Letter (July 23, 1999) (explaining that records needed to be retained to substantiate performance).  In addition, rule 204-2(e)(3)(ii) provides that advisers that had relied on the exemption from registration under section 203(b)(3) of the Act before

n.    Certain additional records if the adviser has custody or possession of clients' cash or securities.[284]

o.    Copies of the code of ethics and amendments thereto.

p.    Records of violations of the code by supervised persons and of any actions taken against violators of the code of ethics.

q.    Copies of each supervised person's written acknowledgment of receipt of a copy of the code of ethics.

r.    Certain additional records regarding political contributions and advisory services to any government entity.[285]

3.    *Other Requirements Regarding Recordkeeping*

a.    All books and records required to be kept by the rule must be maintained and preserved in any easily accessible place for a period of no less than five years.[286]

b.    Records required to be kept may be kept in micrographic media (*e.g.*, microfilm or microfiche) or in electronic storage media (*e.g.*, optical storage discs, CD ROMs).[287]

c.    There are special recordkeeping rules for non-resident investment advisers.[288]

E.    <u>Applicability to Non-U.S. Advisers.</u>

The SEC has stated that most of the requirements (discussed above) do not apply with respect to the non-U.S. clients of an SEC registered adviser whose principal place of business is not in the U.S.[289]  For example, a non-U.S. adviser is not

---

July 21, 2011 (the private adviser exemption) will not be subject to the requirement of maintaining records to support their calculation of the performance, or rate of return, of the accounts they managed or securities they recommended for any period prior to their registration with the SEC, provided that they continue to preserve any records in their possession that pertain to such performance or rate of return.

[284]    Rule 204-2(a)(17)(iii) and (b).

[285]    Rule 204-2(a)(18) and (h).

[286]    Rule 204-2(e).  The first two years, the records must be kept in the offices of the adviser.

[287]    Rule 204-2(g).  An adviser storing records in electronic storage media must establish and maintain procedures:  (i) to preserve the records and safeguard them from loss, alteration or destruction; (ii) limit access to authorized personnel; and (iii) reasonably assure that any reproduction of paper records onto electronic media is accurate.  *See In the Matter of Anthony Fields, CPA, et al.*, Investment Advisers Act Release No. 3348 (Jan. 4, 2012) (The SEC has instituted administrative proceedings alleging that adviser violated section 204 of the Advisers Act and rules 204-2(a)(11) and 204-2(e)(3)(i) thereunder by utilizing several email and online communication providers, each of which routinely deletes emails and online communications after six months, and doing nothing to retain these communications).

[288]    Rule 204-2(j).

[289]    *Registration Under the Advisers Act of Certain Hedge Fund Advisers*, Investment Advisers Act Release No. 2266 (July 20, 2004) at §II.C.(3)(c)(this rule was vacated by a federal court in 2006, *see supra* note 213).  *See also* section 203(b)(3) of the Advisers Act amended by the Dodd-Frank Act,

required to maintain non-U.S. person client assets in accordance with the custody rule.

The SEC staff has stated that a non-U.S. adviser registered with the SEC is subject to examination by SEC staff and must maintain certain records with respect to all of its clients, including non-U.S. clients.[290]

F.    Administrative Oversight

All records of a registered adviser (and not only those required to be created or maintained pursuant to SEC rule) are subject to examination by SEC staff.[291] Personnel in the SEC's Office of Compliance Inspections and Examinations located at SEC headquarters and various regional offices usually conduct inspections.  All examinations are confidential.[292]

1.    *Types of Inspections.*   There are generally three types of inspections.

a.    *Examinations of High-Risk Investment Advisers*.  The SEC staff utilizes a risk-based process, identifying higher-risk investment advisers for examination consideration and focusing examination resources on certain higher-risk activities at selected investment advisers, including conflicts of interest, portfolio management, valuation, performance, advertising and asset verification.  Typically, higher-risk investment advisers are identified based on (i) information contained in regulatory filings; (ii) assessments made during past examinations; and/or (iii) other criteria and available information.[293]

---

Release 3222, *supra* note 68 and Section III. B. 3 of this outline for discussion regarding foreign private adviser exemption.

