**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————

SECURITIES AND EXCHANGE COMMISSION,    )
                                       )
                                       )
                                       )
                     Plaintiff,        )        Civil Action No. 23-cv-8253
                                       )
        v.                             )
                                       )
CONCORD MANAGEMENT LLC and             )
MICHAEL MATLIN,                        )
                                       )
                     Defendants.       )
                                       )
———————————————————————

## ANSWER OF CONCORD MANAGEMENT LLC AND MICHAEL MATLIN

Defendants Concord Management LLC ("Concord") and Michael Matlin, by and through

their undersigned counsel, hereby answer the allegations of the Complaint of the Securities and

Exchange Commission as follows:

## SUMMARY[*]

1.    *Since approximately 1999, Concord and Matlin have operated as investment advisers for the benefit of a single client: a wealthy former Russian political official living outside the United States. From the beginning, the purpose of this investment advisory business was to provide supervisory and management services so that its client's assets would be continuously invested in a diverse portfolio of United-States-based private fund investments. Over time, Concord's assets under management grew substantially. As the assets grew, Concord likewise grew to deliver the increased scale of operational and administrative services necessary to service the securities portfolio. By 2012, Matlin and Concord employed approximately a dozen investment professionals who collectively provided supervisory and management services over hundreds of individual investments. As of January 2022, Concord managed a private fund securities portfolio with an estimated total value of $7.2 billion.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as

to the truth of the allegations in the first sentence of Paragraph 1 and on that basis deny them,

———————————————

[*] The repetition of the headings and subheadings contained in the SEC's complaint is not an adoption of these headings, nor an admission of their truth. Rather, Concord and Mr. Matlin include such headings and subheadings in this Answer for the Court's ease of reference.

except they admit that Concord and Mr. Matlin operated as investment advisers. As to the fifth sentence, Concord and Mr. Matlin admit that Concord employed approximately ten people in 2012. Concord and Mr. Matlin deny all other allegations in Paragraph 1.

2.    *Based on the work that they performed in providing investment advice for compensation, Concord and Matlin acted as investment advisers. And, because Concord and Matlin provided continuous and regular supervisory and management services for the billions of dollars' worth of private fund investments on which they advised, they were required to register with the Commission unless specifically excluded or exempted from doing so. No exclusion or exemption applied to Concord or Matlin, but neither registered with the Commission.*

**ANSWER:** Concord and Mr. Matlin admit the allegations in the first sentence of Paragraph 2. Concord and Mr. Matlin deny the remaining allegations in Paragraph 2, except they admit that neither Concord nor Mr. Matlin was registered as an investment adviser with the Securities and Exchange Commission.

3.    *Matlin's failure to register either Concord or himself as an investment adviser prevented the Commission's oversight of both the organization as a whole and the activities of Matlin and his employees. As a result, over $7 billion of assets that belonged to one foreign individual was actively managed in the United States securities markets by a single advisory firm, out of an office in Tarrytown New York, with no regulatory oversight.*

**ANSWER:** Denied.

4.    *Concord received compensation for its work in the form of a monthly consulting fee, along with an annual performance bonus and expense reimbursement. From 2012 to February 2022, Concord received approximately $85 million in total compensation, comprised of approximately $50 million in performance bonuses, approximately $29 million in fees, and approximately $6 million in reimbursed expenses. Matlin received an annual salary and took distributions of Concord's profits.*

**ANSWER:** The first sentence of Paragraph 4 characterizes or describes the consulting agreement between Concord and its client. That document speaks for itself and thus no response is required. If and to the extent a response is deemed required, Concord and Mr. Matlin deny the allegations in the first sentence of Paragraph 4, except they admit that Concord received compensation for its work pursuant to the terms of the consulting agreement with its client and a subsequent amendment to that document. Concord and Mr. Matlin deny the allegations in the second sentence of

Paragraph 4, except they admit that Concord received approximately $85 million in total compensation for its work pursuant to the terms of the consulting agreement with its client and a subsequent amendment to that document. Concord and Mr. Matlin deny the allegations in the third sentence of Paragraph 4, except they admit that Mr. Matlin received an annual salary and took membership distributions from Concord pursuant to his ownership of the membership interests of Concord.

5.      *As described further below, the client held ownership of the private fund investments through an interrelated group of investing entities. But functionally, regardless of the corporate structure, Concord was one business: a United States investment adviser providing continuous and regular supervisory and management services over a securities portfolio of private fund investments with billions of dollars of assets under management belonging to one individual client.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence and on that basis deny them. Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in the portion of the second sentence preceding the colon and on that basis deny them. Concord and Mr. Matlin deny the allegations in the portion of the second sentence following the colon.

6.      *In March 2022, that client was designated as a sanctioned individual by the United Kingdom and the European Union, and his assets were frozen. As a result of the asset freeze and other factors, Concord and Matlin have not actively engaged in investment activity since that time. However, many of the underlying investments continue to be active, and, if the asset freeze is lifted, Concord and Matlin would be able to resume managing their client's investments.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 6 and on that basis deny them. Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 6 and on that basis deny them, except they admit that Concord and Mr. Matlin have not provided investment-related research and due diligence services to their client since March 2022. Concord and Mr. Matlin deny the allegations in the third sentence of Paragraph 6, except they deny knowledge or information sufficient to form

a belief as to the truth of the allegation that "many of the underlying investments continue to be active" and on that basis deny it.

7.       *As a result of the conduct alleged herein, the Defendants have violated, and unless restrained and enjoined will continue to violate, Section 203(a) of the Investment Advisers Act of 1940 [15 U.S.C. § 80b-3(a)] (the "Advisers Act").*

**ANSWER:** Denied.

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

8.       *The Commission brings this action pursuant to the authority conferred upon it by Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)].*

**ANSWER:** Paragraph 8 states a legal conclusion to which no response is required; for purposes of responding to this complaint, Concord and Mr. Matlin deny these allegations.

9.       *The Commission seeks a final judgment permanently enjoining the Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint; ordering disgorgement of all ill-gotten gains from the unlawful conduct set forth in this Complaint, together with prejudgment interest, and civil penalties pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and ordering such other relief as the Court may deem appropriate.*

**ANSWER:** Concord and Mr. Matlin admit that the SEC purports to seek some of this relief, except they deny that the SEC is entitled to any relief and deny that the SEC continues to seek disgorgement in this proceeding because subsequent to the filing of this Complaint, the SEC agreed to abandon its claim for disgorgement because no victims exist in this action and no one suffered any pecuniary harm.    ECF 30 (so-ordered stipulation withdrawing the SEC's claim for disgorgement); *S.E.C. v. Govil*, 86 F.4th 89, 94 (2d Cir. 2023) (disgorgement cannot be awarded in a case where there are no victims who suffered pecuniary harm).

## JURISDICTION AND VENUE

10.       *This Court has jurisdiction over this action pursuant to Section 214 of the Advisers Act [15 U.S.C. § 80b-14].*

**ANSWER:** Paragraph 10 states a legal conclusion to which no response is required; for purposes of responding to this complaint, Concord and Mr. Matlin deny these allegations.

11.    *Defendants, directly and indirectly, have made use of the means and instrumentalities of interstate commerce, of the mails and wires, and/or of the facilities of a national securities exchange in connection with transactions, acts, practices, and courses of business alleged herein.*

**ANSWER:** Paragraph 11 states a legal conclusion to which no response is required; for purposes of responding to this complaint, Concord and Mr. Matlin deny these allegations.

12.    *Venue lies in this Court pursuant to Section 214 of the Advisers Act [15 U.S.C. § 80b-14]. Certain of the acts, practices, and transactions and courses of business alleged in this Complaint occurred within the Southern District of New York. Specifically, Concord's office, where most of the business activity described herein occurred, was located in Tarrytown, New York.*

**ANSWER:** The first sentence of Paragraph 12 states a legal conclusion to which no response is required; for purposes of responding to this complaint, Concord and Mr. Matlin deny these allegations. As to the second and third sentences of Paragraph 12, Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of these allegations and on that basis deny them, except they admit that Concord's office was located in Tarrytown, New York and that most of its employees and Mr. Matlin worked there.