[290]    The SEC staff has provided guidance in a series of no-action letters regarding the recordkeeping obligations of registered advisers that are located offshore. Under that analysis, the registered adviser must, in order to rely on the no-action relief, comply with the Act's recordkeeping rules, other than (i) rules 204-2(a)(3) and (7) with respect to transactions involving offshore clients that do not relate to advisory services performed by the registered adviser on behalf of United States clients or related securities transactions; and (ii) rules 204-2(a)(8), (9), (10), (11), (14), (15) and (16) and 204-2(b) with respect to transactions involving, or representations or disclosures made to, offshore clients.  *See*, *e.g.*, *Royal Bank of Canada*, SEC Staff No-Action Letter, (June 3, 1998).  The Dodd-Frank Act added section 214(b) to the Advisers Act, which provides extraterritorial jurisdiction to U.S. federal courts regarding actions or proceedings brought by the Commission or the United States for violation of section 206 of the Act involving (i) conduct within the United States even if the violation is committed by a foreign adviser and involves only foreign investors; or (ii) conduct occurring outside the United States that has a foreseeable substantial effect within the United States.

[291]    *See* section 204 ("<u>All</u> records (as so defined) of such investment advisers are subject at any time, or from time to time, to such reasonable periodic, special, or other examinations." (emphasis added)).

[292]    Section 210(b) of the Act generally prohibits the SEC or the SEC staff from disclosing publicly either the existence of an examination or investigation conducted under the Act, or the results of or any facts ascertained during an examination or investigation.

[293]    *See Study on Enhancing Investment Adviser Examinations* (Jan. 19, 2011), *available at* http://sec.gov/news/studies/2011/914studyfinal.pdf (staff study required by section 914 of the Dodd-Frank Act, which directed the Commission to review and analyze the need for enhanced examination and enforcement resources for investment advisers); Commissioner Elisse B. Walter, *Statement on Study Enhancing Investment Adviser Examinations (Required by Section 914 of Title IV of the Dodd-*

b.  *Special Purpose Reviews.*  The SEC staff conducts risk-targeted examination sweeps regarding specific areas of concern within the financial services industry covering a broad sample of regulated entities regarding those areas.  These sweeps are typically limited in scope.  In addition, the SEC staff conducts limited scope examinations of an investment adviser's general business activities and a targeted set of the adviser's books and records to help OCIE better assess the risk profile of an investment adviser.[294]

c.  *Cause Examinations.*  These may be based on receipt of a complaint from a client or a competitor, press reports of problems, rumors, or anonymous tips.

In addition, OCIE launched a presence exams initiative in 2012 to conduct focused, risk-based examinations of investment advisers to private funds that registered with the Commission following the repeal of the private adviser exemption.[295]  The presence exams include three phases:  (i) an initial phase of industry outreach and education; (ii) followed by a coordinated series of examinations of a significant percentage of newly registered advisers focusing on the highest risk areas of their businesses; and (iii) culminating in the publication of a series of "after action" reports, reporting to the industry on the broad issues, risks and themes identified during the course of the examinations.[296]

2.  *Focus of Inspections.*  Examiners will generally focus on the various activities at an investment adviser deemed by the staff to be high risk.  Among other things, the staff is seeking to detect violations of the federal securities laws, including the requirement that the adviser have effective compliance policies and procedures.  When the SEC adopts new rules that are applicable to investment advisers, examiners may inquire about the areas affected by such rules and review relevant documentation to assess how the adviser is complying with the new requirements.  Other examination focus areas are determined by the purpose for conducting the exam, business activities of the investment adviser, and the compliance controls surrounding those activities.[297]

3.  *Results of Inspection.*  Generally, there are three possible results from an examination.

a.  The SEC staff finds no problems and sends the adviser a letter stating that the inspection is finished (a rare event!).

---

[294]  *Frank Wall Street Reform and Consumer Protection Act)* (Jan. 19, 2011), *available at* http://sec.gov/news/speech/2011/spch011911ebw.pdf.

[294]  *Id.*

[295]  *See Letter to Newly Registered Investment Advisers from Drew Bowden, Deputy Director, Office of Compliance Inspections and Examinations, SEC* (Oct. 9, 2012), *available at* http://www.sec.gov/about/offices/ocie/letter-presence-exams.pdf.

[296]  *See* Norm Champ, "*What SEC Registration Means for Hedge Fund Advisers*" (May 11, 2012), *available at* http://sec.gov/news/speech/2012/spch051112nc.htm.

[297]  *See Study on Enhancing Investment Adviser Examinations, supra note* 293.

b.  The SEC staff sends an "exam summary letter," which informs the adviser of any violations or possible violations found and requests the adviser promptly to take any necessary corrective steps and submit a written response to the SEC staff of the corrective actions taken.

c.  The SEC staff refers the inspection to the SEC's Division of Enforcement for further consideration and possible commencement of an enforcement proceeding—not common as a first step.