## DEFENDANTS

13.    ***Concord Management LLC** (Concord), is a limited liability company based in Tarrytown, New York that was incorporated in Delaware in May 1999 and re-incorporated in Delaware in May 2012.*

**ANSWER:** Concord and Matlin admit the allegations in Paragraph 13.

14.    ***Michael Matlin**, age 59, is a resident of Airmont, New York. Matlin was born in Russia, and emigrated to the United States in 1988. He is a citizen of the United States. Matlin founded Concord in 1999 and is its managing member and 100% owner.*

**ANSWER:** Concord and Mr. Matlin admit the allegations in the first, third, and fourth sentences of Paragraph 14, except they deny that Mr. Matlin is 59 years old. Concord and Mr. Matlin deny the allegations in the second sentence of Paragraph 14, except they admit that Mr. Matlin was born in the former Soviet Union and emigrated to the United States in 1988.

## RELEVANT ENTITIES

15.    *UBO A is a Russian individual that was the Ultimate Beneficial Owner (UBO) of all assets managed by Concord until February 2022.  UBO A is a former Russian political official widely regarded as having political connections to the Russian Federation and vast wealth from the privatization of state-run industries after the collapse of the former Soviet Union.  In March 2022, the United Kingdom and the European Union designated UBO A as a sanctioned individual, and in April 2022, the Royal Court of Jersey issued an order freezing his assets.*

**ANSWER:** Concord and Mr. Matlin deny the allegations in the first sentence of Paragraph 15.

Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth

of the allegations in the second and third sentences of Paragraph 15, and on that basis deny them.[*]

16.    *Company 1 is a limited liability company organized in the British Virgin Islands in February 2002 and one of the principal corporate entities through which UBO A held beneficial ownership of the assets managed by Concord.  Company 1 is the direct controlling owner of certain subsidiary Investing Entities, defined further below, which in turn held direct nominal ownership of the investments.  Company 1 is also the entity through which UBO A eventually contracted with Concord for investment advisory services, as described further below.  Company 1 is thus the corporate entity that is technically Concord's client.  Company 1 re- domiciled to the Isle of Jersey in April 2021.  In February 2022, UBO A transferred beneficial ownership of Company 1 to five of his children.*

**ANSWER:** As to the first sentence of Paragraph 16, Concord and Mr. Matlin deny the  allegations,

except they admit that Company 1 was a limited liability company formed in the British Virgin

Islands, was Concord's client, and was beneficially owned by UBO A.  Concord and Mr. Matlin

deny knowledge or information sufficient to form a belief as to the truth of the allegations in the

second sentence of Paragraph 16, and on that basis deny them.  The third sentence of Paragraph

16 characterizes or describes the consulting agreement between Concord and its client.  That

document speaks for itself and thus no response is required.  If and to the extent a response is

deemed required, Concord and Mr. Matlin deny knowledge or information sufficient to form a

---

[*] Prior to the filing of this Answer, counsel for Plaintiff informed counsel for Defendants of its position regarding the identities of the individuals or entities to which the Commission refers to in the Complaint by the following terms: "UBO A"; "Person B"; "Employee C"; "Company 1"; "Company 2"; an "energy-focused private equity company"; the "Cypriot entity"; and the "Investing Entities" which are alleged to have been redomiciled in 2021.  Concord and Mr. Matlin's Answer is based on and subject to the Commission's representations in this regard.

belief as to the truth of these allegations and on that basis deny them.  Concord and Matlin deny

the allegations in the fourth sentence of Paragraph 16.  Concord and Mr. Matlin admit the

allegations in the fifth and sixth sentences of Paragraph 16.

17.  ***The "Investing Entities"*** *are the nominee companies that UBO A uses to hold the hedge fund and private equity fund investments for which Concord and Matlin provided continuous and regular supervisory and management services.  Directors of these nominee companies sign subscription documents as the named investor, but they held legal title for the benefit of UBO A. Between 1999 and 2015, Company 1 held ownership of over a dozen different nominee companies. In 2015, UBO A consolidated Company 1's subsidiary nominee entities down to four British Virgin Islands ("BVI") limited liability companies.  In April 2021, UBO A "re-domiciled" these entities from the BVI to the Isle of Jersey.  UBO A also held ownership of other nominee entities through parent vehicles other than Company 1.  One of these nominee entities was a Cyprus limited liability company, which UBO A used to hold certain private equity investments.  For the purpose of this complaint, the Commission uses the term "Investing Entities" to refer to all of the nominee entities UBO A used to hold hedge fund and private equity investments for which Concord and Matlin provided continuous and regular supervisory and management services, which includes all the Company 1 nominee entities and the Cypriot entity.*

**ANSWER:**  As to the first sentence of Paragraph 17, Concord and Mr. Matlin deny these

allegations, except they admit that UBO A held hedge fund and private equity fund investments

through corporate entities.  Concord and Mr. Matlin deny knowledge or information sufficient to

form a belief as to the truth of the allegations in the second sentence of Paragraph 17, and on that

basis deny them.  Concord and Mr. Matlin admit the allegations in the third sentence of Paragraph

17.  Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the

truth of the allegations in the fourth sentence of Paragraph 17, and on that basis deny them, except

they admit that the corporate entities through which Company 1 invested were consolidated down

to four British Virgin Islands companies.  Subject to the referenced "entities" being the four

companies referenced in Concord and Mr. Matlin's response to the fourth sentence of Paragraph

17, Concord and Mr. Matlin admit the allegations in the fifth sentence of Paragraph 17.  Concord

and Mr. Matlin deny knowledge or information sufficient to form a belief as to the allegations in

the sixth and seventh sentences of Paragraph 17, and on that basis denies them.  As to the eighth

sentence of Paragraph 17, Concord and Mr. Matlin deny these allegations.  For purposes of

answering this Complaint, Concord and Mr. Matlin define "Investing Entities" as the entities that held the hedge fund and private equity fund investments in connection with which Concord provided its consulting services.

18.    *Company 2 is an entity domiciled in the United Kingdom that is affiliated with UBO A. With respect to Concord's investment operations, Company 2 employees provided back-office administrative support services. Between 2005 and June 2022, its registered office was in London.*

**ANSWER:** Concord and Mr. Matlin admit the allegations in the first sentence of Paragraph 18. Concord and Mr. Matlin deny the allegations in the second sentence. Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18, and on that basis deny them.

19.    *Person B was born in Russia and is reportedly a citizen of both the United States and the United Kingdom. He is a longtime close associate of UBO A. As of March 24, 2022, Person B was designated as a sanctioned individual in the United Kingdom. Person B was the point of contact for receiving investment advice from Matlin and Concord and for either deciding or communicating the decision whether to go forward with recommended transactions.*

**ANSWER:** Concord and Mr. Matlin admit the allegations in the first and third sentences of Paragraph 19. Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 19, and on that basis deny them. As to the fourth sentence, Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegation that Person B "decid[ed] … whether to go forward with recommended transactions," and on that basis denies it, except and admit that Person B was the point of contact for the receipt of investment advice from Concord.

20.    *Employee C worked for Concord from its early days through 2023. Employee C was invited to join Matlin and Concord's business through Person B, a longtime friend of Employee C. Employee C, Person B, and Matlin grew up in Russia and met as students in Moscow. When UBO A decided to invest in United States private funds, Concord was created as the vehicle to do so, with Matlin as the owner and operator and Employee C as the functional head of operations. As the assets Concord managed grew, Matlin hired investment analysts and administrative personnel to handle the increased scale of investment and asset management services. Company 2 appointed staff to assist with the back-office operations and help facilitate the completion of transaction paperwork. Employee C's formal title became Head of Operations & Administration, but she continued to supervise or manage both operational and administrative*

8

*services necessary to implement the business of managing UBO A's private fund investments. Employee C also handled the performance reporting for UBO A's portfolio of assets under management, which Employee C delivered monthly to Matlin and representatives of UBO A.*

**ANSWER:** As to the first sentence of Paragraph 20, Concord and Mr. Matlin admit that Employee C worked for Concord between approximately 1999 and 2023, and aver that beginning in 2020, Employee C performed her work for Concord as an independent consultant. Concord and Mr. Matlin admit the allegations in the second and third sentence of Paragraph 20. Concord and Mr. Matlin deny the allegations in the fourth sentence of Paragraph 20. As to the allegations in the fifth sentence of Paragraph 20, Concord and Mr. Matlin deny these allegations, except they admit that Concord hired additional investment analysts and administrative personnel between 1999 and 2023. As to the allegations in the sixth sentence of Paragraph 20, Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in the sixth sentence of Paragraph 20, and on that basis deny them, except they admit that Company 2 hired employees to facilitate the completion of transaction paperwork and otherwise assist the Client. Concord and Mr. Matlin deny the allegations in the seventh sentence of Paragraph 20, except they admit that Employee C's title was "Head of Operations and Administration." Concord and Mr. Matlin deny the allegations in the eighth sentence of Paragraph 20.

## FACTUAL ALLEGATIONS

### A. Formation of Concord

21.    *Matlin founded Concord in 1999, two years after obtaining a Masters in Business Administration from an Ivy League university and working at a United States hedge fund. Matlin founded Concord to provide investment advice for compensation, and to supervise and manage UBO A's investments in United States-based private funds, focusing on hedge funds and ultimately including private equity funds and other investments. Person B, a close associate of UBO A and former classmate of Matlin and Employee C, recruited Matlin to run the business of managing UBO A's private fund securities portfolio, and he asked Employee C to provide operational and other support to the business. Person B received all investment recommendations from Matlin and Concord. Person B also made investment decisions based on those recommendations, and communicated the decisions to Matlin.*

**ANSWER:** Concord and Mr. Matlin admit the allegations in the first sentence of Paragraph 21.

Concord and Mr. Matlin deny the allegations in the second sentence of Paragraph 21, except they admit that Mr. Matlin founded Concord to provide investment advice for compensation. Concord and Mr. Matlin deny the allegations in the third sentence of Paragraph 21, except they deny knowledge or information sufficient to form a belief as to the truth of the allegations that Person B asked Employee C to provide operational and other support to the business, and on that basis deny them. As to the fourth sentence of Paragraph 21, Concord and Mr. Matlin deny knowledge or information as to whether recommendations from Concord were the only investment recommendations received by Person B, and on that basis deny the allegations in this sentence, except they admit that investment recommendations from Concord were provided to Person B. As to the fifth sentence in Paragraph 21, Concord and Mr. Matlin deny knowledge or information as to whether Person B made these decisions or conveyed decisions made by another individual not affiliated with Concord, and on that basis deny these allegations, but admit that Person B communicated investment decisions to Concord.

22.    *Concord grew from Matlin and Employee C to a much larger business operation. By March 2012 and continuing through at least March 2022, Concord employed approximately ten individuals, most of whom were investment analysts. As further detailed below, these employees worked to identify investment opportunities, to facilitate the execution of investments, and to monitor fund and investment performance. Matlin supervised and directed the investment analysts and engaged with them in analysis and development of investment advice. Matlin then communicated the investment recommendations directly to Person B. The Concord investment analysts never communicated recommendations directly to Person B.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 22, and on that basis deny them. Concord and Mr. Matlin admit the allegations in the second sentence of Paragraph 22, although the exact number of employees Concord employed varied at different points during that period. Concord and Mr. Matlin deny the allegations in the third sentence of Paragraph 22, except they admit that, as part of their core research and due diligence function, Concord employees worked to identify for Concord's client investment opportunities and monitor fund and investment

performance.  Concord and Mr. Matlin deny the allegations in the fourth sentence of Paragraph

22, except they admit that the investment analysts reported to Mr. Matlin and that he engaged with

them in analysis and development of investment advice.  Concord and Mr. Matlin admit the

allegations in the fifth and sixth sentences of Paragraph 22.

23.    *While Concord employees generally became aware over time of the identity of UBO A, Matlin not only did not directly tell them who it was, but he also created an atmosphere that discouraged speculation or discussion regarding UBO A's identity.  With limited information regarding the beneficiary of the funds they were managing, Concord employees typically described Concord to outside parties as a fund of funds or as a family office for high-net-worth European families.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as

to the truth of the allegations in Paragraph 23 and on that basis deny them, except deny that Mr.

Matlin "created an atmosphere that discouraged speculation or discussion regarding UBO A's

identity."

24.    *By contrast, Matlin and Employee C knew that UBO A was the source of assets that Concord managed.  They also communicated with Person B directly and in communications amongst their three-person group via email, text, and messaging applications including WhatsApp and Telegram.  When it was necessary to disclose UBO A's identity pursuant to the terms of a particular investment, Employee C, working with Company 2, facilitated the provision of information (i.e. "know your customer" or "KYC" documents) that revealed UBO A's identity on a transaction-by-transaction basis to private fund advisers or their third-party administrators.*

**ANSWER:** Concord and Mr. Matlin deny the allegations in the first sentence of Paragraph 24.

Concord and Mr. Matlin admit the allegations in the second sentence of Paragraph 24.  Concord

and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the

allegations in the third sentence of Paragraph 24, and on that basis deny them, except they admit

that they understood that documents and information were provided in response to requests made

by or on behalf of private funds regarding KYC.

### B.  Concord's Business Activities: Continuous and Regular Supervision and Management of UBO A's Private Fund Securities Portfolio

25.    *On a day-to-day basis, Concord and Matlin provided continuous and regular supervision or management services over UBO A's private fund securities portfolio.  As explained*

*in detail below, they were responsible for supervising and managing substantially all aspects of the Investing Entities' continuous cycle of investments.*

**ANSWER:** Denied.

> i.    *Sourcing Private Fund Investments*

26.    *Concord and Matlin's continuous and regular supervision and management services included continuously sourcing potential investments for the Investing Entities. The Investing Entities' assets were spread over hundreds of private fund advisers, and the Investing Entities often invested in more than one fund with the same adviser. The Investing Entities typically made initial investments of $10 to $15 million, with additional follow-on investments in increments of $10 to $15 million. Given the breadth of this investment activity, Concord analysts were constantly scouring the private funds market for investment opportunities.*

**ANSWER:** Concord and Mr. Matlin deny the allegations in the first sentence of Paragraph 26. As to the second sentence of Paragraph 26, and subject to Concord and Mr. Matlin's definition of "Investing Entities" contained in Paragraph 17 of their Answer, Concord and Mr. Matlin admit these allegations. Subject to Concord and Mr. Matlin's definition of "Investing Entities" contained in Paragraph 17 of their Answer, Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence of Paragraph 17 and on that basis deny them, except they admit that the Investing Entities sometimes made initial investments of $10 to $15 million and that follow-on investments were sometimes made in increments of $10 to $15 million. Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in the fourth sentence of Paragraph 26 and on that basis deny them.

27.    *Concord was given a broad, open-ended mandate to identify hedge funds and private equity funds, primarily based in the United States. There was no limit on the number of investments that Concord and Matlin could recommend to Person B, and no formal restrictions on the investments that analysts could recommend. Concord and Matlin's principal goal was to ensure that UBO A's assets were continuously invested in private funds.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 27 and on that basis deny them. Concord and Mr. Matlin deny the allegations in the second sentence of Paragraph 27, except deny

knowledge or information sufficient to form a belief as to the truth of the allegation that there was "no limit on the number of investments that Concord and Matlin could recommend to Person B," and on that basis deny it. Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence of Paragraph 27 and on that basis deny them.

28. *Concord analysts, under Matlin's supervision, utilized various methods to identify and maintain a constant awareness of potential investments, such as participating in programs that match advisers and prospective investors offered by investment banks and by attending industry conferences.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 28 and on that basis deny them, except they admit Concord analysts used various methods to try to identify potential investments, including attending industry conferences.

29. *While Concord primarily focused on hedge funds, the Investing Entities invested in at least six private equity funds, with initial capital commitments ranging from $5 million to $100 million. Once the Investing Entities made an initial investment in a particular hedge fund or private equity fund, the private fund advisers often solicited Concord analysts for follow-on investments, co-investments, or new investments in other affiliated funds. These solicitations were another source of investment recommendations made by Concord and Matlin to Person B.*

**ANSWER:** Subject to Concord and Mr. Matlin's definition of "Investing Entities" contained in Paragraph 17 of the Answer, Concord and Mr. Matlin admit the allegations in the first and third sentences of Paragraph 29. Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 29 and on that basis deny them.

*ii.    Due Diligence and Negotiations*

30. *Concord and Matlin's continuous and regular supervision and management services included due diligence and investment negotiations. Once Concord analysts identified a potential investment, they conducted due diligence on the fund adviser, from its investment track record and performance to its back-office operations and compliance infrastructure.*

**ANSWER:** Concord and Mr. Matlin deny the allegations in the first sentence of Paragraph 30. As

to the second sentence of Paragraph 30, Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegation that Concord analysts only conducted due diligence "once" a "potential investment" had been "identified" and on that basis deny it, and admit that Concord analysts conducted due diligence on fund advisers, including, among other things, their investment track record, performance, back-office operations, and compliance infrastructure.

31.     *To conduct the diligence, Concord analysts requested and received ongoing access to confidential, non-public fund data from the fund adviser, such as detailed portfolio holdings. Concord analysts were typically required to sign confidentiality agreements with the fund adviser as a condition of receiving this access.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 31 and on that basis deny them, except they admit that, as part of their research and due diligence services, Concord analysts requested and received information from fund advisers, including detailed portfolio holdings, and that Concord analysts sometimes signed confidentiality agreements before receiving this information.

32.     *Concord analysts reviewed governing fund documents, such as private placement memoranda and limited partnership agreements.*

**ANSWER:** Concord and Mr. Matlin admit these allegations.

33.     *Concord analysts extensively negotiated key terms with the fund advisers, primarily lower management fees, most favored nations clauses, reduced redemption fees, and rights to be a member of any fund advisory committee.*

**ANSWER:** Concord and Mr. Matlin deny the allegations in Paragraph 33.

34.     *Concord analysts reviewed, revised and helped execute these specific terms in side letters with fund advisers.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 34, and on that basis deny them.

35.     *These negotiations generally occurred before any recommendations were made, but Concord sometimes negotiated and facilitated the execution of side letters in connection with follow-on and co-investments that occurred after the initial recommendation and investment.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 35, and on that basis deny them.

> iii. *Investment Recommendation and Approval Process*

36. *Concord and Matlin's continuous and regular supervision and management services included a regular, routinized process for making investment recommendations and receiving client approvals. On a monthly basis, Concord analysts recommended potential investments to Matlin. If Matlin agreed with the recommendation, he would include it in a monthly "short list" that he compiled and emailed to Person B each month. The short list contained information about the funds being recommended for investment, including descriptions of the fund's strategy, securities portfolio, track record, fees, and adviser.*

**ANSWER:** Concord and Mr. Matlin deny the allegations in the first sentence of Paragraph 36. Concord and Mr. Matlin admit the allegations in the second and third sentences of Paragraph 36. The fourth sentence of Paragraph 36 characterizes or describes documents sent to Person B by Mr. Matlin. Those documents speak for themselves and thus no response is required. If and to the extent a response is deemed required, Concord and Mr. Matlin refer the court to those documents.

37. *Matlin knew how much money was available to invest each month because Concord tracked the Investing Entities' incoming and outgoing cash flows. Matlin typically confirmed the amount available for investment by emailing or messaging Employee C, who received daily updates on the Investing Entities' bank account balances from Company 2.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 37 and on that basis deny them.

38. *Matlin regularly provided Employee C with a list of fund names and allocated investment amounts recommended to Person B so that Employee C could initiate the process of preparing transaction documents for execution.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 38 and on that basis deny them.

39. *For these recommended investments, Employee C requested and/or received from each Concord analyst (i) the documents necessary to make each investment, (ii) the dates on which subscription documents were due, and (iii) the dates on which wire transfers were due. After the Investing Entities were re-domiciled to Jersey in April 2021, in order to comply with policies and procedures connected to that move, Employee C also requested and received from each analyst a short explanation of the investment rationale that would be provided to the director of the Investing Entity signing the investment documents.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39 and on that basis deny them.

40.    *Throughout this process, Person B, Matlin, and Employee C would share confidential information about the recommendations, decisions, and cash positions by phone, text messages, or messaging applications.  Before the end of each month, Person B communicated whether investments were approved or not.  These communications typically happened during one-on-one telephone calls between Matlin and Person B.  Person B typically approved the investments that Matlin and his team recommended.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 40 and on that basis deny them, except they admit that Person B, Mr. Matlin, and Employee C would at times share information about the recommendations, decisions, and cash positions by phone, text messages, or messaging applications.  Concord and Mr. Matlin admit the allegations in the second and third sentences of Paragraph 40.  Concord and Mr. Matlin deny the allegations in the fourth sentence of Paragraph 40.

### iv.    Execution of the Investments

41.    *Concord and Matlin's continuous and regular supervision and management services included responsibility for arranging and facilitating execution of the transaction with the private funds.  Once Person B communicated his decision on whether to invest in a particular fund, the process of making the investments required a series of coordinated actions.  The logistics of coordinating these actions were often complicated by the tight timing of the monthly investment cycle.  Funds typically are open for new investments at the same time, generally the first business day of the month.  In months where Concord was arranging and facilitating the execution of multiple new investments, these investments all happened simultaneously or within a day or two of each other.  Further, the paperwork required to make a new investment varied by private fund.  Generally, the investment is made through a subscription agreement, which is the investor's application to join the private fund (usually a limited partnership).  The supporting documentation can include anti-money laundering (AML) and know-your-customer (KYC) forms.*

**ANSWER:** Concord and Mr. Matlin deny the allegations in the first sentence of Paragraph 41.  As to the remaining allegations in Paragraph 41, Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of these allegations and on that basis deny them, and they deny that Concord "arrang[ed]" or "facilitat[ed]" the execution of any investments.

42.    *In Concord's earlier days, Employee C handled much of the coordination and paperwork for the subscription process on her own. However, as the number and size of Concord's recommended investments grew over time, the paperwork requirements of the funds generally increased as well (for instance, funds increasingly asked for more robust AML/KYC disclosure regarding the investment's UBO). As a result, Company 2 assumed a greater role in providing administrative back-office support—filling out transaction documents, compiling AML/KYC disclosure and obtaining any necessary signatures. Employee C, however, retained a central role in supervising and managing this process. During each monthly cycle, Employee C communicated frequently with Company 2 and Concord employees to collaboratively ensure that documents for the approved transactions were filled out correctly, signed, and timely delivered to the funds or their third-party administrators.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42 and on that basis deny them, and they deny that Employee C "supervis[ed]" or "manag[ed]" the functions provided by Company 2.

43.    *For instance, as Employee C collected documents and information, she created and updated a spreadsheet that she emailed to Company 2 staff with the recommended investments, so that Company 2 staff would be prepared to execute the back-office administrative functions necessary to complete the approved investments. The spreadsheet typically included the names of recommended investments, the amount of the investments, deadlines for the submission of documents and money wires, a column with initials identifying each covering Concord analyst, and a column for indicating whether an investment was ready to proceed (titled as "good to go") or still in progress (titled "working").*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 43 and on that basis deny them.

44.    *At the same time, Employee C and Matlin allocated the approved investments among the Investing Entities, and added that information to the spreadsheet. If the Investing Entities had more or less cash on hand than needed for all approved investments, Matlin and Employee C would collaborate on the decision of which investment(s) to increase or decrease.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44 and on that basis deny them.

45.    *Employee C also emailed Company 2 staff with updated spreadsheets as investments were approved, deadlines were received for executed documents and wire transfers, and investments were ready to proceed.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 45 and on that basis deny them.

46.     *As Person B approved recommended investments, Employee C updated her detailed list to Company 2 staff to inform them that the approved investments on the list were ready to proceed.  Company 2 staff filled out the relevant documents, which were then signed by the directors of the relevant Investing Entities as necessary.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 46 and on that basis deny them.

47.     *Employee C reviewed and commented on the executed documents before Company 2 staff submitted them to the fund adviser or fund administrator.  Based on her knowledge and experience at Concord working with United States investment funds, Employee C at times had corrections or adjustments to make to the forms, and Company 2 would not send the executed documents until Employee C performed a quality control review and confirmed they were ready to send.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 47 and on that basis deny them.

48.     *Company 2 employees typically sent the executed documents and AML/KYC paperwork to the relevant fund adviser or fund administrator directly, copying Employee C. Employee C, however, sometimes sent the executed documents to the fund adviser or its fund administrator herself, and Concord analysts would sometimes email executed side letters directly to the relevant fund adviser.  And on the occasions when Company 2 employees sent the executed documents directly, they would sometimes do so with a coversheet on Concord letterhead, listing Matlin and Employee C as the appropriate contacts.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 48, and on that basis deny them.

49.     *Concord did not have direct control of the Investing Entities' bank accounts. Company 2 staff were responsible for ensuring that the Investing Entities sent wire transfer payments by the deadlines gathered and communicated by Employee C each month.  Employee C sometimes provided the relevant wire instructions to Company 2 staff if the information was not in the relevant fund documents.  Regardless of the sequence, Company 2 would not submit any executed documents or wire money for investments unless Employee C confirmed that Company 2 should do so.*

**ANSWER:** As to the first sentence of Paragraph 49, and subject to Concord and Mr. Matlin's definition of "Investing Entities" contained in Paragraph 17 of their Answer, Concord and Mr. Matlin admit they did not have direct control of the Investing Entities' bank accounts.  Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the

remaining allegations in Paragraph 49 and on that basis deny them.

50.    *Employee C informed Concord analysts when the relevant documents and wires were submitted, so that the Concord analysts could then confirm the relevant adviser received them.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 50 and on that basis deny them.

*v.    Active Monitoring of the Private Fund Securities Portfolio*

51.    *Concord and Matlin's continuous and regular supervision and management services included active monitoring of the private fund securities portfolio. Once an investment was made, Concord assigned two analysts—a lead and a secondary—to cover the position. A Concord employee, often Matlin, was typically listed in subscribing documents as a point of contact for investor correspondence.*

**ANSWER:** Concord and Mr. Matlin deny the allegations in the first sentence of Paragraph 51. Concord and Mr. Matlin deny the allegations in the second sentence of Paragraph 51. The third sentence of Paragraph 51 characterizes or describes subscription documents executed by companies beneficially owned by UBO A. Those documents speak for themselves and thus no response is required. If and to the extent a response is deemed required, Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 51 and on that basis deny them.

52.    *As the main point of contact for the investment, Concord employees requested and were given access to all confidential information concerning investments, such as access to client portals and registration on client distribution lists. Concord was also the point of contact for receiving notices of financial statements, distributions, and capital calls.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 52 and on that basis deny them, except they admit that Concord analysts at times received information from the funds in which investment companies owned by Company 1 had invested.

53.    *As part of their ongoing monitoring, Concord analysts routinely requested and received periodic performance reports and regularly inquired about fund performance, as well as audited financial statements. They also requested and received periodic on-site meetings with fund*

*advisers.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 53 and on that basis deny them, except Concord and Mr. Matlin admit that as part of their core research and due diligence function, Concord analysts: received periodic performance reports and audited financial statements; inquired regarding fund performance; and requested and received on-site meetings with fund advisers.

54.    *Concord analysts also served as the Investing Entities' representative on the advisory committees of at least four different private equity funds and two creditors' committees. In this capacity, Concord had the authority to act on the relevant Investing Entity's behalf, without consulting Person B or UBO A.  For example, Concord served as the relevant Investing Entities' authorized representative for over ten years on two redeemer committees, which oversaw and made decisions with respect to the liquidation of hedge funds, in order to ensure  that its client recovered as much money as possible.*

**ANSWER:** Concord and Mr. Matlin deny the allegations in the first sentence of Paragraph 54, except that, subject to Concord and Mr. Matlin's definition of "Investing Entities" contained in Paragraph 17 of their Answer, Concord and Mr. Matlin admit that, over the course of a more-than-20-year period during which Company 1 made hundreds of investments, Concord analysts served as authorized representatives on behalf of Company 1 on four advisory committees to private equity funds and two redeemer committees.  The second sentence of Paragraph 54 states a legal conclusion to which no response is required.  If and to the extent a response is deemed required, Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in this sentence and on that basis deny them.  As to the third sentence of Paragraph 54, Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of these allegations and on that basis deny them, except they admit that a single Concord employee served as an authorized representative on two redeemer committees related to Company 1's investments in two funds managed by Highland Capital Partners, and that the redeemer committees monitored the liquidation of the Highland funds.

55.    *More broadly, Concord analysts, under Matlin's supervision, collected and analyzed investment-related information on both particular investments and on the collective portfolio of investments made by the Investing Entities.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 55 and on that basis deny them, except they admit that Concord analysts collected and analyzed investment-related information for investments made by the Investing Entities, as defined in Concord and Mr. Matlin's Answer to Paragraph 17.

56.    *For example, Concord analysts maintained running logs of active investments, which tracked fees paid, key terms, cash flow, existing balance, and distributions, and separately tracked the status of all illiquid investments, including likelihood of return of funds.*

**ANSWER:** The allegations in Paragraph 56 characterize or describe "running logs" prepared by Concord analysts. Those documents speak for themselves and thus no response is required. If and to the extent a response is deemed required, Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 56 and on that basis deny them.

57.    *Concord analysts also tracked performance information for investments made by the Investing Entities and analyzed it based on the composition of each Investing Entity's portfolio. They also monitored cash flow on a portfolio-wide basis by tracking investment allocations, distributions and redemptions for all investments made by the Investing Entities.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 57 and on that basis deny them, except that, subject to Concord and Mr. Matlin's definition of "Investing Entities" contained in Paragraph 17 of their answer, Concord and Mr. Matlin admit that Concord analysts tracked performance information for investments made by the Investing Entities.

58.    *Concord employees actively and regularly shared this fund performance information with each other and conducted ongoing analysis of the investments. On a weekly or bi-weekly basis, Matlin, Concord analysts, and Employee C had a staff meeting where they would report on market conditions, investment performance, and operational and management issues. As part of these meetings, a Concord analyst was typically assigned to conduct a "portfolio review" of an existing fund position. The assigned analyst would prepare a comprehensive review of the fund holdings and performance for discussion by the group.*

**ANSWER:** As to the first sentence in Paragraph 58, Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of these allegations, and on that basis deny them, except they admit that Concord employees shared fund performance information with each other and conducted ongoing analysis of the investments as part of their core research and due diligence function. As to the second and third sentences of Paragraph 58, Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the allegation that the referenced assignments occurred "typically" and on that basis deny it, but admit that Mr. Matlin, Concord analysts, and Employe C had a staff meeting on a weekly or biweekly basis, and that Concord analysts were assigned to conduct "portfolio reviews" of existing fund positions  Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in the fourth sentence of Paragraph 58 and on that basis deny them.

59.     *On at least a monthly basis, Matlin or Employee C sent Person B performance updates based on the performance of all of the Investing Entities' private fund investments managed by Concord and Matlin.*

**ANSWER:** Concord and Mr. Matlin deny the allegations in Paragraph 59, except they admit that, subject to Concord and Mr. Matlin's definition of "Investing Entities" contained in Paragraph 17 of their Answer, Mr. Matlin or Employee C sent Person B performance updates regarding the performance of the Investing Entities' private fund investments.

60.     *Further, Employee C received a daily snapshot from Company 2 of the cash available in the Investing Entities' bank accounts. Employee C monitored this information in order to confirm that the Investing Entities received any expected distributions and redemptions.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 60 and on that basis deny them.

vi.     *Responsibilities for Existing Positions and Related Opportunities*

61.     *Concord and Matlin's continuous and regular supervision and management services also included evaluating, offering investment advice, and sometimes taking direct action on behalf of the Investing Entities, both concerning existing positions as well as new investment opportunities arising from those existing positions in UBO A's private fund securities portfolio.*

*Concord and Matlin were responsible for evaluating and facilitating subsequent investment decisions with respect to each investment on an ongoing basis, including whether to maintain the investment, add to the investment, redeem the investment in full or in part (or rescind any redemption request), as well as whether to participate in any co-investments or secondary transactions.*

**ANSWER:** Concord and Mr. Matlin deny the allegations in the first sentence of Paragraph 61. Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 61 and on that basis deny them, except they admit that Concord, at times, provided advice regarding investments its client had already made.

62.     *Concord analysts continuously evaluated whether or not to redeem all or some of the Investing Entities' investments from private funds based on performance and other factors, and would make any redemption recommendations to Matlin.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 62 and on that basis deny them, except they admit that Concord analysts made redemption recommendations to Mr. Matlin.

63.     *As with initial investments, Matlin typically determined which redemptions to recommend and made any such recommendations to Person B.  However, Concord analysts had significantly more discretion and apparent authority with respect to redemptions and redemption rescissions.  For example, while Employee C coordinated the execution of any documentation required by the adviser for redemptions or rescissions with Company 2 staff, Concord analysts would often inquire directly about the redemption (or rescission) and would sometimes submit the request themselves via email if the fund adviser did not require any formal documentation.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 62 and on that basis deny them, except they admit that Mr. Matlin determined which redemptions to recommend and made such recommendations to Person B.  Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in the second and third sentences of Paragraph 63, and on that basis deny them, except that they deny that Employee C "coordinated the execution of any documentation" with regards to redemption.

64.     *Concord analysts considered and made recommendations on interim investment-related decisions, including whether to provide investor consent when required by governing fund*

*documents and whether to pursue co-investment opportunities offered by fund advisers. Concord analysts routinely evaluated and facilitated follow-on investments made in the same fund, as well as co-investments, which are minority investments in a single company alongside, but not through, the private equity fund.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 64 and on that basis deny them, except they deny that Concord analysts ever "facilitated" any investments.

65.    *For example, in 2014, Concord evaluated and facilitated an initial $100 million commitment to an energy-focused private equity fund. Over the next four years, while supervising and managing this investment, Concord evaluated several opportunities and facilitated two subsequent co-investments totaling $44 million. For both co-invest opportunities, the covering Concord analyst communicated to the adviser the Investing Entity's binding commitment to invest, including the amount committed, using a Concord e-mail account. Employee C coordinated with Company 2 staff to submit the relevant documentation.*

**ANSWER:** Concord and Mr. Matlin deny the allegations in the first sentence of Paragraph 65, except they admit that in 2014, Concord evaluated on behalf of its client a potential investment in an energy-focused private equity fund. Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 65 and on that basis deny them, except they deny that Concord "supervis[ed]" or "manag[ed]" this investment or "facilitat[ed]" any subsequent co-investments. Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in the third and fourth sentences of Paragraph 65 and on that basis deny them.

66.    *As part of its continuous and regular supervision and management services, Concord was always in the process of analyzing additional investments and redemptions, and providing advice and recommendations about those positions—in addition to making investment recommendations in entirely new private funds. Concord's business was thus cyclical, continuous, and overlapping. There was a monthly cadence of entering and exiting investments, and a weekly or bi-weekly cadence of meetings where performance was analyzed and monitored. And, on a daily basis, some aspect of each of these business functions occurred: Concord was sourcing, analyzing, vetting, negotiating, recommending, monitoring, and arranging and facilitating the execution of investments in the private fund securities portfolio of UBO A.*

**ANSWER:** Concord and Mr. Matlin deny that Concord provided continuous and regular supervision and management services and otherwise deny knowledge or information sufficient to

form a belief as to the truth of the allegations in Paragraph 66, and on that basis deny them.

### C. Concord and Matlin Acted as Investment Advisers

67.    *Concord and Matlin provided the above services to UBO A for compensation, without a written agreement, from 1999 until 2012. In 2012, Matlin executed a "consulting agreement" on behalf of Concord with Company 1 (signed by Person B) to provide "consulting services" to Company 1.*

**ANSWER:** Concord and Mr. Matlin deny the allegations in the first sentence of Paragraph 67. The second sentence of Paragraph 67 characterizes or describes the consulting agreement between Concord and its client. That document speaks for itself and thus no response is required. If and to the extent a response is deemed required, Concord and Mr. Matlin deny that Person B signed the consulting agreement between Concord and its client.

68.    *Under the terms of the agreement, Concord received a monthly fee of $235,000, reimbursement of monthly expenses, and an annual "performance bonus." This monthly fee eventually increased to approximately $350,000. Between approximately February 2012 and February 2022, Concord received approximately $85 million in total compensation, comprised of approximately $50 million in performance bonuses, approximately $29 million in fees, and approximately $6 million in reimbursed expenses. The total bonus amount fluctuated each year, ranging from approximately $4,021,000 in 2015 to $7,128,000 in 2014.*

**ANSWER:** The first sentence of Paragraph 68 characterizes or describes the consulting agreement between Concord and its client. That document speaks for itself and thus no response is required. If and to the extent a response is deemed required, Concord and Mr. Matlin refer the court to that document. Concord and Mr. Matlin admit the allegations in the second sentence of Paragraph 68. Concord and Mr. Matlin deny the allegations in the third sentence of Paragraph 4, except they admit that Concord received approximately $85 million in total compensation for its work pursuant to the terms of the consulting agreement with its client and a subsequent amendment to that document. Concord and Mr. Matlin deny the allegations in the fourth sentence of Paragraph 68.

69.    *The financial structure of the arrangement allowed Concord to pay its expenses and Matlin to take distributions of profit each year, the combination of which exhausted substantially all of Concord's cash.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as

to the truth of the allegations in Paragraph 69 and on that basis deny them, except they admit that

Concord paid expenses and Mr. Matlin took membership distributions from Concord in accordance

with his membership interests in Concord.

70.     *In exchange for this compensation, Matlin and Concord engaged in the business of advising UBO A, through Person B, as to the value of securities and as to the advisability of investing in, purchasing, and selling securities.  In doing so, they acted as investment advisers.*

**ANSWER:** Paragraph 70 states legal conclusions to which no response is required; for purposes

of responding to this complaint, Concord and Mr. Matlin deny these allegations.

### D.  <u>Concord and Matlin Failed to Register</u>

71.     *The Advisers Act requires that, with certain exceptions, firms or individuals that are in the business of advising others about securities investments and are compensated for doing so must register with the Commission and comply with certain regulations.  While many of the Advisers Act regulations are designed to protect individual clients of each adviser, the Advisers Act as a whole serves to protect the securities markets and the national economy.[1]*

**ANSWER:** The body of Paragraph 71 states legal conclusions as to which no response is required;

for purposes of responding to this complaint, Concord and Mr. Matlin deny these allegations.  As

to the footnote contained in Paragraph 71, the statutory text of 15 U.S.C. § 80b-1 speaks for itself

and thus no response is required.  If and to the extent a response is deemed required, Concord and

Mr. Matlin refer the court to 15 U.S.C. § 80b-1.

72.     *Specifically, the registration provision of the Advisers Act makes it is unlawful for any non-registered investment adviser to make use of the mails or any means or instrumentality of interstate commerce in connection with its business as an investment adviser unless it is (1) prohibited from registering with the Commission pursuant to Section 203A, which prohibits Commission registration for certain small or mid-sized advisers; or (2) exempted from registration under Section 203(b).*

---

[1] *See e.g.*, Section 201 of the Advisers Act, finding that "investment advisers are of national concern, in that, among other things…their advice, counsel, analyses and reports customarily relate to the purchase and sale of securities traded on national securities exchanges and in inter-state over-the-counter markets, securities issued by companies engaged in business in interstate commerce…[and] the foregoing transactions occur in such volume as substantially to affect interstate commerce, national securities exchanges, and other securities markets, the national banking system and the national economy."

**ANSWER:** Paragraph 72 states a legal conclusion to which no response is required; for purposes of responding to this complaint, Concord and Mr. Matlin deny these allegations.

73.    *Registration with the Commission subjects investment advisers to periodic reporting requirements and comprehensive examination by the Commission. This regulatory oversight enables the Commission to collect information and to assess and monitor systemic risk both at the adviser and in the private fund industry more generally.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information to form a belief as to the truth of the allegations in Paragraph 73 and on that basis deny them, except the allegation as to "periodic reporting requirements" states a legal conclusion to which no response is required; for purposes of responding to this complaint, Concord and Mr. Matlin deny these allegations.

74.    *Pursuant to the relevant provisions of Sections 203(a) and 203A of the Advisers Act, by no later than March 2012, investment advisers with a principal office and place of business in New York have been required to register with the Commission if they have assets under management exceeding $25 million. Section 203A defines assets under management as "the securities portfolios with respect to which an investment adviser provides continuous and regular supervisory or management services."*

**ANSWER:** Paragraph 74 states a legal conclusion to which no response is required; for purposes of responding to this complaint, Concord and Mr. Matlin deny these allegations.

75.    *As explained above, Concord and Matlin provided continuous and regular supervisory and management services for the portfolio of investments made by the Investing Entities, which were ultimately beneficially owned by UBO A.*

**ANSWER:** Denied.

76.    *The securities portfolio for which Concord and Matlin provided continuous and regular supervisory and management services had an average value of several billion dollars. The following table shows the total approximate number of fund advisers with which the Investing Entities invested and the total approximate value of their investments within each year from 2017 through 2022. The lowest value in 2019, $5.5 billion, was still more than 200 times the $25 million threshold for registration.[2]*

| Year | Number of Investment Advisers | Securities Portfolio Estimated Value |
|------|-------------------------------|--------------------------------------|
| 2017 | 155 | $6,463,955,160 |
| 2018 | 136 | $6,577,947,545 |

---

[2] This chart does not include investments owned by the Cypriot Entity, which was not a Company 1 subsidiary. As of year-end 2021, that entity's investments were worth at least $182 million.

| 2019 | 156 | $5,574,380,485 |
| 2020 | 106 | $6,262,084,064 |
| 2021 | 106 | $7,049,850,986 |
| 2022 | 112 | $7,204,844,740 |

*Further, neither Concord nor Matlin qualified for any exemption from registration under Section 203(b) of the Advisers Act. Nevertheless, neither Concord nor Matlin as an individual ever registered with the Commission as an investment adviser as required by the Advisers Act.*

**ANSWER:** Concord and Mr. Matlin deny the allegations in the first sentence of Paragraph 76. Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence and the accompanying table of Paragraph 76, and on that basis deny them. The third sentence of Paragraph 76 states a legal conclusion to which no response is required; for purposes of responding to this complaint, Concord and Mr. Matlin deny these allegations, except they admit that $5.5 billion is more than 20 times $25 million. As to the footnote in Paragraph 76, Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of these allegations and on that basis deny them, except they admit that the chart prepared by the SEC does not appear to include investments owned by the Cypriot entity. The fourth sentence of Paragraph 76 states a legal conclusion to which no response is required; for purposes of responding to this complaint, Concord and Mr. Matlin deny these allegations. Concord and Mr. Matlin deny the allegations in the fifth sentence of Paragraph 76, except they admit that they were not registered as investment advisers with the SEC.

### E. Events of 2022

77.    *In late 2021 and early 2022, there were media reports regarding the possibility that Russia would enter into a military operation aimed at Ukraine, with far reaching global consequences.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in the Paragraph 77 and on that basis deny them.

i.    *Concord's Effort to Redeem or Monetize the Investing Entities' Holdings*

78.    *In early February 2022, Matlin instructed Concord analysts to liquidate the Investing Entities' investments. The decision to redeem billions' of dollars of private fund investments en masse was a significant change of course. Indeed, as of the beginning of that month (mere days earlier), Concord and Matlin had just arranged, and Person B had just approved, ten private fund investments valued over $100 million, including two investments with new private fund advisers.*

**ANSWER:** Concord and Mr. Matlin deny the allegations in the first sentence of Paragraph 78, except they admit that in early February 2022, Mr. Matlin conveyed the client's instruction to determine whether the client's outstanding investments could be liquidated. Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in the second and third sentences, and on that basis deny them. Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence of Paragraph 78 and on that basis deny them, except they deny that Concord or Mr. Matlin arranged any investments and admit that on January 23, 2022, Mr. Matlin conveyed to Person B a short list of ten suggested private fund investments.

79.    *As part of the liquidation mandate, Matlin directed Concord analysts to review all hedge fund investments and identify which investments could be redeemed quickly, and instructed them to investigate secondary transactions for investments that could only be redeemed on a quarterly basis.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 79 and on that basis deny them, except they admit that Mr. Matlin directed Concord analysts to review all of the client's hedge fund investments and identify which investments could be redeemed quickly, and instructed them to investigate secondary transactions for investments.

80.    *Concord analysts contacted numerous hedge fund advisers seeking to redeem the Investing Entities' investments, representing that Concord required the redemption for unexpected cash needs and liquidity purposes.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 80 and on that basis deny them, except they admit that,

subject to Concord and Mr. Matlin's definition of "Investing Entities" contained in Paragraph 17 of their Answer, Concord analysts attempted to contact hedge fund advisers to inquire about the possible redemption of the Investing Entities' investments.

<em>ii.    Change of Beneficial Ownership to UBO A's Children</em>

81.    *At approximately the same time as the effort to redeem or otherwise monetize the Investing Entities' securities portfolio, UBO A transferred beneficial ownership of Company 1 and the Investing Entities to five of UBO A's children.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 81 and on that basis deny them, except that, subject to Concord and Mr. Matlin's definition of "Investing Entities" contained in Paragraph 17 of their Answer, Concord and Mr. Matlin admit that UBO A transferred beneficial ownership of Company 1 and the Investing Entities to five of his children.

82.    *In March 2022, representatives of UBO A sent letters to fund administrators on behalf of the Investing Entities, notifying administrators of the change in beneficial ownership.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 82 and on that basis deny them.

<em>iii.    Attempt to Market and Sell the Private Fund Securities Portfolio</em>

83.    *Shortly before, in February 2022, Matlin, Person B, and one of UBO A's children began an effort to market and sell the Investing Entities' hedge fund portfolio. The proposed transaction was structured to allow Concord and its employees to continue managing the same portfolio of assets, while allowing UBO A to extract himself and obtain cash for the value of his portfolio of illiquid private fund investments.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 83 and on that basis deny them, except they deny that Mr. Matlin "began an effort to market and sell the Investing entities' hedge fund portfolio." Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 83 and on that basis deny them, except they deny that Concord and its employees ever "manag[ed]" any "portfolio of

assets," and that any potential transaction "was structured to allow Concord and its employees to continue managing the same portfolio of assets."

84.    *As part of the process of marketing the managed portfolio, Employee C and Matlin, with substantive input from Concord staff, worked together with UBO A's son to prepare a PowerPoint presentation for the purpose of marketing and selling an ownership stake in the Investing Entities' private fund portfolio in hedge funds. The presentation described the portfolio as a fund of hedge funds and explained the fund's investment management process in a substantially similar manner to Section B above: with Matlin, Concord and its employees managing a portfolio of United-States-based alternative funds. Indeed, the presentation highlighted details of the portfolio's professional management as one of its selling points.*

**ANSWER**: Concord and Mr. Matlin deny the allegations in the first sentence of Paragraph 84, except they admit that Employee C and Mr. Matlin communicated with UBO A's son regarding a draft PowerPoint presentation, with input from Concord staff. The second and third sentences of Paragraph 84 characterize or describe a draft PowerPoint presentation prepared in or around February 2022. That document speaks for itself and thus no response is required. If and to the extent a response is deemed required, Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of these allegations and on that basis deny them.

85.    *The final version of the presentation entitled, "Secondary offering of interest in Fund of Hedge Funds" (hereinafter, the "Fund of Hedge Funds Presentation"), included a slide entitled "Portfolio Highlights," which described certain aspects of the hedge fund portfolio. The slide described the fund of hedge funds as receiving "[a]ctive portfolio management including opportunistic divestments and reallocations" as well as "[s]elective direct co-investment opportunities." The same slide described an "[e]xpert team of 6 investment professionals, leveraging broader Family Office ecosystem."*

**ANSWER**: Paragraph 85 characterizes or describes a PowerPoint presentation dated February 2022. That document speaks for itself and thus no response is required. If and to the extent a response is deemed required, Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations, including what any "final version" of the referenced presentation reflected or described, and on that basis deny them.

86.    *A later slide described the Fund of Funds' "Organizational Structure and Team." The slide listed an "Investment and Portfolio Management" group consisting of seven persons. Matlin and Concord's analysts made up six of the seven persons listed. The seventh was Person*

*B.  The same slide listed a two-person "Operations" team consisting of Employee C and Matlin's administrative assistant.*

**ANSWER:** Paragraph 86 characterizes or describes a PowerPoint presentation dated February 2022.  That document speaks for itself and thus no response is required.  If and to the extent a response is deemed required, Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations and on that basis deny them.

*iv.    Asset Freeze and Concord at a Standstill*

87.     *In March 2022, after Russia had invaded Ukraine the previous month, UBO A was sanctioned by the United Kingdom and the European Union, and his assets were subsequently frozen by a formal order, known as a saisie judicaire, imposed by the Royal Court of the Isle of Jersey in April 2022.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 87 and on that basis deny them.

88.     *Concord itself functionally froze in place as well.  Concord and Matlin appear to have halted any active investment activity because of the asset freeze and sanctions.  For a few months, until approximately the summer of 2023, some employees were still being paid a salary.  But the underlying investments continue to be active, and if the asset freeze is lifted, Concord and Matlin would be able to resume acting as unregistered investment advisers.*

**ANSWER:** Concord and Mr. Matlin deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first and second sentences of Paragraph 88 and on that basis deny them, except they admit that Concord has not provided any research and due diligence services to its client since March 2022.  Concord and Mr. Matlin deny the allegations in the third sentence, except they admit that some Concord employees continued to receive a salary after February 2022.  Concord and Mr. Matlin deny the allegations in the fourth sentence.

## CLAIM FOR RELIEF

### Violation of Section 203(a) of the Investment Advisers Act of 1940

89.     *The Commission re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 88.*

**ANSWER:** In response to Paragraph 89 of the Complaint, Concord and Mr. Matlin incorporate

their responses to Paragraphs 1 through 39 as though fully set forth herein.

90.    *By reason of the conduct described above, between at least March 2012 and March 2022, Defendants acted as investment advisers within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)] and, directly or indirectly, made use of the mails or means or instrumentalities of interstate commerce in connection with their business as investment advisers without being registered with the Commission and without the applicability of Section 203(b) of the Advisers Act [15 U.S.C. § 80b-3(b)] or Section 203A of the Advisers Act [15 U.S.C. § 80b-3a].*

**ANSWER:** Paragraph 90 states a legal conclusion to which no response is required; for purposes

of responding to this complaint, Concord and Mr. Matlin deny these allegations.

91.    *As a result, Defendants have violated and, unless enjoined, will continue to violate Section 203(a) of the Advisers Act [15 U.S.C. § 80b-3(a)].*

**ANSWER:** Denied.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Concord and Mr. Matlin

demand a jury trial in this matter.

**GENERAL DENIAL**

Concord and Mr. Matlin deny each and every allegation in the Complaint except as

otherwise set forth above.

**FIRST AFFIRMATIVE DEFENSE**

**(Failure to State a Claim)**

92.    The complaint fails to state a claim upon which relief can be granted.

**SECOND AFFIRMATIVE DEFENSE**

**(Statute of Limitations)**

93.    Plaintiff's claim for civil penalties is barred, in whole or in part, by the statute of

limitations.

**THIRD AFFIRMATIVE DEFENSE**

**(Lack of Due Process and Fair Notice – Registration)**

94.    Plaintiff's claims fail in whole or in part for failure to provide Concord and Mr. Matlin with fair notice that their alleged conduct could subject them to the Investment Advisers' Act's registration requirement.

### FOURTH AFFIRMATIVE DEFENSE

### (Lack of Due Process and Fair Notice – Matlin)

95.    Plaintiff's claims as to Mr. Matlin fail in whole or in part for failure to provide Mr. Matlin with fair notice that a failure-to-register claim could be brought against an individual where, as here, the firm with which he is associated was also not registered.

### FIFTH AFFIRMATIVE DEFENSE

### (Barred From Registration)

96.    Plaintiff's claims fail in whole or in part because, pursuant to 15 U.S.C. § 80b-3a(a)(1)(A), Concord and Mr. Matlin were prohibited from registering with the Securities and Exchange Commission.

### SIXTH AFFIRMATIVE DEFENSE

### (Abuse of Discretion – Notice-and-Comment Rulemaking)

97.    Plaintiff's claims fail in whole or in part because Plaintiff abused its discretion by bringing this enforcement action, including by bringing it instead of engaging in notice-and-comment rulemaking.

### SEVENTH AFFIRMATIVE DEFENSE

### (Abuse of Discretion – Deficiency Letters)

98.    Plaintiff's claims fail in whole or in part because Plaintiff abused its discretion by bringing this enforcement action, including by bringing it instead of addressing the matter through a deficiency letter and/or a dialogue with an entity.

## EIGHTH AFFIRMATIVE DEFENSE

### (Laches)

99.     Plaintiff's claims fail in whole or in part because the relief Plaintiff seeks is barred, in whole or in part, by the doctrine of laches.

## NINTH AFFIRMATIVE DEFENSE

### (Estoppel)

100.    Plaintiff's claims fail in whole or in part because the relief Plaintiff seeks is barred, in whole or in part, by the doctrine of estoppel.

## TENTH AFFIRMATIVE DEFENSE

### (Right to Assert Affirmative Defenses)

101.    Concord reserves the right to assert additional affirmative defenses based upon further investigation and discovery.


**WHEREFORE**, Concord prays for judgment as follows:

1.      That Plaintiff take nothing by its Complaint;

2.      That Plaintiff be denied all relief sought;

3.      For costs of suit herein; and

4.      For such other and further relief as this Court deems just and proper.

Dated: June 27, 2025
New York, New York

MORVILLO ABRAMOWITZ GRAND
IASON & ANELLO P.C.

By:  /s/ *Benjamin S. Fischer*
        Benjamin S. Fischer
        Christopher B. Harwood
        Peter Menz
        Kyle Fraser
        565 Fifth Avenue
        New York, New York 10017

(212) 856-9600 (phone)
(212) 856-9494 (fax)
bfischer@maglaw.com

*Attorneys for Concord Management LLC*
*and Michael Matlin*